ORIGINAL

**Name:**          Rauland J. Grube
**Prisoner #:**       34949
**Place of Confinement:**    Idaho State Correctional Institution, Boise, Idaho

Gregory W. Moeller
Idaho State Bar #: 4228
  **Rigby, Thatcher, Andrus,**
**Rigby, Kam & Moeller,** *Chartered*
PO Box 250
Rexburg, ID  83440
(208) 356-3633
Fax No. (208) 356-0768

Attorneys for Petitioner

## IN THE UNITED STATES DISTRICT COURT
## FOR THE STATE OF IDAHO

| | |
|---|---|
| RAULAND J. GRUBE,<br><br>      Petitioner,<br>        vs.<br><br>JOE KLAUSER, Warden, Idaho<br>State Correctional Institution,<br>and the Attorney General of the<br>State of Idaho, ALLAN G. LANCE<br><br>      Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. CIV 01 - 0357 - S   EJL LMB |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

COMES NOW the Petitioner, RAULAND J. GRUBE, and through his attorneys of record, Rigby, Thatcher, Andrus, Rigby, Kam & Moeller, *Chartered* hereby files this Petition for a Writ of Habeas Corpus. On behalf of this Petition, Petitioner respectfully alleges as follows:

1. Petitioner Rauland J. Grube (hereinafter "Grube") is currently incarcerated in the Idaho State Correctional Institution, Boise, Idaho. His prisoner number is 34949.

2. Grube plead "not guilty" to the charge of murder in the first degree, but was later convicted by a jury after an approximate two-week trial. Grube did not testify at his original trial, but he did call numerous witnesses. Those witnesses testimonies, coupled with the other evidence produced by many of the states own witnesses, provided a complete defense to the charge of first degree murder.

3. On October 16, 1991, Grube was convicted of first degree murder. On March 27, 1992 he was given a fixed life sentence and has been serving his sentence at the Idaho State Correctional Institution ever since.

4. Grube appealed his conviction to the Idaho Supreme Court. On September 7, 1994, the Idaho Supreme Court affirmed Grube's conviction and fixed life sentence. *State v. Grube, 126 Idaho 377, 883 P. 2d 1069 (1994).* (Hereinafter, Grube's first trial and appeal will be referred to as "Grube I") .

5. On February 16, 1995 Grube filed a "Petition for Writ Certiorari" to the United States Supreme Court. The United States Supreme Court denied Grube's petition. *Grube v. Idaho, 514 U.S. 1098, 115 S.Ct. 1828, 131 L.Ed. 2d 749 (1995).*

6.  During the pendency of Grube's first appeal before the Idaho Supreme Court, new exculpatory evidence came to his attorneys' attention.  This evidence was known to the State of Idaho before Grube's original trial, but had not been disclosed by the State.

7.  As a result of the discovery of this new and undisclosed evidence, Petitioner filed a "Petition for Post Conviction Relief," with the Fremont County District Court on September 6, 1995. (Fremont County Case No. SP-95-172).  Said Petition raised five (5) grounds for post conviction relief which are summarized as follows:

A-  Petitioner's conviction and sentence were in violation of the Constitution of the United States and the Constitution and Laws of the State of Idaho because the State of Idaho failed to disclose the existence and substance of the anticipated testimony of an exculpatory witness. *Idaho Code § 19-4901 (A)(1). (Brady v. Maryland 373 U.S. 83, 83 S.C.T. 1194, 10 L.E.D. 2(d) 215 (1963).*

B-  Petitioner is entitled to a vacation of the conviction and sentence because there exists evidence of material facts not previously presented and heard. *Idaho Code § 19-4901 (A)(4).*

C-  Petitioner's conviction and sentence were in violation of the U.S. Constitution and the Constitution and Laws of the State of Idaho because the trial courts *sua sponte* decision to not include a man slaughter instruction violated Petitioner's rights under the Constitution of the United States and the Constitution and laws of the State of Idaho. *Idaho Code § 19-4901 (A)(1).*

D-  Petitioner's conviction and sentence were in violation of the U.S. Constitution and the Constitution and laws of the State of Idaho because the impact of the newly discovered evidence upon virtually all the legal issues raised in the appeal require reconsideration of those issues.  *Idaho Code § 19-4901 (A)(1).*

E-  Petitioner's conviction and sentence were in violation of the U.S. Constitution and the Constitution and laws of the State of Idaho because the newly discovered exculpatory evidence would have had a significant impact on sentencing or entitled Petitioner to a reduced sentence.

8.  Grube was granted an evidentiary hearing, which took place on May 12, 1998. The District Court, on June 30, 1998 issued its "Memorandum Decision and Order Denying Post-Conviction Relief." Grube appealed the denial of post-conviction relief to the Idaho Supreme Court on July 20, 1998.

9.  On January 7, 2000 the Idaho Supreme Court, by only a 3-2 decision, affirmed the District Court's order denying post-conviction relief. *Grube v. State*, *134 Idaho 24, 995 P.2d 794 (2000)*. (See attached Exhibit "A"). Grube filed a petition for rehearing on January 26, 1999. On March 3, 2000 the Idaho Supreme Court issued it's "Order Denying Petition for Rehearing." (Hereinafter, Grube's post-conviction proceeding and the Idaho Supreme Court's 3-2 decision will be referred to as "Grube II").

10.  Grube believes that he has exhausted all of his State Court remedies. Because his rights under the United States Constitution have been severely violated by the State of Idaho, Grube brings this application for habeas corpus under *28 U.S.C. § 2254*.

11.  Grube has steadfastly maintained his innocense throughout every stage of the proceedings, and continues to do so now.

## GROUNDS FOR RELIEF

### FIRST GROUND FOR RELIEF
### (BRADY VIOLATION)

12.  Grube is entitled to relief because his Fourteenth Amendment rights to a fair trial were violated when the State of Idaho failed to disclose material exculpatory evidence at his original trial. *Brady v. Maryland*, *373 U.S. 83 (1963)*. On behalf of this allegation, Grube provides the following brief outline of the facts. Given an additional opportunity, Grube will be pleased to provide a more detailed analysis.

13. On or about May 23, 1994, shortly after the oral argument in <u>Grube I</u>, Grube's attorneys were approached by Lynn Gifford. Before that time, Grube's attorneys had not heard of Mr. Gifford nor met with him. The contents of Mr. Gifford's statements to Grube's attorneys are set forth in the affidavit of <u>Lynn Gifford</u>, dated September 5, 1995, which was attached to Grube's original "Petition for Post-Conviction Relief," dated September 6, 1995. Mr. Gifford later testified at Grube's hearing on the post-conviction relief proceeding.

14. Mr. Gifford testified that he had been interviewed by representatives of the State of Idaho prior to Grube's trial. *Grube II, Tr. Vol. I, p.6, Ll. 10-25, and p. 7.* During that interview, he told the investigators that on the night Amy Hossner was murdered, he was on the streets of Ashton between 2:00 and 2:30 a.m. At that time, he observed Officer Brood, another suspect in the case, driving within a few blocks of the victim's home. *Grube II, Tr. Vol. I, p. 9; pp. 14-20.* He also testified that he was the person who informed Grube of the victim's murder the next morning. He testified that Grube's reaction appeared to be one of sincere surprise. *Grube II, Tr. Vol. I, p. 27.*

15. Acting upon this information, Grube's attorneys filed a "Petition for Post-Conviction Relief" and were eventually granted a hearing. As a direct result of this new investigation, additional exculpatory information came to Grube's attention when police logs were introduced into the evidence by the State in an attempt to undermine Gifford's observations from the night of the murder. The logs allegedly showed that another Ashton Police Officer, Ed Sebek, not Brood, was on duty that night. However, upon closer examination of the relevant police logs, it appeared that they had been altered. With permission from the Court, an expert was appointed for the defense who conducted a scientific analysis of the police logs. His findings confirm that

very specific alterations were made in the documents which corroborated Mr. Gifford's testimony. *Grube II, Trial Exhibits O and P.*

16. In <u>Grube I</u>, one of the main defense theories was that Grube was innocent because the crime was actually committed by Steven Brood. Brood was a member of the Ashton Police Department at the time of the murder and initially became a suspect in Amy Hossner's murder for several important reasons. First, due to the nature of the wound, it was initially believed that a sawed-off shotgun was used. *Grube I, Tr. Vol. V p. 892 L. 5-20.* Investigators discovered that Officer Brood owned an illegal sawed-off shotgun and a search warrant was obtained for his residence. *Grube I, Tr. Vol. VI, pp. 997-998.* The Idaho Supreme Court noted in <u>Grube I</u>:

> Brood also turned his sawed-off shotgun over to the authorities. Brood's gun, along with a police shotgun and the shotgun obtained from Grube, were sent to California by an expert, Ed Peterson. (Peterson), with the Bureau of Alcohol Tobacco and Firearms (ATF). After testing the weapons by firing them through a recreation of the crime scene, Peterson eliminated Grube's shotgun as a possible murder weapon. *883 P.2d at 1071.*

Peterson also determined that Brood's sawed-off shotgun could not be eliminated as a possible murder weapon. *Grube I, Defense Exhibits H and U.*

17. During <u>Grube II</u>, Steven Watts, who was the Chief Investigator for the State of Idaho in 1983, testified that although Brood was a primary suspect at the time, he had an alibi for the evening the victim was shot. His alibi was that he was at his girlfriend's home until 1:00 a.m. and then slept in his home the rest of the evening. *Grube II, Tr. Vol. I, P. 93 LL. 7-25.* Please see also <u>Grube II</u>, Exhibit L. The new evidence completely undermined Brood's alibi.

18. During the course of the trial in <u>Grube I</u>, the Trial Court refused to allow additional testimony which would have indicated why Brood was a primary suspect. In the course of his interview as the lead investigator, Brood made incriminating statements which caused Watts

substantial concern. Mr. Watts was present at the probable cause hearing and could have testified concerning the evidence concerning the search warrant of Brood's home. Mr. Watts would have testified that during interviews, Brood told him that he went home to check his gun to make sure it had not been fired when he heard about the shooting. He would have testified that Brood told him that there may have been a possibility that there was a dark side of him that could have committed the crime. He would have testified that Brood was interviewed by Reed & Associates who utilized methods of questioning designed to observe certain responses to determine whether the interviewee was lying. Mr. Watts would have testified that as a result of the interview, he determined that Brood either was involved in the death of Amy Hossner or knew who was involved in the death of Amy Hossner. *Grube I, Tr. Vol. IX, P. 1680-82.* This review of some of the evidence presented and suppressed against Mr. Brood at both trials is important in understanding the context within which Lynn Gifford's undisclosed and exculpatory testimony arose.

19.   After Lynn Gifford came forward as a witness and Grube filed his "Petition for Post-Conviction Relief," Gifford was interviewed by an attorney and investigators for the State of Idaho at the Law Offices of Rigby, Thatcher, Andrus, Rigby, Kam & Moeller. During the course of that interview, Gifford was shown a copy of a police log dated June 3, 1983, purporting to establish that Officer Ed Sebek was on duty until 2:30 a.m. on the morning of the murder. *Grube II, Tr. Vol. I, P. 57, L. 13-25; p. 58, L. 1.* This was obviously an attempt by the State of Idaho to convince Gifford that he had not actually seen Brood, but Sebek at the time in question. During that interview, and during the course of his testimony at the hearing on this matter, Gifford remained steadfast that it was Brood he had seen between 2:00 and 2:30 a.m. that morning. He

described the physical differences in Brood and Sebek's appearances that made it obvious to him who he had seen. *Grube II, Tr. Vol. I, p. 23, L. 23-25; p. 24, L. 1-14[1]*.

20. When confronted with the police logs, Grube's attorneys noted an apparent alteration of Officer Sebek's June 3, 1983 log. *Grube II, R. pp. 109-114*. The defense team made several attempts during the Summer of 1996 to obtain the original version of the police logs in question. However, it was represented by the State of Idaho that the originals were lost. Assuming that the copies of the police logs could not be used to impeach Gifford because the originals had been in the possession of the State of Idaho and later lost, Grube did not pursue this matter further.

21. However, at 5:00 p.m. on October 15, 1996, (the day before the first scheduled trial on Grube's "Petition for Post-Conviction Relief"), the original police logs were unexpectedly found by the State of Idaho. Upon a personal inspection of the original documents on the early morning of October 16, 1996, (the day of trial) Grube's attorneys determined that the apparent alterations were clear and obvious. They asked the Court for a continuance so that an expert could examine the original documents, which was granted. Following the continuance, and the appointment of an expert, reports were later filed by the defense expert and by the State of Idaho's own expert verifying that at least one number had been altered on the document and that the handwriting of more than one officer was noted on the individual logs.

22. This becomes important because Sebek emphatically testified that only he had access to his personal logs. *Grube II, Tr. Vol. I, p. 214, L. 3-14*. The analysis of **both** experts clearly contradicts Sebek because they **both** concluded that Brood's handwriting appeared on some of Sebek's logs, including the log for the night of the murder. See Hearing Exhibits "P" and "8."

---

[1] Sebek also described Brood as quite different in appearance from himself. Grube II, Tr. Vol. I, p. 226, L. 4-18.

Writ of Habeas Corpus – Grube – Page - 8
H:\WP6\GM\GRUBE.WHC

Sebek also testified that only he was driving the police car that night.  Sebek, a convicted felon[2], is now contradicted by Gifford and by the findings of both experts.

23.  The defense expert concluded, and the State's expert agreed, that the end mileage contained on the June 3, 1983 Sebek log (Hearing Exhibit M) had been changed from a "five" to a "six," thereby adding ten miles to the total traveled that night.  Hale testified that the change from a five to a six had been done very carefully, unlike any of the other changes contained in the other police logs (Hearing Exhibits M and N).  *Grube II, Tr. Vol. I, p. 132, L. 24-25; p. 133, L. 1-13.*  He explained this provided strong evidence of an intent to deceive.  A copy of the June 3, 1983, Police Log is attached to this Petition as Exhibit "B".

24.  Mr. Hale further concluded that the total mileage contained on the June 3, 1983, Sebek log had not been written by Sebek, but appeared to be written in the handwriting of Brood.  *Grube II, Vol. I, p. 120, L. 2-6.*  While the State's expert, Gregory Floyd, could not positively say that Brood wrote the questioned "41," in his examination notes he clearly admits that the "41" appears to more closely resemble Brood's handwriting than that of any other potential known writers.  *Grube II, Tr. Vol. I, p. 262, L. 19-24.*  An enlarged photo copy of the relevant portion of Exhibit "B" is attached hereto as Exhibit "B-1".

25.  The defense expert also noted another highly relevant peculiarity in Sebek's June, 3, 1983 log.  The final time entry "2:30" appears to be written so that the last two digits avoided a hole which was punched in the document.  *Grube II, Tr. Vol. I, p. 130, L. 4-9.*  He testified that this was unique in all of the logs located in Hearing Exhibits M and N.  All other entries by a hole show that the hole punch went through the entries.  This is the only instance in which it appears that an entry was written after the holes were punched in a conscious effort to avoid the

---

[2] Sebek was convicted of Aggravated Assault and Battery.  Grube II, Tr. Vol. I, p. 226, L. 19-24.

hole. This becomes important because of Sebek's testimony that only after the logs were completed and later placed in a three-ring notebook for review by the City Council a month later, would the holes be punched in those documents. *Grube II, Vol. I, p. 206, L. 1-7.* If that is true, this strong evidence that the 2:30 a.m. entry by Sebek was written much later than June 3 or 4, 1983. This also appears to confirm Steve Watt's testimony that he had been told by Sebek that the evening of June 3, 1983 had been quiet and that he had gone home around midnight. *Grube II, Vol. I, p. 98, L. 12-22.* An enlarged photocopy of the relevant portion of Exhibit "B" is attached as Exhibit "B-2".

26. The conclusions of Grube's expert are set forth in his report (Grube's Hearing Exhibit P) and in the analysis contained in Hearing Exhibits O1 through O6. A copy of the report is attached hereto as Exhibit "C". Hale's conclusions provide strong evidence which should have been presented to the jury that Sebek's log of June 3, 1983, had been altered by Brood that evening, to add an additional 10 miles to the log. This would account for Brood using the vehicle after Sebek had gone home early. There is also strong evidence to suggest that Sebek or Brood, sometime much later, changed the log to show that he was on duty until 2:30 a.m.

27. In his dissent in Grube II, Justice Kidwell analyzed all of the relevant facts of the case which lead him to reach the conclusion that Grube "did not receive the fair trial to which he is entitled under our Constitutional system." *995 P. 2d at 801* (See attached Exhibit "A"). This conclusion was based upon the "withheld evidence, doctored police logs, evidence that suspiciously appeared after several years and the absence of convincing direct proof . . ." Ibid.

## SECOND GROUND FOR RELIEF
## (GUILT NOT ESTABLISHED BEYOND A REASONABLE DOUBT)

28. Grube's constitutional rights under the Fourteenth Amendment were denied when the Idaho Courts permitted him to be convicted without sufficient evidence establishing guilt beyond a reasonable doubt.

29. It has been Grube's position in every pleading filed and in every forum in which he appeared since the onset of his case, that the evidence against him was extremely weak, circumstantial, and did not establish his guilt beyond a reasonable doubt.  In his dissenting opinion, Justice Kidwell provides a compelling synopsis of the weakness of the State's case against Grube.  Please see *995 P.2d, 801-804*.  The complete text of the dissenting opinion has been attached hereto as Exhibit "A".

30. It was the Defense's theory at trial that someone manufactured evidence against Grube sometime after 1983 in order to convict him and exonerate the other suspect, Steven Brood, an Ashton police officer.  In his dissenting opinion, Justice Kidwell concludes that "abundant evidence supported this theory." *995 P.2d at 802*.  In that opinion, Justice Kidwell set forth eight (8) significant, and unrefuted, points that completely undermine the State of Idaho's case.  Because of their importance to this case, they have been quoted within the text of this Petition as follows:

- In 1983 or 1984, Idaho investigators specifically requested that ATF firearms expert Peterson inspect the suspect guns for brown paint residue. In reply, Peterson told State investigator Jim Mason that he did not find any brown paint on the barrels of any of the suspect guns.
- Peterson examined Grube's shotgun again after the aluminum and paint marks were found in 1991. He testified that he could not reproduce the tool marks be recoil, that the shotgun would have to pivot in an extremely unusual pattern on recoil to receive the transfer, and that he could reproduce the marks on the shotgun only be mechanically scraping the gun barrel with the window trim.

- Ashton Police Chief Sebek testified that he did not see the tool marks on the window frame trim until 1991. He "couldn't believe that [he] didn't see them before." He was surprised to see the tool marks at Grube's preliminary hearing because they looked fresh and he'd never seen them before. Sebek conceded that tool marks on the trim were not visible in pictures taken in 1983.
- Bob Perez, who joined the Ashton police force in June 1983, looked at Grube's gun when it was handed to the police in 1983. He never saw transfers on the barrel before 1991.
- Burt Bates, the lead investigator for Fremont County, did not notice any unusual marks, dents, or scratches on Grube's gun when police took possession of the gun in 1983. At that time, he noticed the dent in the window trim, and a place where brown paint was scraped off the trim, but he first saw tool marks in the window trim in 1991.
- State investigator Stephen Watts, who left State employ in 1985, knew of the dent in the window trim but never knew of transfers on Grube's gun or tool marks on the window frame. Kurtis Hillman, a Fremont County deputy who took charge of the Fremont County evidence after Bates left the force in August 1988, received Grube's shotgun and the window trim back from the ATF in November 1988. The first time he noticed tool marks on the window trim was in January 1991.
- John Lewoczko, an FBI tool marks examiner, stated that it was impossible to determine when the tool marks were made on the window trim. David Nichols, an FBI materials analyst, stated that there was no way to determine how long the brown paint was on Grube's gun barrel. *995 P.2d at 802.*

31.  Justice Kidwell also concluded that the evidence linking the shot pattern on the victims body to Grube's shot gun was "inconclusive at best." *Ibid.* In summarizing the ATF test in 1983 and the State of Idaho tests conducted in 1991, and the FBI's tests from 1991, FBI firearms expert, Gerald Wilkes, who had been called to refute Peterson's testimony, ultimately concluded that "it was not possible to eliminate any shot gun as the murder weapon and stated that the shot pattern from his own test firing had 'no relevance to the Defendant.' *995 P.2d at 802-803.*

32.  Another substantial issue from Grube I also had to do with serious discovery violations on the part of the State of Idaho.  Most notably, Grube was greatly prejudiced by the

Writ of Habeas Corpus – Grube – Page - 12
H:\WP6\GM\GRUBE.WHC

admission of the results of the test firing of Grube's shotgun on a deer neck which commenced after the trial began. On this issue, the Supreme Court in Grube I commented:

> We first note that the test in question was performed on October 17, 1991, the results were published on October 18, 1991 and the trial started on October 16, 1991; therefore, no pre-trial disclosure of the test results was possible and the pre-trial disclosure rules do not apply. . .in order for the introduction of late evidence to be reversible error, there must be prejudice that the defendant's right to a fair trial was denied . . .
>
> While the late disclosure of evidence is always problematic and may very well be unfairly prejudicial, we are not convinced in this instance that Grube was unfairly prejudiced by the late disclosure of the firearm test and the shot analysis which was performed on the deer neck. **Admittedly, the test was performed and the results made available in an untimely fashion of which we do not approve.** Nonetheless, even with all the tests which were performed on the shotgun, none of the experts who examined the results were able to state conclusively that Grube's shotgun was the murder weapon. *883 P.2d at 1074.* (Emphasis added).

33. While Grube I involved a serious discovery violation which the Court appears to have narrowly decided in the State of Idaho's favor, it stated affirmatively that the "untimely fashion" of the disclosure was "not approve[d]." Grube II obviously involves an even more serious discovery violation: withholding material evidence and offering altered evidence.

34. Grube also presented a very strong alibi at trial. At trial there was testimony that he was in bed asleep by 11:00 p.m. on the night before the shooting and was there until 7:00 a.m. that morning. Grube shared the room with two brothers and his parent's bedroom was located at the bottom of the stairs. There was unrefuted testimony that it would have been extremely difficult for him to sneak out of the house unnoticed by either of his parents or his brothers.

35. Based upon this and other evidence, Justice Kidwell concluded as follows:

> In light of the weak evidence linking Grube to the shooting, the State's suppression of Gifford's testimony, along with the newly discovered evidence uncovered as a result of his testimony, was prejudicial to Grube. . . . The doctored logs lend substantial credence to the Defense's assertion that the police manufactured the tool marks and transfer evidence directly linking Grube's shot gun to the window of Amy's bedroom. *995 P.2d at 804.*

36. Petitioner believes that the evidence presented at the first trial, even without the evidence that was later developed and presented in the post-conviction relief proceedings, was not sufficient to produce a conviction. Taken together, it is now abundantly clear that the first trial was constitutionally deficient in that Defendant was not proven guilty beyond a reasonable doubt.

### THIRD GROUND FOR RELIEF
### (NEWLY DISCOVERED EVIDENCE)

37. Grube's constitutional rights under the Fourteenth Amendment were denied when he was denied a right to a new trial based upon newly discovered evidence. Even if there was no Brady violation, Grube should have had the right to present the newly discovered evidence to a jury.

38. The same facts as set forth above, further justify a new trail for Grube under the Constitution based upon the grounds of newly discovered evidence. In the interest of brevity, those facts set forth above will not be set forth again.

### FOURTH GROUND FOR RELIEF
### (FAILURE TO PROPERLY INSTRUCT JURY)

39. In Grube I, Grube maintained that his constitutional rights were violated when the trial court *sua sponte* refused to give a manslaughter instruction. Grube believes that his constitutional rights have been violated in this regard because this newly discovered evidence, if not entitling him to a new trial, would have at least entitled him to a manslaughter instruction at trial. This issue was also raised in the Grube I appeal and the subsequent post conviction proceedings.

Writ of Habeas Corpus – Grube – Page - 14
H:\WP6\GM\GRUBE.WHC

## FIFTH GROUND FOR RELIEF
### (UNFAIR SENTENCING)

40. Grube was unconstitutionally denied a fair sentencing due to the State's failure to disclose the exculpatory evidence.

41. Arguably, had this exculpatory evidence been available at sentencing, Grube could have provided facts to the court which could have been mitigating in nature. For example, Grube could have argued that Gifford's testimony of sincere surprise would have suggested a lack of malice or intent. The evidence upon which this argument is based has been set forth above.

42. All of the grounds set forth above have previously been argued in the course of Grube's State Court proceedings, both at the District Court level, and on appeal before the Idaho Supreme Court.

### CONCLUSION AND PRAYER

43. Grube has no other petition or appeal now pending either in State or Federal Court as to the judgment under attack.

44. Grube has been represented since the beginning of this matter by Michael S. Kam and Gregory W. Moeller of the firm of Rigby, Thatcher, Andrus, Rigby, Kam & Moeller, Chartered, Rexburg, Idaho. This firm and these attorneys were appointed by the Fremont County Court and have represented Grube at the preliminary hearing, arraignment, trial, sentencing, appeal in Grube I, post-conviction proceeding, and appeal in Grube II.

45. Grube desires that Mr. Kam and Mr. Moeller, as well as their firm, remain as his attorneys of record.

46. Grube was sentenced on only one count of an indictment. Due to the fixed nature of Grube's life sentence, he has no future sentence to serve after completion of this sentence.

WHEREFORE, Petitioner Rauland J. Grube respectfully prays that this court grant Petitioner the relief to which he may be entitled in this proceeding.

_____
Gregory W. Moeller
    of Rigby, Thatcher, Andrus,
    Rigby, Kam & Moeller, Chartered

I, Rauland J. Grube, declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on the _14th_ day of July, 2001.

_____
Rauland J. Grube

Writ for Habeas Corpus – Grube – Page – 16
H:\WP6\GM\GRUBE.WHC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY That on this 19th day of July, 2001, a true and accurate

copy of the foregoing was sent by Certified Mail, postage prepaid, to the following:

        Joseph Klauser, Warden
        Idaho State Correctional Institution
        Pleasant Valley Road
        Boise, Idaho 83712

        Alan G. Lance
        Attorney General of the State of Idaho
        210 Statehouse
        Boise, Idaho 83720-1000

                        Gregory W. Moeller

*Writ of Habeas Corpus – Grube – Page - 17*
H:\WP6\GM\GRUBE.WHC

995 P.2d 794
(Cite as: 134 Idaho 24, 995 P.2d 794)
⚓

Editor's Note: Additions are indicated by < <+Text
+>> and
deletions by < <-Text->>.

Supreme Court of Idaho,
Pocatello, September 1999 Term.

**Rauland J. GRUBE, Petitioner-Appellant,**
**v.**
**STATE of Idaho, Respondent.**

No. 24854.

Jan. 7, 2000.
Rehearing Denied March 3, 2000.

Defendant convicted of murder, affirmed at 126
Idaho 377, 883 P.2d 1069, filed application for post-
conviction relief. The District Court, Fremont
County, Brent J. Moss, J., denied relief, and
defendant appealed. The Supreme Court, Walters, J.,
held that defendant was not entitled to relief on the
grounds of undisclosed or newly discovered evidence.

Affirmed.

Kidwell, J., filed dissenting opinion in which
Schroeder, J., concurred.

West Headnotes

**[1] Criminal Law ⚖1158(1)**
110k1158(1) Most Cited Cases

Where there is competent and substantial evidence to
support the district court's decision made after an
evidentiary hearing on an application for post-
conviction relief, that decision will not be disturbed on
appeal.

**[2] Criminal Law ⚖1653**
110k1653 Most Cited Cases
        (Formerly 110k998(18))

Credibility of the witnesses, the weight to be given to
their testimony, and the inferences to be drawn from
the evidence are all matters solely within the province
of the district court on post-conviction relief
application.

**[3] Criminal Law ⚖700(3)**
110k700(3) Most Cited Cases

Witness' interview with state investigator was
improperly withheld by the State in response to
defense's request for exculpatory information under
*Brady*; witness testified that he was the first one to
inform defendant of victim's murder, that defendant
appeared sincerely upset and sad by the news, and that
the witness had seen another suspect, a police officer,
pass by on the night of the murder. U.S.C.A.
Const.Amend. 14.

**[4] Criminal Law ⚖919(1)**
110k919(1) Most Cited Cases

New trial was not warranted by *Brady* violation in
State's failure to disclose evidence of interview with
witness who testified that he was the first one to
inform defendant of victim's murder, that defendant
appeared sincerely upset and sad by the news, and that
the witness had seen another suspect, a police officer,
pass by on the night of the murder; jury had already
heard tape on which defendant indicated that witness
had told him about the murder and that the news had
made him sick, and testimony as to the officer's
whereabouts did not significantly impeach the
truthfulness of prosecution witnesses. U.S.C.A.
Const.Amend. 14.

**[5] Criminal Law ⚖700(2.1)**
110k700(2.1) Most Cited Cases

**[5] Criminal Law ⚖700(4)**
110k700(4) Most Cited Cases

Under *Brady*, the prosecution is bound to disclose to
the defense all exculpatory evidence known to the
state or in its possession; this duty to disclose
encompasses impeachment evidence as well as
exculpatory evidence. U.S.C.A. Const.Amend. 14.

**[6] Criminal Law ⚖1134(2)**
110k1134(2) Most Cited Cases

Where a general request for *Brady* materials is made
and the exculpatory information in the possession of
the prosecutor may be unknown to the defense, the
reviewing court must look to the whole record and
determine whether the omitted evidence creates a
reasonable doubt that did not otherwise exist.
U.S.C.A. Const.Amend. 14.

**[7] Criminal Law ⚖919(1)**
110k919(1) Most Cited Cases

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



EXHIBIT

995 P.2d 794
(Cite as: 134 Idaho 24, 995 P.2d 794)

If there is no reasonable doubt about guilt whether or not additional evidence is considered, there is no justification for a new trial based on a *Brady* violation; on the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. U.S.C.A. Const.Amend. 14.

**[8] Constitutional Law** ☞**268(5)**
92k268(5) Most Cited Cases

Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. U.S.C.A. Const.Amend. 14.

**[9] Criminal Law** ☞**700(2.1)**
110k700(2.1) Most Cited Cases

Evidence is material, for purposes of *Brady* analysis, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; reasonable probability is a probability sufficient to undermine confidence in the outcome. U.S.C.A. Const.Amend. 14.

**[10] Criminal Law** ☞**700(2.1)**
110k700(2.1) Most Cited Cases

For purposes of *Brady* analysis, question is not whether the defendant would more likely than not have received a different verdict with the undisclosed evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. U.S.C.A. Const.Amend. 14.

**[11] Criminal Law** ☞**700(3)**
110k700(3) Most Cited Cases

When undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs. U.S.C.A. Const.Amend. 14.

**[12] Criminal Law** ☞**700(6)**
110k700(6) Most Cited Cases
Files.

Expert testimony that related to police logs was not in the possession of the prosecution until after trial, and thus, could not be deemed withheld or in any way suppressed by the State in contravention of *Brady*

principles. U.S.C.A. Const.Amend. 14.

**[13] Criminal Law** ☞**700(3)**
110k700(3) Most Cited Cases

There was no evidence that defendant had any knowledge that a witness had been questioned and the interview recorded by a state investigator, and thus, it was not shown that defense could have obtained the witness' testimony through exercise of due diligence, so as to defeat claim of *Brady* violation in State's failure to disclose the interview. U.S.C.A. Const.Amend. 14.

**[14] Criminal Law** ☞**945(1)**
110k945(1) Most Cited Cases

Newly discovered evidence of tampering of with police logs, allegedly corroborating a witness' testimony that he saw a police officer pass by on the night of a murder and supporting the defense theory that the officer was responsible for the murder, would not probably have produced an acquittal, as required for a new trial; evidence as to the officer's whereabouts did not significantly impeach the truthfulness of prosecution witnesses. I.C. § 19-4901(a)(4).

**[15] Criminal Law** ☞**938(1)**
110k938(1) Most Cited Cases

To be granted a new trial on the ground of newly discovered evidence, a defendant must demonstrate that the newly discovered evidence was unknown to the defendant at the time of trial; the evidence is material, not merely cumulative or impeaching; the evidence will probably produce an acquittal; and the failure to learn of the evidence was due to no lack of diligence on the part of the defendant. I.C. § 19-4901(a)(4).

**[16] Criminal Law** ☞**1180**
110k1180 Most Cited Cases

Denial of a manslaughter instruction at trial and claimed errors related to sentencing were raised and disposed of, or should have been, on direct appeal, and were not subject to further review by appellate court on review of denial of post-conviction relief.
**795 *25 Rigby, Thatcher, Andrus, Rigby, Kam & Moeller, Rexburg, for appellant.   Gregory W. Moeller argued.

Hon. Alan G. Lance, Attorney General;   Kenneth K.

Jorgensen, Deputy Attorney General, Boise, for respondent.  Kenneth K. Jorgensen argued.

WALTERS, Justice.

This is an appeal from the denial of a post-conviction relief application filed with regard< <-s-> > to Rauland Grube's conviction for first-degree murder in the 1983 death of Amy Hossner in Ashton, Idaho. The order denying relief is affirmed.

## BACKGROUND

Amy Hossner was murdered while she slept in her bedroom in the basement of her parent's home in the early morning hours of June 4, 1983.  She was killed by a single shotgun blast through a window above her bed.  Rauland Grube was tried for the crime in October of 1991, after information came to light placing Grube at Amy Hossner's house on the night of the murder.  Brenda Fredricksen Briggs, a witness who did not come forward until 1991, testified at trial that **796 *26 shortly after the murder, Grube had approached her and told her that he had a crush on Amy and had spoken to Amy through her bedroom window the night Amy was murdered.  Briggs also testified Grube told her that when Amy failed to meet him several hours later, he went back to her house and looked in the window, whereupon he told Briggs that he had "never seen so much blood in his life."  Although Grube did not testify, a tape-recorded interview of Grube which had been conducted by the police in 1991 was played for the jury, in which Grube said the story he had told Briggs was a lie.  There was testimony relating to the various tests performed by firearms experts on Grube's weapon, a shotgun, both in 1983 and in 1991.  The jury found Grube guilty of first-degree murder in the death of Amy Hossner, and he was sentenced to life imprisonment without the possibility of parole.  The judgment of conviction and the sentence were upheld by this Court on direct appeal in *State v. Grube*, 126 Idaho 377, 883 P.2d 1069 (1994).

In 1994, while Grube's appeal from the judgment of conviction was pending, Lynn Gifford approached defense counsel.   Gifford indicated that he was the person who had first told Grube that Amy Hossner had been murdered, and that although he had been interviewed by the police in 1991, he had not been called to testify at Grube's trial.   In their conversation with Gifford, defense counsel learned information (1) that Grube had reacted with genuine surprise and sadness to the news of Amy Hossner's

death, and (2) that Gifford had reported seeing Ashton police officer Stephen Brood--an early suspect in this crime--driving a police car within a few blocks of Amy Hossner's house at approximately 2:30 a.m. on the night of the murder.   This information had been communicated to the police investigator in 1991 but was never disclosed by the state to the defense, prompting counsel to seek post-conviction relief on Grube's behalf from the district court.

In his application for post-conviction relief, Grube asserted that he was entitled to a new trial because he had been denied due process by the state's failure to disclose exculpatory information contained in Gifford's interview with the investigator in 1991. The Gifford information led defense counsel to discover that Ashton police logs recording activity the night of the murder appeared to have been altered. Consequently, Grube also alleged that he was entitled to a new trial on the basis of that evidence which only came to light subsequent to the trial.   After denying the state's motion to dismiss Grube's request for post-conviction relief, the district court conducted an evidentiary hearing on the application.  According to the state, the police logs in question could not be located and were unavailable for the defense to examine whether they corroborated Gifford's story and supported an investigator's testimony that Chief of Police Sebek, the only other Ashton police officer, had gone home before midnight the night that the murder took place.  Just days before the scheduled post-conviction hearing, the police logs were found, necessitating a continuance to allow examination of the logs by forensic experts.

The district court denied Grube any relief on his post-conviction application.   The district court made the following findings:  (1) that even if it were proven that Officer Brood had written on the log of June 3, 1983, such evidence does little more than prove that he had access to the logs and does not provide any solid footing to conclude that Officer Brood may have murdered Amy Hossner or had access to the police vehicle on that date;  (2) that Gifford's observation, even assuming it was accurate, was only marginally relevant in view of the other evidence presented at trial;  (3) that Gifford's testimony fails to cast any different light on the trial which would undermine confidence in the jury's verdict;   (4) that the additional evidence did not contradict any physical evidence and failed to impeach the testimony of any witness critical to the state's case or to weaken the overall case against Grube;   (5) that the post-conviction evidence failed to establish the reasonable

995 P.2d 794
(Cite as: 134 Idaho 24, *26, 995 P.2d 794, **796)

probability of a different verdict; and (6) that Gifford's conclusions regarding Grube's reactions upon learning of Amy Hossner's murder would not be admissible over an appropriate objection. Grube filed a notice of appeal to this Court.

## **797 *27 ISSUES ON APPEAL

1. Did the state violate Grube's due process rights by failing to disclose *Brady* evidence in the form of Lynn Gifford's interview with the state investigator?

2. Did Grube show that he was entitled to a new trial on the basis of newly discovered evidence?

3. Did the state's failure to disclose the Gifford interview deny Grube the right to a manslaughter instruction at his trial on the murder charge?

4. Did the state's failure to disclose the Gifford interview deny Grube a fair proceeding at the time he was sentenced?

## STANDARD OF REVIEW

[1][2] An applicant for post-conviction relief bears the burden of proving, by a preponderance of the evidence, the allegations on which the applicant's claims are based. I.C.R. 57(c); *McCoy v. State*, 129 Idaho 70, 72-73, 921 P.2d 1194, 1196-97 (1996); *Clark v. State*, 92 Idaho 827, 830, 452 P.2d 54, 57 (1969). Where there is competent and substantial evidence to support the district court's decision made after an evidentiary hearing on an application for post-conviction relief, that decision will not be disturbed on appeal. *McCoy, supra; State v. Pizzuto*, 119 Idaho 742, 778, 810 P.2d 680, 716 (1991). The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court. *Larkin v. State*, 115 Idaho 72, 764 P.2d 439 (Ct.App.1988).

## DISCUSSION

### A. *Brady* violation.

[3][4] Grube contends that the state withheld evidence favorable to him upon a discovery request by the defense. Only after the trial did Grube learn that the state's investigator had interviewed Lynn Gifford in 1991 at which time Gifford provided information that contradicted the testimony of the state's primary witness against Grube, put into question the alibi of the other suspect (Brood), and supported Grube's

theory of defense that someone else had killed Amy Hossner. This evidence, commonly referred to as *Brady* material, is required to be disclosed if the police or prosecutor possessed the evidence.

[5][6][7] Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution is bound to disclose to the defense all exculpatory evidence known to the state or in its possession. The duty to disclose encompasses impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985). In the situation where a general request for *Brady* materials is made and when the exculpatory information in the possession of the prosecutor may be unknown to the defense, the reviewing court must look to the whole record and determine whether "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342, 354 (1976).

> If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 112-13, 96 S.Ct. at 2402, 49 L.Ed.2d at 354-55.

[8][9][10] Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; see also *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565- 66, 131 L.Ed.2d 490, 505-06 (1995). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* As **798 *28 the Supreme Court elaborated in *Kyles*, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434, 115 S.Ct. at 1565, 131 L.Ed.2d at 505.

In a recent decision, the United States Supreme Court further explained the holding of *Kyles*, stating that

995 P.2d 794
(Cite as: 134 Idaho 24, *28, 995 P.2d 794, **798)

"the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) [citations omitted]. Therefore, we examine the withheld evidence in Grube's case to determine whether it substantially undermined confidence in the outcome of the jury's verdict, thus entitling Grube to a reversal of his conviction and a new trial. [FN1]

> FN1. In addition to asserting his right to a new trial under *Brady,* Grube also requested a new trial pursuant to the state constitution and I.C.R. 16. We do not address these requests, only mentioned in his appellate brief, which Grube failed to argue or support with authority. *See Davis v. Parrish,* 131 Idaho 595, 599, 961 P.2d 1198, 1202 (1998), *citing Smith v. J.B. Parson Co.,* 127 Idaho 937, 945, 908 P.2d 1244, 1252 (1996).

Lynn Gifford testified at the post-conviction proceeding that he had been the one to first inform Grube that Amy Hossner had been found murdered in her home. Gifford testified that he learned of the murder the following morning at a convenience store in Ashton where he went on his break from the potato warehouse where he and Grube worked. When he returned to work, he told Grube and others of the murder that had taken place the night before. Gifford testified that Grube fell to his knees, exclaiming "Oh, God!" and that he appeared to be sincerely upset and sad upon learning of Amy's death. Gifford then testified that Grube left work, feeling sick, and went home thereafter. In addition to this information, Gifford testified that he had also told the state investigator in 1991 that, on the night of the murder, he had seen Steven Brood pass by in the police vehicle between 2:00 and 2:30 a.m. He testified that the investigator did not want to hear about Officer Brood, only about Rauland Grube.

*1. Grube's reaction to news of the death of Amy Hossner.*

Grube argues that the district court erred when it found that the contents of the Gifford interview were only marginally relevant, did not impeach the testimony of any witness critical to the state's case,

and did not undermine confidence in the jury's verdict. Grube contends that Gifford's testimony about Grube's reaction to the news of Amy Hossner's death would have provided the defense with evidence to rebut Brenda Fredericksen Briggs' testimony at trial which suggested that Grube had been with Amy the night of the murder and had personal knowledge that she had been killed.

[11] The information contained in the statement from Gifford that was withheld from Grube was information which the jury had already heard when the tape of Grube's interview with the police was played during the trial. On the tape, Grube indicated that it was Gifford who had told him about the murder and that the news had made him sick such that he did not return to work after his break. For Gifford to testify to these same observations would present cumulative evidence. When nondisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs. *Spence v. Johnson,* 80 F.3d 989 (5th Cir.1996); *United States v. Marashi,* 913 F.2d 724 (9th Cir.1990); *United States v. Page,* 828 F.2d 1476 (10th Cir.1987). This evidence from Gifford, had it been disclosed, would not have led to a different result and would not have cast the entire case in such a different light as to undermine confidence in the verdict.

*2. Seeing Officer Brood on the night of the murder.*

Grube argues that the Gifford evidence relating to Officer Brood's whereabouts at **799 *29 the approximate time of the murder suggested that Brood may have committed the murder. Grube claims that the withheld evidence was material because it undermined the testimony of the state's "Brood alibi" witness (Investigator Watts) who testified that Brood reported spending the night of the murder at his girlfriend's house in Ashton until 1:00 a.m., after which he went home and stayed there the rest of the night. The evidence also called into question the police logs from the night of the murder, which appeared to have been altered and which supported the defense theory that Brood had committed the murder and that his involvement was being covered up.

This information was explored at the hearing on the post-conviction application. Gifford gave details about seeing Officer Brood on the night of the murder. He indicated that he was sixteen years old in June of 1983. He related that he was in his car with a friend, visiting with two other friends in another car, in the parking lot of the REA store across from

995 P.2d 794
(Cite as: 134 Idaho 24, *29, 995 P.2d 794, **799)

the Circle K in Ashton between 2:00 and 2:30 a.m. when he noticed a police vehicle approach from the west on Idaho Street, then turn north on Seventh Street. Gifford testified that when the police car stopped at the stop sign, Gifford could see that it was Officer Brood in the vehicle which was lit by the street light. The officer looked at the cars with the teens, then left and was not seen again that night which, according to Gifford, was unusual because the police usually stayed around until the teenagers dispersed and went home. Gifford testified that he had no doubt that it was Officer Brood in the police car, whom he not only saw and recognized but who, in terms of physical size was a much smaller man than Chief Sebek, the only other policeman on the Ashton police force.

Chief Sebek testified in the post-conviction proceeding that he, not Officer Brood, was on duty the night of the murder and that he had ended his shift at 2:30 a.m. He testified that he had filled out the log sheets at the police station showing that he was the officer on duty and that his shift ended at 2:30 a.m. Chief Sebek also related that he had written a traffic ticket at 1:59 a.m., again showing that he, not Officer Brood, was on duty and patrolling in the town's only police car.

The district court concluded that the information from Gifford, which the court found had been suppressed by the state, was not material in view of the other evidence upon which Grube was convicted. Even if believed, Gifford's observations only established that Officer Brood was out later the night of the murder than he claimed and that he and Chief Sebek either were mistaken or lied about their activities that night. Although the defense argued that the jury could have inferred from Gifford's testimony that Officer Brood was involved in the murder, the testimony does not exonerate Grube. Gifford's testimony does not significantly impeach the truthfulness of any prosecution witness who provided incriminating evidence against Grube at his trial, nor does it impair the incriminating quality of such testimony. Gifford's testimony did not contradict the physical evidence of tool marks on Grube's gun and the window through which the fatal shot was fired or the pellets in Amy's body that came from the same batch as the unfired shells that were found in Grube's possession. Those items of evidence do not change regardless of Gifford's version of the events and any records shown in the police logs. Nor does the Gifford testimony weaken the overall case against Grube, which included testimony from a parade of

witnesses about Grube's obsession with Amy Hossner and statements made by Grube that Amy had rearranged the furniture in her bedroom and that the shooter never meant to kill her. The evidence from Gifford, which was withheld, does not as a matter of law raise a reasonable doubt as to Grube's guilt that did not otherwise exist in the evidence presented at Grube's trial, *see United States v. Buchanan*, 891 F.2d 1436, 1445 (10th Cir.1989), which compels us to uphold the district court's ruling on materiality. Accordingly, the nondisclosure of the Gifford testimony, because it was not material and would not have changed the outcome of the trial, does not entitle Grube to post-conviction relief for the alleged *Brady* violation.

**800 *30 3. *The police logs from the night of the murder.*

[12] Until the Gifford testimony was developed, the relevance of the police logs for the night of Amy Hossner's murder was not readily apparent. The logs were examined to verify which officer was on duty and which officer had filled in the daily log and could have been used to argue to the jury that not only did Officer Brood commit the murder, but he was involved in a coverup to hide his involvement. The state argues that only the testimony of the forensic expert who examined the police logs, not the logs themselves, could be considered exculpatory. Since the expert testimony that related to the police logs was not in the possession of the prosecution, the state properly asserts that such evidence could not be deemed withheld or in any way suppressed by the state in contravention of *Brady* principles.

[13] We complete our analysis of the claimed *Brady* violation by addressing whether with due diligence the defense could have obtained Gifford's testimony. The state argues that because Grube had mentioned Gifford in his interview with the police in January of 1991, the defense could have obtained Gifford's testimony through the exercise of due diligence. Although the state is not required to furnish a defendant with exculpatory evidence that is fully available through the exercise of due diligence by the defendant, *United States v. McMahon*, 715 F.2d 498, 501 (11th Cir.1983), there is no evidence in the record to suggest that Grube had any knowledge that Gifford had been questioned and the interview recorded by the state investigator. The state's excuse for not providing Grube with the Gifford interview is, therefore, without merit.

995 P.2d 794
(Cite as: 134 Idaho 24, *30, 995 P.2d 794, **800)

**B. Newly discovered evidence.**

[14] As another basis for requesting a new trial, Grube argued that Gifford's testimony and the evidence of tampering of the police logs was newly discovered evidence. The police logs were shown to Gifford at the time of his 1991 interview in order to attempt to impeach his observation of Officer Brood in the police car between 2:00 and 2:30 a.m. the night of the murder in the vicinity of the Hossner home. Examination by forensic document experts revealed a number of discrepancies and notably, that at least two persons had recorded information on the log for the night of the murder. The defense expert, Mr. Hale, concluded that the mileage total for the night of the murder appeared to have been written by Brood and not Chief Sebek who testified that he was on duty and that he completed the log record for the night in question. Unique to this night's log, the final time entry "2:30" appeared to be written so that the last two digits avoided a hole which was punched in the document; all other entries by a hole show that the hole punch went through the entries. Grube contends that this evidence strongly suggested that the police records were doctored thus corroborating Gifford's testimony and supporting the defense theory that Brood was responsible for the murder.

[15] Idaho Code Section 19-4901(a)(4) authorizes post-conviction relief upon a showing that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice. To be granted a new trial on the ground of newly discovered evidence, a defendant must demonstrate that the newly discovered evidence was unknown to the defendant at the time of trial; the evidence is material, not merely cumulative or impeaching; the evidence will probably produce an acquittal; and the failure to learn of the evidence was due to no lack of diligence on the part of the defendant. *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976).

The district court in this case concluded that Gifford's testimony was insufficient to refute the other evidence of Grube's guilt and thus was not material. The district court also dismissed the relevance of the log changes "in the mix" when it concluded that the post-conviction evidence failed to establish a reasonable probability of a different result. Having affirmed the district court's materiality finding under the *Brady* analysis above, we conclude that this same evidence cannot meet the *Drapeau* standard which requires that the new information or evidence "will

probably produce an acquittal," **801 *31 which is a higher standard. The district court did not err in denying Grube a new trial on the basis of newly discovered evidence.

**C. Miscellaneous issues.**

[16] Grube contends on appeal that the state's failure to disclose the Gifford testimony denied him the right to a manslaughter instruction at trial and the right to a fair sentencing. Our holding that the post-conviction evidence would not have changed the outcome of the case renders these questions moot. Moreover, the district court's denial of a manslaughter instruction at trial and claimed errors related to sentencing were raised and disposed of, or should have been, in the direct appeal and are not subject to further review by this Court. *See Paradis v. State*, 110 Idaho 534, 716 P.2d 1306 (1986); *State v. Ruth*, 102 Idaho 638, 637 P.2d 415 (1981).

**CONCLUSION**

Lynn Gifford's interview with the state investigator in 1991 was improperly withheld by the state in response to the defense's request for exculpatory information under *Brady*. The withheld evidence, however, does not raise a reasonable doubt about Grube's guilt that did not previously exist and would not, as required for newly discovered evidence, likely produce an acquittal. Therefore, the district court properly concluded that Grube was not entitled to relief under the standards applicable to undisclosed evidence or newly discovered evidence.

The district court's order denying Grube's application for post-conviction relief is affirmed.

Chief Justice TROUT, and Justice SILAK, concur.

Justice KIDWELL, dissenting.

Upon review of withheld evidence, doctored police logs, evidence that suspiciously appeared after several years, and the absence of convincing direct proof, my confidence in the original jury verdict has been undermined. Mr. Grube did not receive the fair trial to which he is entitled under our constitutional system. Therefore I respectfully dissent.

It should be noted at the outset that the evidence at trial linking Grube to Amy's shooting was scant. The prosecution's case rested on two grounds. First, the prosecution showed that Grube, who had some

psychological problems, obsessed about Amy for years *after* her death. [FN2] Second, the prosecution attempted to link Grube's shotgun to the scene of the shooting.    It attempted to make this link by demonstrating that Grube's shotgun had contacted the trim around Amy's window and by showing that the shot pattern produced by Grube's gun was consistent with the shot pattern on Amy.

> FN2. The prosecution introduced evidence that Amy had, for several months before her death, received strange and distressing phone calls from a man.  The prosecution failed to show, however, that Grube made these calls.  Indeed, Briggs testified that Amy had told her, in the months before her death, that a guy named Jack was calling her on the telephone and scaring her.  It is undisputed that Amy and Grube attended the same church and knew each other.  Mrs. Hossner testified that Grube made four to six "pointless" phone calls to her in the six months before Amy's death, but he did not mention Amy during these calls.  It is difficult to understand why Grube identified himself to Mrs. Hossner if he was concealing his identity from Amy.

Key to the prosecution's case was evidence that Grube's shotgun had scraped against the aluminum trim of Amy's window frame.  Both the transfers on the gun barrel and the tool marks on the window trim were obvious to every person who examined the evidence in 1991.    Investigators had removed the window trim from the Hossners' house late in 1983. The trim was sent to Edward Peterson, a firearms expert at the Bureau of Alcohol, Tobacco, and Firearms (ATF), in November 1983.    In 1983, several persons had noticed that the trim had a dent in it.    *For eight years, however, none of the city, county, state, or federal investigators working on the Hossner case noticed either the tool marks on the aluminum trim or the aluminum and paint transfers on Grube's shotgun.*  Mysteriously, investigators discovered these marks only in 1991 after Briggs's statements to police made Grube a suspect again.

**802 *32 The defense's theory was the police manufactured this evidence sometime after 1983 to pin the blame on Grube and exonerate Steven Brood, an Ashton police officer and an original suspect. Abundant evidence supported this theory:

. In 1983 or 1984, Idaho investigators specifically requested that ATF firearms expert Peterson inspect the suspect guns for brown paint residue.    In reply, Peterson told State investigator Jim Mason that he did not find any brown paint on the barrels of any of the suspect guns.

. Peterson examined Grube's shotgun again after the aluminum and paint marks were found in 1991.  He testified that he could not reproduce the tool marks by recoil, that the shotgun would have to pivot in an extremely unusual pattern on recoil to receive the transfer, and that he could reproduce the marks on the shotgun only by mechanically scraping the gun barrel with the window trim.

. Ashton Police Chief Sebek testified that he did not see the tool marks on the window frame trim until 1991.    He "couldn't believe that [he] didn't see them before."    He was surprised to see the tool marks at Grube's preliminary hearing because they looked fresh and he'd never seen them before. Sebek conceded that tool marks on the trim were not visible in pictures taken in 1983.

. Bob Perez, who joined the Ashton police force in June 1983, looked at Grube's gun when it was handed to the police in 1983.    He never saw transfers on the barrel before 1991.

. Burt Bates, the lead investigator for Fremont County, did not notice any unusual marks, dents, or scratches on Grube's gun when police took possession of the gun in 1983.    At that time, he noticed the dent in the window trim, and a place where brown paint was scraped off the trim, but he first saw tool marks in the window trim in 1991.

. State investigator Stephen Watts, who left State employ in 1985, knew of the dent in the window trim but never knew of transfers on Grube's gun or tool marks on the window frame.

. Kurtis Hillman, a Fremont County deputy who took charge of the Fremont County evidence after Bates left the force in August 1988, received Grube's shotgun and the window trim back from the ATF in November 1988.  The first time he noticed tool marks on the window trim was in January 1991.

. John Lewoczko, an FBI tool marks examiner, stated that it was impossible to determine when the tool marks were made on the window trim.  David Nichols, an FBI materials analyst, stated that there was no way to determine how long the brown paint was on Grube's gun barrel.

In addition, the evidence linking the shot pattern of Grube's gun to the shot pattern at the scene was inconclusive at best.  The shot that killed Amy went through two panes of glass and a curtain.  In 1983, ATF firearms expert Peterson test-fired Grube's shotgun and the two shotguns of Brood.  Peterson conducted the test firings through two panes of glass and a curtain.  When Peterson compared the shot patterns from his test firings to the pattern in Amy's room, he eliminated Grube's shotgun as the murder

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

995 P.2d 794                                                                                                                                                      Page 10
(Cite as: 134 Idaho 24, *32, 995 P.2d 794, **802)

weapon but could not eliminate Brood's two guns. When the State began reinvestigating Grube in 1991, its firearms examiner conducted four series of test firings, again using intervening objects. Peterson opined that the State's first three tests were consistent with the results of his own 1983 test firing. On the basis of the State's fourth test on deer necks, conducted *during* the trial, Peterson stated that he could not eliminate Grube's gun, but he emphasized that the pattern differed from the shot pattern on the victim and another test shot was needed. Even though Peterson had testified for the State, the prosecution brought in an FBI firearms expert, Gerald Wilkes, to refute Peterson's equivocal testimony. Wilkes opined that it was not possible to reproduce shot patterns through intervening objects, and thus that it was unreasonable for Peterson to eliminate Grube's gun on the basis of test firings done through glass. However, Wilkes ultimately **803 *33 stated that it was not possible to eliminate *any* shotgun as the murder weapon and stated that the shot pattern from his own test firing had "no relevance to the Defendant."

No evidence placed Grube near the scene on the night of the shooting. One neighbor testified to hearing a shotgun blast at 4:24 a.m. the morning of the shooting, followed within a few minutes by a souped-up vehicle starting up and driving off. The prosecution did not attempt to link Grube to any vehicle. Although the State provided some evidence that Grube sometimes walked around town late in the evening, it provided no evidence of Grube ever driving. Grube introduced abundant testimony that he had no access to any vehicles and that none of the family vehicles were "souped-up." No one saw Grube either walking or driving on the night of the shooting. In addition, Grube presented three witnesses who testified that he was in his room, along with his two brothers, from 11:00 p.m. on the night before the shooting until 7:00 a.m. the following morning, and that it was extremely difficult to sneak out of the house unnoticed by his father and brothers.

Further, fingerprint evidence tended to exonerate Grube. On the night of the shooting, electricity in the Hossners' house (but not elsewhere in the neighborhood) was off for forty-five minutes. The electrical box for the Hossners' house was directly outside Amy's window. Seven fingerprints were lifted from the electrical box. Six prints were from persons involved in the investigation, but one suspicious partial print was on the edge of the electrical box. Testifying for the State, fingerprint expert Robert Kerchusky testified that the print was

negative as to Grube.

Here, the State withheld evidence that its investigator, Scott Birch, had interviewed Lynn Gifford, who had impeaching and exculpatory information. Gifford impeached the testimony of Brenda Fredrickson Briggs, the witness whose testimony placed Grube outside Amy's bedroom shortly after the shooting. Gifford testified to telling Birch that he had been the person to first inform Grube that Amy had been shot, and that Grube reacted as though he were sincerely surprised at the news. Gifford's testimony also cast serious doubt on Brood's alibi. Gifford testified to telling Birch that he saw Brood driving the Ashton patrol car between 2:00 and 2:30 a.m. (shortly before the time of the shooting) in the vicinity of the Hossners' house. Gifford noted that Brood departed from his usual late-night routine in dealing with juveniles. He emphasized that he knew both of Ashton's police officers well by sight and that he had clearly recognized the officer in the patrol car as being Brood. As a direct result of Gifford's testimony, defense counsel reexamined prosecution documents. This led to the discovery that police logs for the night of the shooting had been altered.

In *Brady v. Maryland,* the U.S. Supreme Court held, "[S]uppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215, 218 (1963). The duty to disclose encompasses impeachment as well as exculpatory evidence, and evidence known only to police as well as that known by prosecutors. *Strickler v. Greene,* 527 U.S. 263, 275, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286, 301 (1999). The U.S. Supreme Court recently clarified:

There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Id.*

To show prejudice, it is not enough to show "that it made [a defendant's] conviction more likely" than if the withheld evidence had been used, or that "discrediting [a witness's] testimony might have changed the outcome of the trial." *Id.* at 279, 119 S.Ct. at 1952, 144 L.Ed.2d at 291. "The question is

not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, **804 *34 434, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 505 (1995)).

In light of the weak evidence linking Grube to the shooting, the State's suppression of Gifford's testimony, along with the newly discovered evidence uncovered as a result of his testimony, was prejudicial to Grube. Gifford's testimony placed Brood near the scene shortly before the shooting. It directly contradicted the alibi that had Brood leaving his girlfriend's house at 1:00 a.m. and spending the rest of the evening at home, far removed from the Hossners' house.    More importantly, however, Gifford's testimony directly supported the defense's theory of a police coverup.   It directly contradicted Chief Sebek's testimony about his activities on the night of the shooting.    Gifford's information led directly to the discovery that the Ashton police patrol logs for the night of the shooting had been deliberately altered.   The doctored logs lend substantial credence to the defense's assertion that the police manufactured

the tool mark and transfer evidence directly linking Grube's shotgun to the window of Amy's bedroom.

In conclusion, it is my opinion that Rauland Grube was convicted of murder based on possibly doctored physical evidence, on inconclusive test-firing evidence, and on evidence that Grube had an unhealthy obsession with Amy after her death. Gifford's direct evidence impeached several key prosecution witnesses, put another suspect, who was a policeman, near the murder scene, and led to the discovery that the police logs for the night of the shooting had been doctored.    The possibility that police lied on the witness stand and doctored the police logs undermines the validity of the physical evidence linking Grube to the shooting.    Combined with the weakness of the other evidence presented in the trial, this is enough to undermine confidence in the original verdict.    Therefore, the State's suppression of the Gifford evidence meets *Strickler* 's prejudice prong, and the case should be sent back to give Mr. Grube a fair trial.

Justice SCHROEDER concurs.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# Ashton Police Department

7701 Q'

DAILY LOG

PAGE _1_ OF ____

OFFICER _____

END MILAGE 96069
START " 96028
TOTAL 41

DATE 06-03-83
FINISH SHIFT 02:30
START " 10:30
TOTAL 16
D.O.W. Fri

Rc/over

| TIME | LIC. NO. | ACTIVITY | LOCATION | WW | OW | ARREST CODE NO | CITATION NO. | M | F |
|------|----------|----------|----------|----|----|----------------|--------------|---|---|
| 10:50 | | 1100 in Service | | | | | | | |
| 11:00 | | #6 lunch | Ash Carb | | | | | | |
| 12:30 | | #9 Patrol | | | | | | | |
| 13:05 | | #6 Plato | CT, OB | | | | | | |
| 14:12 | | #9 Patrol | | | | | | | |
| 17:30 | | #6 | Co-op | | | | | | |
| 18:00 | | #8 Patrol | | | | | | | |
| 19:40 | | #2 Dinner | P.S. | | | | | | |
| 22:00 | | #8 Patrol | | | | | | | |
| 23:20 | | #6 10-16 | Derby Club | | | | | | |
| 23:40 | | #8 Patrol | | | | | | | |
| 0:15 | J 23726 | #6 Roy Bowman | 4th & main | | x | | | | x |
| 0:03 | | #8 Patrol | no Tail lights | | | | | | |
| 02:30 | | ... | | | | | | | |

EXHIBIT

Ashton Police Department

OFFICER _____

END MILAGE _96069_

START " _96028_

TOTAL _41_

FINISH SHIFT _02:30_

START " _10:30_

TOTAL _16_

| TIME | LIC. NO. | ACTIVITY |
|------|----------|----------|
| 6:30 | | 1/00 in Service |

EXHIBIT

| | |
|---|---|
| 19:40 | |
| 22 00 | |
| 23:30 | |
| 23:40 | |
| 0158 | 1/J  23750 |
| 0203 | |
| 02:30 | |

EXHIBIT

# NORTHERN ARIZONA FORENSIC LABORATORY

*J. L. "John" Hale, Jr.* ● *Forensic Document Analyst*
*P.O. Box 26424* ● *Prescott Valley, Arizona 86312-6424*
*Phone (520) 772-5760* ● *Fax (520) 772-5860*



**EXHIBIT**

*C*

August 29, 1997

Mr. Gregory W. Moeller, Attorney
RIGBY, THATCHER, ANDRUS,
RIGBY, KAM, & MOELLER, *Chartered*
Post Office Box 250
Rexburg, Idaho   83440-0250

*Re: 9704CR (Grube v. State of Idaho – Fremont County Case # SP 95-00172)*

## REPORT OF FORENSIC DOCUMENT ANALYSIS

### Questioned Document:

**Item Q1:** An Ashton Police Department Daily Log, dated 6-3-83, bearing text purportedly produced by Officer Sebek. The primary portion of questioned text is contained in the "End Mileage, Start ", and Total (mileage) lines of the form, located in the upper left corner of the page.

### Known Documents:

**Items K1A-V:** Twenty-two original Ashton Police Department Daily Log forms, dated 6-2-83, and 6-4-83 through 6-29-83, respectively, bearing known handprinted and numerical entries, purportedly all executed by Officer Sebek.
**Items K2A-E:** Five original Daily Log forms, described as above, dated 6-5-83, 6-12-83, 6-13-83, 6-13-83, & 6-19-83, respectively, bearing known handprinted and numerical entries, purportedly all executed by Officer Steve Brood.

### Examination Requested:

**1.** Determine whether or not any of the numerical entries in the "End Mileage" & "Total Mileage" lines of Item Q1 have been altered.
**2.** Determine authorship of the alterations, if any are discovered.
**3.** Determine if all the numerical and handprinted entries displayed in the texts of each known document, described above Items K1A-V and K2A-E, were produced by each respective Officer, as described when the documents were received by Mr. Moeller, thereby determining whether either Officer had ready access to the other's Daily Logs.

### Results of Analysis:

Examination and comparison of Item Q1 ( Sebek - 6-3-83) with Items K1A-V (Sebek) and K2A-E (Brood) resulted in the following conclusions and observations:

### CONCLUSIONS:

1. The numerical entry "96069" displayed on the "End Mileage" line of Item Q1 *has been altered.*
   a. Based on a stereomiscroscopic examination of the questioned numerical entry, and on the size, style, and height ratios of Officer Sebek's numerals '5' and '6', it was concluded the second *six* in the series "96069" was originally a numeral *five.* Therefore, an additional ten miles of vehicle usage was logged for this vehicle, under Officer Sebek's name, due to the alteration.

2. The "Total" (mileage) line, however, was *not* altered. This line had been blank when the entry "41" was introduced onto it.
   a. This numerical entry "41" was *not* executed by Officer Sebek. It is of a variant style.
   b. This particular entry "41" is identified as having been executed by the maker of Items K2A-E (Officer

Page Two
9704CR
August 29, 1997

### Results of Analysis (Continued)

3. Regarding the purportedly known handprinted and numerical entries displayed on Items K1A-V and K2A-E, whomever was informed that each Officer (Sebek & Brood, respectively) had executed all the entries displayed in the texts of each of these document has been slightly misinformed.

    a. Item K1A (Sebek's document): The "Start Mileage" line "95968" was executed by Officer Brood, *not* Sebek.

    b. Item K2A (Brood's document): The entries "Brood"; "06-05-83"; "Sun."; the Start Mileage "96139"; the "Start Shift" time "04:30"; and the word "Work" were written by Sebek, *not* Brood.
        1. Ergo, each officer had access at times, to the Daily Logs of the other.

### OBSERVATIONS:

1. Using a Kinderprint Electrostatic Indentation Materializer (EID), indentations were detected on Items Q1, and K1A-C. As I do not have access to transcripts and other foregoing testimony and evidence in this case, the EID-lifts are being submitted to Mr. Moeller, for his staff to investigate.
    a. Among other elements of indented information, some of the EID-lifts display several of Officer Brood's Daily-Log entries indented onto Officer Sebek's documents, again indicative Officer Brood had access to Officer Sebek's documents.

    b. Other indentations display a list of activities that occurred, dated through August 8, 1983, more than two months past the date of Item Q1 (6-3-83).

2. The original Daily log of Officer Brood, for the same date as Item Q1 ( June 3, 1983), was previously requested. I believe, in light of the altered condition of Item Q-1, it is reasonable that Officer Brood's Daily Log for that date, and for 6-4-83 might also contain evidence of having been altered to correspond with and support Item Q-1. Although requested, that document was not submitted for analysis. Examination of that document might prove productive.

### Chain-of-Custody-of-Evidence:

The original evidence described above, Items Q1, K1A-V, and K2A-E were received From the Fremont County Sheriff's Department on April 8, 1997, via U.S. Postal Certified Mail #Z 708-673-371, Return Receipt Requested. The evidence has been reproduced to facilitate production of court charts, illustrative of the elements of this analysis, should the necessity arise. Two charts are being submitted with this report, to briefly illustrate the alteration of Item Q1, and the identification of Officer Brood. This documentation will be submitted to Mr. Moeller via U. S. Postal Certified Priority Mail #Z 064-083-540. The original evidence will be returned to Deputy Kurt Hillman, Fremont County Sheriff's Department via U. S. Postal Certified Priority Mail #Z-064-083-541, Return Receipt Requested.



J. L. Hale, Jr. D-ABFDE
Forensic Document Analyst