Dennis Benjamin
NEVIN, BENJAMIN & McKAY LLP
P.O. Box 2772
303 W. Bannock
Boise, Idaho 83701
(208) 343-1000

Attorneys for Petitioner

## IN THE UNITED STATE DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RAULAND J. GRUBE, | ) | No. CV01-357-S-BLW |
| Petitioner, | ) ) | |
| | ) | PETITIONER'S |
| vs. | ) | BRIEF RE: ACTUAL INNOCENCE |
| | ) | |
| JOE KLAUSER, et. al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Pursuant to this Court's Order of January 24, 2003, Petitioner Rauland Grube submits the

following in support of his argument that his attorney's failure to timely file his petition for a writ of

habeas corpus may be excused because he is actually innocent of the crime for which he is being held in

custody.

## I. ACTUAL INNOCENCE EXCUSES THE UNTIMELY FILING OF AN AEDPA PETITION.

A good place to start is with this Court's order, wherein it noted: "After the parties filed their

Memoranda in this case, the Ninth Circuit issued its opinion in *Majoy v. Roe*, 296 F.3d 770 (9th Cir.

2002), which suggests that equitable tolling may be available in cases where the petitioner can make a

1 •    PETITIONER'S BRIEF RE: ACTUAL INNOCENCE

ORIGINAL

showing of actual innocence under *Schulp v. Delo*, 513 U.S. 298 (1995)." Order, pg 8. *Majoy*
further noted that the question of "whether surviving the rigors of the [*Schulp v. Delo*, 513 U.S. 298
(1995)] gateway has the consequence of overriding AEDPA's one-year statute of limitations [is a] legal
question not yet decided by this Circuit or the Supreme Court. If the answer to this question is in the
affirmative, then his otherwise-barred claims must be heard on the merits." *Id*, at 776.

This Court should hold that the "actual innocence" or "miscarriage of justice" gateway to
overcome a procedural default, as articulated in *Schlup v. Delo*, 513 U.S. 298 (1995), is a basis for
equitable tolling in Mr. Grube's case and order further proceedings in this case, including discovery and
an evidentiary hearing. The "miscarriage of justice" exception applies in extraordinary instances when a
constitutional violation probably has caused the conviction of one innocent of the crime. *See*
*McCleskey v. Zant*, 499 U.S. 467, 494 (1991). The miscarriage of justice exception is a judicially-
created doctrine which was originally formulated to provide relief to certain classes of habeas
petitioners whose claims would otherwise be barred either because they failed to present their claims in
state court and can no longer do so (procedural default) or because they already have pursued habeas
relief in federal court (successive petition/abuse of the writ). *See, Sawyer v. Whitley*, 505 U.S. 333,
338-39 (1992).

District Judge Rafeedie has found that the miscarriage of justice exception is available to
overcome a timeliness bar in an appropriate case. *United States v. Zuno-Arce*, 25 F. Supp.2d 1087,
102 (C.D. Cal. 1998), *aff'd on other grounds*, 209 F.3d 2095 (9th Cir. 2000). While this holding
has not yet been adopted by the United States Supreme Court or by any federal circuit court, at the

same time, no circuit court has held that it does not apply.[1] Notwithstanding the above, Judge

Rafeedie's order in *Zuno-Arce* is well-reasoned and Petitioner discusses it in detail below.

In *Zuno-Arce*, the petitioner filed an untimely motion for new trial. The court construed it as a

section 2255 motion, which was also untimely. Zuno-Arce thus sought an extension through the

"miscarriage of justice gateway." *Id.* at 1099, The district court explained that

> The miscarriage of justice gateway first identified by a plurality in *Kuhlman v. Wilson*,
> 477 U.S. 436, and then delineated in *Schlup v. Delo*, 513 U.S. 298 (1995) is a limited
> exception to the rule that a court will not consider pre-AEDPA habeas petitions or
> motions that are abusive, successive, or procedurally defaulted. *Under the gateway, a*
> *court may review otherwise-barred constitutional claims where the movant*
> *makes a colorable showing of actual innocence, i.e., 'persuades the district court*
> *[that it is more likely than not] that, in light of ... new evidence, no juror, acting*
> *reasonably, would have voted to find him guilty beyond a reasonable doubt.'*

*Zuno-Arce*, 25 F. Supp.2d at 1099, citing *Schlup v. Delo*, 513 U.S. at 329 (emphasis added).

> 'Actual innocence' in habeas jurisprudence refers to a means by which petitioners can
> avoid certain procedural bars to having their habeas petitions considered on the merits.
> As described by the Supreme Court, the type of actual innocence claim asserted by
> petitioner in this case 'is not itself a constitutional claim, but instead a gateway through
> which a habeas petitioner must pass to have his otherwise barred constitutional claim
> considered on the merits.' *Schlup v. Delo*, 513 U.S. at 314.

The *Zuno-Arce* court noted that the statute of limitations was not a jurisdictional bar and

believed that the "statute of limitations is similar in a sense to the procedural default doctrine, which bars

habeas review of constitutional claims that a movant has failed to present at procedurally required

opportunities, such as at trial." Id. at 1099-1100 (citations omitted).

---

[1] In *Felder v. Johnson*, 204 F.3d 168, 171 and n.8 (5th Cir. 2000) the court did not discuss
the miscarriage of justice exception per se and simply said that "Felder's actual innocence claim also
does not constitute a 'rare and exceptional' circumstance, given that many prisoners maintain they are
innocent" and "Felder has not made a showing of actual innocence, as the district court noted."

[I]n deciding whether to extend the gateway to overcome the procedural bar of a statute of limitations, the Court also bears in mind that to bar a claim of actual innocence on an accused's first motion to vacate implicates serious constitutional concerns. 'Dismissal of a first federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty.'

*Zuno-Arce*, 25 F. Supp.2d at 1100, citing *Lonchar v. Thomas*, 517 U.S. 314, 324 (1996).

The *Zuno-Arce* court held that "to foreclose a claim of constitutional violation where there has been a colorable showing of factual innocence would likely constitute a due process violation or an improper suspension of habeas corpus relief." *Id.* at 1102. Thus,

An otherwise-[time]barred constitutional claim, and the evidence to support it, may be considered if the movant produces reliable new evidence not admitted at trial which demonstrates that it is more likely than not that no reasonable juror would have convicted him.

*Zuno-Arce*, 25 F. Supp.2d at 1102, citing *Schlup v. Delo*, 513 U.S. at 326-28.[2]

One of the cases that *Zuno-Arce* found to be "well-reasoned and thorough" was *Alexander v. Keane*, 991 F. Supp. 329 (S.D.N.Y. 1998). In that case, the district court found that the "petitioner has not made a colorable showing of actual innocence, and therefore does not need to reach the difficult constitutional issues . . . " *Id.* at 341. Nevertheless, the court reviewed the Supreme Court's various rulings on "actual innocence" in great detail and emphasized that "the Supreme Court has long

---

[2] The court ultimately concluded that Zuno-Arce had not presented any evidence that would meet the *Schlup* standard of "actual innocence" and dismissed the § 2255 motion. 25 F. Supp.2d at 1109 and 1123. On appeal, the COA was limited to whether the "period of limitation operates to exclude specific facts that the defendant believes entitle him to an evidentiary hearing." This Court did not rule on the miscarriage of justice issue and upheld the denial of an evidentiary hearing because any evidence Zuno-Arce had to support his allegations was "speculative." *United States v. Zuno-Arce*, 209 F.3d 1095, 1102-1103 (9th Cir. 2000).

noted that concern about the injustice that results from the conviction of an innocent person has long

been at the core of our criminal justice system." *Id.* at 338, *citing Schlup v. Delo*, 513 U.S. at 324 and

*O'Neal v. McAninch*, 513 U.S. 432 (1995) (describing as a "basic purpose underling the writ," the

correction of an error "that risks an unreliable trial outcome and the consequent conviction of an

innocent person.").

 *Alexander v. Keane* also pointed out that "the Supreme Court has often justified pruning back

the scope of federal habeas review by cutting away those aspects which do not bear on actual

innocence." 991 F. Supp. at 338, *citing e.g., Teague v. Lane*, 489 U.S. 288, 312-13 (1989)

[retroactivity on collateral review] and *Stone v. Powell*, 428 U.S. 465, 491 (1976) [Fourth

Amendment claims not cognizable on habeas review because petitioner 'is usually asking society to

redetermine an issue that has no bearing on the basic injustice of an incarceration' and does not remove

a 'safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty.'].

> The point of the discussion is this: If there is any core function of habeas corpus – any
> constitutionally required minimum below which the scope of federal habeas may not be
> reduced – it would be to free the innocent person unconstitutionally incarcerated. Thus
> ... does the Suspension Clause require that an exception for actual innocence be made
> to the AEDPA statute of limitations? – translates into the more basic question. Does the
> Suspension Clause require Congress to provide any federal habeas relief for state
> prisoners whatsoever?

*Alexander v. Keane*, 991 F. Supp. at 338.[3]

---

 [3] The *Alexander* court further noted that whether the statute of limitations could be forgiven by
claims of actual innocence was "an extremely difficult question, implicating as it does some of the most
fundamental and fiercely contested issues of constitutional law – relations among the three branches of
the federal government, and the balancing of individual liberty interest against society's need for a
criminal justice system that at some point rests in its adjudication of guilt. The Supreme Court itself
avoided these questions in *Felker v. Turpin*, 518 U.S. 651 (1996) ...." 991 F. Supp. at 338.

The court ultimately found that the petitioner could not meet the test set out in *Schlup v. Delo*, 513 U.S. at 323-27. In *Schlup*, the "Supreme Court clarified its earlier cases, and held that in a habeas petition challenging a conviction, the *Carrier*[4] standard applied, while in a challenge to capital sentencing, the *Sawyer*[5] standard applied." *Alexander v. Keane*, 991 F. Supp. at 339.

> *Schlup* cited two reasons for distinguishing between the two standards. First, it noted that claims of actual innocence of crime are much less likely to be successful than a challenge to a capital sentence, and thus 'the threat to judicial resources, finality, and comity posed by claims of actual innocence ... is significantly less than that posed by claims relating only to sentencing.' [513 U.S. at 324]. Second, the Court felt that the injustice of executing (or incarcerating) one innocent of the crime is greater than imposing a too-severe sentence upon one who is factually guilty, and therefore 'the overriding importance of this greater individual interest merits protecting by imposing a somewhat less exacting standard of proof .... [513 U.S. at 325]. This reasoning would be no less applicable in overcoming a statute of limitations here than in overcoming the various procedural bars in *Schlup*, and thus this Court will evaluate the instant petition's claims under the *Carrier* standard, as explicated in *Schlup*.

*Alexander v. Keane*, 991 F. Supp. at 339.

> Under *Schlup*, "the petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" .... the Court emphasized that this is a question of actual innocence, and thus 'the district court is not bound by the rules of admissibility that would govern at trial' but instead 'must make its determination .... in light of all the evidence, including that alleged to have been illegally admitted .... [or] wrong excluded or to have become available only after the trial.

*Alexander v. Keane*, 991 F. Supp. at 339, citing *Schlup*, 513 U.S. at 327-28.

---

[4] In *Murray v. Carrier*, 477 U.S. 478, 496 (1986) the "Supreme Court defined actual innocence as a showing by an otherwise-barred petitioner that a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Alexander v. Keane*, 991 F. Supp. at 339.

[5] In *Sawyer v. Whitley*, 505 U.S. 333, 348 (1992), the Supreme "Court held that 'actual innocence' in the capital sentencing context required that the petitioner show 'by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty ...." *Alexander v. Keane*, 991 F. Supp. at 339.

6 •   PETITIONER'S BRIEF RE: ACTUAL INNOCENCE

The *Schlup* burden, it should be noted, is not whether no reasonable juror could find petitioner guilty, and is therefore less than the insufficiency of evidence standard of *Jackson v. Virginia*, 443 U.S. 307 (1979) [citing *Schlup*, 513 U.S. at 330]. It is, however, a significantly higher burden than showing prejudice, which only requires a reasonable probability that the factfinder would have reasonable doubt, and moreover is evaluated only in light of the evidence that should have properly been before the factfinder. In order to pass through the actual innocence gateway, a petitioner's case must be 'truly extraordinary.'"

*Alexander v. Keane*, 991 F. Supp. at 339, citing *Schlup*, 513 U.S. at 327.

Subsequent to *Alexander v. Keane*, 991 F. Supp. 329, a number of federal district courts have "'assumed' that actual innocence would excuse non-compliance with the AEDPA's statute of limitations." *See, Neuendorf v. Graves*, 110 F. Supp.2d 1144, 1157 (N.D. Iowa, 2000).

In *Neuendorf*, the district court concluded that "'actual innocence' can overcome the procedural default of timeliness requirements, even as timeliness is now codified under the AEDPA in 28 U.S.C. § 2244(d)(1)," *Id.* at 1156, but found that the petitioner had not made a sufficient showing of actual innocence to forgive the untimeliness bar. *Id.* at 1160-62. Nevertheless, the court engaged in an extensive review of the decisions of other courts, noting that "several Circuit Courts have *suggested* that the 'actual innocence' gateway must remain open, notwithstanding the AEDPA's express time limitations, to avoid rasing serious constitutional questions." *Id.* at 1156 (emphasis added). Because the petitioners in those cases had not made an adequate showing of "actual innocence" the Courts of Appeal only suggested but did not actually hold that the miscarriage of justice exception applied to the AEDPA's statute of limitations. *See e.g. Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 108 (2nd Cir. 2000) ("Because we conclude that Lucidore has not demonstrated 'actual innocence,' we do not reach the question of whether the Constitution requires that we assume the existence of an

'actual innocence' exception to the AEDPA's limitations period"); *Triestman v. United States*, 124

F.3d 361, 378-79 (2d Cir. 1999)[observing without deciding that the denial under AEDPA of

collateral review to a party claiming actual innocence could raise serious Eighth Amendment and due

process questions]; *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998) [same]; *In re Dorsainvil*,

119 F.3d 245, 248 (3d Cir. 1997) [same].

In light of the above, it is clear that the emerging consensus of opinion is that the miscarriage of

justice gateway, to overcome a procedural bar, as clarified in *Schlup v. Delo*, 513 U.S. 298, does

permit an otherwise time-barred habeas petition to be decided on the merits where the petitioner makes

a showing that his claim of a constitutional violation has probably resulted in the conviction of one who

is actually innocent.

*Zuno-Arce,* however, is not the only case which finds that a showing of actual innocence

excuses an untimely petition.  More recently, District Judge Aiken wrote that an "'actual innocence'

exception to the habeas corpus statute of limitations is a logical extension of the Supreme Court's well-

established rule that a habeas petitioner may circumvent a 'procedural default' by proving his 'actual

innocence.'" *O'Neil v. Lampert* 199 F.Supp. 1064, 1066 (D. Oregon 2002).

> When a federal court on habeas corpus review applies the "actual innocence"
> exception to circumvent a procedural default regarding a state procedural rule
> (including a state statute of limitations), the federal court necessarily transgresses
> principles of federalism and comity as well as the principle of 'finality' in criminal cases.
> However, due to the prisoner's actual innocence, such important principles must give
> way to justice. *When an innocent state court prisoner's violation of the federal
> habeas corpus statute of limitation is at issue, the federalism and comity interests
> are not nearly as strong as when a state court must forgive an innocent prisoner's
> procedural default of a state's habeas corpus statute of limitations. Therefore, I
> find that it is reasonable to provide the same protection to a state prisoner who
> procedurally defaults by failing to meet a state statute of limitations' filing*

> *deadline as to a state prisoner who fails to meet the federal statute of limitations'*
> *filing deadline.*

*Id* (emphasis added).

This logic seems to Petitioner to be incontrovertible. Since the federal court may forgive a petitioner's failure to met a statute of limitations in state court upon a showing of actual innocence, it must follow that it may forgive a petitioner's failure to meet the AEDPA statute of limitations upon the same showing. *See, Kaufman v. United States*, 394 U.S. 217, 228 (1969) ([T]here is no reason to ... give greater preclusive effect to procedural defaults by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations."). *See also, Holloway v. Jones*, 166 F.Supp.2d 1185 (E.D. Michigan 2001).[6]

For all the reasons expressed above, this Court should also find that an actual innocence exception to the AEDPA one year statute of limitations exists.

## II. MR. GRUBE IS ACTUALLY INNOCENT OF FIRST DEGREE MURDER.

The *Majoy* Court remanded that case to the district court with the following instructions:

> We note that "it is not the district court's independent judgment as to whether reasonable doubt exist," [in determining whether the petitioner is actually innocent] but whether "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329, 115 S.Ct. 851. In this regard, the "habeas court must make its determination "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to

---

[6] The District Court in *Holloway* concluded "that to utilize the one year statute of limitations contained in the AEDPA to preclude a petitioner who can demonstrate that he or she is factually innocent of the crimes that he or she was convicted of would violate the Suspension Clause contained in U.S. Const. Art. I, § 9 cl. 2, as well as the Eighth Amendment's ban on cruel and unusual punishment. The Court therefore holds that an actual innocence exception exists to the statute of limitations contained within §2244(d)(1)." *Id*, at 1190.

any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial.'" *Id.* At 328, 115 S.Ct. 851 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments* 38 U. Chi. J.Rev. 142, 160 (1970).

296 F.3d at 778.[7]

Petitioner presents below the facts presented at trial, the facts found at the state post-conviction evidentiary hearing and additional evidence which was either newly discovered or wrongfully excluded at trial. When all those facts are evaluated, the Court will conclude that the Petitioner is actually innocent under *Schlup*.

## A. *The Evidence Presented at Trial.*

In the early morning hours of June 4, 1983, Amy Hossner was fatally shot with a shotgun as she was lying asleep in her bed. Amy's bedroom was in the basement of her parent's house located in Ashton, Idaho and the shot was fired through a window next to an alley way. The shot went through a double-paned window and also through heavy curtains. T. Vol. V, pg. . It is clear that Amy did not know there was anyone outside her window because the curtains were drawn shut and she was laying on the bed when the shot was fired. There is no eyewitness to the shooting, nor is there any motive for the shooting, although Amy's mother and father testified that Amy was getting telephone calls from someone named "Jack" and that these telephone calls bothered Amy. Tr. Vol. V, pg. 820-21.

Although Amy's family was present in the home at the time of the shooting, no one heard the shotgun fire, or even anything unusual. Tr. Vol. V, pg. 804. In fact, Amy's sister was sleeping in the room directly next to Amy's and even she did not hear the shot. A neighbor testified that she thought

---

[7] The *Majoy* case is still before the district court pending an evidentiary hearing.

she heard a shot at approximately 4:24 a.m. and shortly afterwards heard a loud vehicle leaving the scene. (Tr. Vol. V, pg. 803-08, 840-42).

Because no one in the Hossner family had heard anything unusual during the night, the police were not called until around 11:00 a.m., approximately eight and one-half hours after the shooting, when Amy's father discovered her. Tr. Vol. V, pg. 805-6. While waiting for the police to arrive, the family discovered that all of the electronic clocks in the house were approximately 45 minutes slow. Tr. Vol. V, pg. 807.

The police examined both the bedroom and the alleyway from where the shot was fired. The police found several fingerprints on a power box in the alley. None of these fingerprints belonged to Petitioner. Tr. Vol. VIII, pg. 1396-97. There was one fingerprint belong to Police Chief Ed Sebek[8] and other prints were found that have yet to be identified. Tr. Vol. VIII, pg. 1393-4; 1397. It was believed that the shooter had turned off the power to the house before firing the shot, but returned later to turn the power back on. It appears that Amy had fallen asleep with her light on and it was still on at 11:00 a.m. Tr. Vol. V, pg. 808.

While examining the broken window, the police discovered what they described as a "small dent" on the top of the window frame. Tr. Vol. V, p. 893. There are several photographs taken at that time, which show investigators pointing to the location of the dent. Nevertheless, the window frame was not immediately taken into evidence and probably remained on the house for six months after the

---

[8]  After the trial in this case, Police Chief Sebek was twice convicted of a serious felony. The first was an aggravated battery in Butte County. The second felony was for Lewd and Lascivious Conduct on a Minor Under Sixteen, for which Chief Sebek is now serving a prison sentence.

incident. Tr. Vol. V, pg. 912-14.

Due to the nature of the wound, it was initially believed that a sawed-off shotgun was used. Tr. Vol. V, p. 892, l. 5-23. The police later obtained two weapons from Stephan Brood, an Ashton police officer and the main suspect in this case for much of the investigation. One of the weapons obtained from Officer Brood was an illegal sawed-off shotgun. A search warrant was obtained to Brood's residence. Vol. VI, pg. 997-98.

On July 14, 1983, the Petitioner reported his shotgun stolen to the police. It was later discovered that his shotgun had not been stolen, but had been hidden by his father who did not allow guns in their home. His father and brother turned over the shotgun to the police. Vol. VI, p. 1044; Vol. IX, pg. 1593-94. Petitioner's shotgun shells were also voluntarily turned over to the police.

Officer Brood's two shotguns, along with the Petitioner's shotgun, were sent to the Bureau of Alcohol, Tobacco and Firearms and tested by Ed Peterson, a firearms examiner. Tr. Vol. VII, pg 1255. Mr. Peterson recreated the crime scene by test-firing the weapons through glass and curtains. Tr. Vol. VIII, pg. 1265-1266; 1349. His conclusions were: 1) that the Petitioner's gun could not have made the pattern on the decedent's body and 2) both of Brood's shotguns made a shot pattern consistent with the fatal wound. Tr. Vol. VII pg. 1269-1274.

Officer Brood was never charged with the offense.

More than seven years later, in December of 1990, the Fremont County Sheriff's Office was contacted by Brenda Fredrickson Briggs. She reported that approximately one month after Amy's death she had spoken with the Petitioner. He told her that he had spoken with Amy on the evening she was shot. He left after agreeing to meet Amy the next morning at church. He also told her that he went

12 •   PETITIONER'S BRIEF RE: ACTUAL INNOCENCE

the next morning to the church and waited for Amy to show up.  When she did not arrive, he went to her house, looked in the window and said that he had never seen so much blood in his life."

We know, however, that these statements, even if they were made, were false.  First, as noted above, the photographs taken in Amy's bedroom show that no one could have looked in the windows because the curtains were drawn shut (the shotgun pellets frayed the curtains, but did not knock them open) and that there was not a great deal of blood in the room.[9]  In fact there was surprisingly little blood.  Second, we know that Petitioner did not go to either the church or to Amy's house in the morning because the evidence is undisputed that Petitioner was unexpectedly called into work that morning and that he left his house for work at about 9:00 a,m.  *See,* Tr. Vol. VII 1246 (testimony of Officer Russ Reneau). (As discussed below, it is discovered after the trial that Petitioner learned of Amy's death while at work and that he is both surprised and upset at the news.)

In a subsequent interview with the police, the Petitioner admitted that he had told this story to Ms. Briggs, but he denied that he had actually been at the scene.  He said that this story was untrue and merely an attempt to impress her because he had been a friend of the decedent.  Trial Exhibit 37.

Ms. Briggs also indicated that she had gone for a drive with the Petitioner several years later and he had asked if Amy had ever mentioned him.  Ms. Briggs waited more than eight years to bring forth this evidence and attributed the delay to her lack of "maturity" at the time and because her mother said that Petitioner was just "doing things to get my attention."  Tr. Vol. VII, pg. 1178-82, p. 1186, pg.

---

[9]  When the state's firearms examiner Martin Ols test fired the weapon through a window frame and curtains, he did not pull the curtains shut.  He explained he opened the curtains "so I can see what I was shooting."  Tr. Vol. VIII, pg 1461.  The state never explained how the shooter was able to know where he was shooting when Mr. Ols was not able to see through similar curtains.

1188-95.

Juliette Bruner testified that she was approximately Amy's age and that she had a boyfriend who was a friend of Petitioner and approximately the same age.  Tr. Vol. VII, pg. 1161.  Petitioner was 19 and Amy was 15.  Ms. Bruner said that Petitioner asked her to mention him to Amy on a couple of occasions because he thought she was cute.  Tr. Vol. VII pg. 1156-7.  In fact, it appears that Amy was a cute girl, who was popular in school and on the drill team.  Tr. Vol. VII, pg 1163.  Sometime after Amy's death, Petitioner told Ms. Bruner that he thought it horrible that Amy had been killed and that he couldn't believe Amy was dead.  Tr. Vol. VII, pg. 1158.  Ms. Bruner testified that she thought Petitioner was sad about Amy's death, that she has had conversations with Petitioner on topics other than Amy and that these conversations about Amy did not alarm her or cause her to go to the police.  Tr. Vol. VII, pg 1162.

Chad Perry testified that the Petitioner wanted him to find out if a young woman liked Petitioner.  He asked Mr. Perry to arrange for a girlfriend of his to call the young woman and say her name was Amy.  However, it turns out that "Amy" is the name of one of the friends of the young woman and this request occurred approximately eight years after the shooting.  Tr. Vol. VII, pg. 1232-33.  When Mr. Perry couldn't make the arrangements to do so, the Petitioner said "Then, don't worry about it.  That's fine."  Tr. Vol. VII, pg. 1230.

Johnna Sans testified that Petitioner had told her in1983 that she reminded him of Amy, Tr. Vol. VII, pg. 1203, and that he was an officer for the Ashton Police Department investigating the case.  He made statements to her to the effect that the shots inside the bedroom were not meant to kill Amy, but only to scare her.  Tr. Vol. VII, 1204; 1222.  He also stated that he wished to solve the case to avenge

14 •    PETITIONER'S BRIEF RE: ACTUAL INNOCENCE

Amy's death but he wasn't actually investigating the case. Petitioner never told her that he wanted to kill Amy or that he had any bad feelings towards her. Tr. Vol. VII, 1221. On several occasions he told her that she knew too much about the murder. He seemed to be upset when he said that. Tr. Vol. V, p. 1202-04. However, his statements about the shooting actually show that Petitioner was misinformed about the facts because there was only a single shot fired into the bedroom, not multiple shots as he stated.

The Petitioner never suggested that he had anything to do with the shooting in any of these conversations. Tr. Vol. VII, p. 1152-68, p. 1220-23, p. 1228-37.

In late 1990, the window frame and shotgun were re-examined. Upon re-examination, the police noted ten readily apparent fresh-looking marks in the window frame which apparently corresponded with Petitioner's shotgun. Tr. Vol. V, p. 896-97. *However, in 1983 several law enforcement agents had examined or handled the window frame and none of them recalled seeing the markings,* Tr. Vol. VII, pg 1141, *even though the mark is right next to the "dent" which was noted in the reports and is, in fact, much larger than the dent itself. See testimony of* Jim Mason, Tr. Vol. VI, pg. 1076 ("I was surprised [to learn of the mark]"); Burt Bates, Tr. Vol. VI, pg. 1006 ("I didn't see those tool marks.") ; Ed Sebek, Tr. Vol. V, pg. 895-6 ("I never noticed them before and I couldn't believe that I didn't see them before."); Bob Perez, Tr. Vol. VI, pg. 1046 (I can't recall seeing those marks on it when I looked at it, no."); Steve Watts, Tr. Vol. XI, pg. 1749.).

Deputy Bates admitted that the mark is "unique" and is not difficult to spot, Tr. Vol VI 1006-07, yet when he inspected the trim he did not see it, even though he saw the dent right next to it. In fact, when he sent the trim to Ed Peterson for evaluation he sent a letter informing Mr. Peterson that he

had outlined where the spot where the dent was because it "was difficult to locate." Brown paint and aluminum was also discovered on the barrel of the shotgun in 1991. Tr. Vol. IX, p. 1532.

This new evidence was re-evaluated and sent to the FBI. Among other findings, the FBI concluded that it was impossible to determine when the mark was made. Tr. Vol., IX, pg 1558.

Two photographs of the Petitioner's shotgun were produced: one taken in February, 1991 by the FBI and the other taken on August 22, 1991 by the defense. See, State's Exhibit 50 and Defendant's Exhibit CC. These photos show that additional brown paint appeared on the barrel over the six month period. It is important to note that no photographs of Petitioner's shotgun were taken between 1983 and late 1991. FBI Agent David Nichols testified that the paint on the shotgun barrel was the same color as the paint on the trim, but he could not say that it was the same paint. Tr. Vol. IX, pg. 1563: 1568-69.

The State conducted multiple shotgun tests attempting to recreate the pellet pattern on the victim. (Exhibits 39, 40, 46-48, 55, O, P, Q, R, LL, MM and NN). These shotgun tests, one of which was conducted after the trial commenced, either proved inclusive or actually supported the defense's theory that the pattern was not the same on the decedent's body as would be created by Petitioner's gun. Tr. Vol. VIII, p. 1335-37; 1389. The tests showed that Petitioner's gun consistently made a "collective entry wound" while Dr. Fantelli's autopsy confirmed there was no collective entry wound. Since Petitioner's shotgun was a full choke model, it would be expected to fire with a tight shot pattern. However, the wound here was not of that type. Tr. Vol. VII, p. 1296-1305; Tr. Vol. VIII, p. 1445-48; Exhibit N.

Ed Peterson testified that the State's first shotgun tests were "irrelevant to anything that

happened at the crime scene" because, in part, they did not recreate the conditions of the actual

shooting, such as shooting through a window and curtains and never created a valid matching pattern

with Petitioner's gun. Tr. Vol. VIII, pg 1351.

Mr. Peterson's testimony also called into question the reliability of the state's evidence about

the newly discovered brown paint and markings on the window frame. First, he was asked back in

1983 to look for brown paint on any of the guns and he reported that no brown paint appeared on the

Petitioner's shotgun. Tr. Vol. VI, p. 1089-90; Vol. VIII, pg. 1365. When he was asked to reexamine

the gun in 1991, he noted a transfer on the barrel of aluminum and on "the surface of the aluminum was

a small transfer of brown paint." Tr. Vol. VIII, pg. 1277.

Mr. Peterson then compared the markings on the window frame with Petitioner's gun. His

opinion was that the mark on the trim was made by ribbing on the top of the barrel of Petitioner's gun,

Tr. Vol. VIII, pg 1284, but it was not made by the barrel striking the window in an upward motion, as

it would have as a result of the recoil from firing the weapon. (In this regard, it is important to

remember, however, that while Mr. Peterson believes Petitioner's gun made the mark, he also believes

that Petitioner's gun was not the one used in the shooting.) Another state expert, FBI Agent John

Lewoczko, testified only that the mark could have been made by Petitioner's gun or another shotgun of

the same make and model. Tr. Vol. IX, pg. 1545.

Mr. Peterson was the only witness who conducted test firings to see if a similar mark could be

made by impact (called an "impressed mark") as opposed to by scraping (called a "striated" mark).

He was able to produce the mark found on the window frame most closely "by taking the barrel and

the aluminum strip and scraping the rib of the barrel against the aluminum strip."   Tr. Vol. VIII, pg.

1297.  Additionally, Mr. Peterson testified that the angle of the mark on the window frame was such

that the shotgun would have had to have been facing away from the actual angle of the shot.  Tr. Vol.

VII, pg. 1300.[10]

Mr. Peterson's opinion was that the mark was made by the gun being "forcefully scraped

against the surface of the aluminum in a certain direction." Tr. Vol. VII, pg. 1281.  Agent Lewoczko,

also opined that the mark was "made by a sliding or a slipping action." Tr. Vol. IX, pg. 1542.

Finally, Mr. Peterson noted that a single impact could not have caused the mark because there

was brown paint on top of the aluminum found on the gun.  Since the window frame was made of

aluminum painted brown, the gun would have had the paint next to the barrel and the aluminum on the

top of that, if there was a single impact against the frame from the recoil. Instead, brown paint was

found on top of the aluminum.  Thus, the most logical explanation is that the barrel came into contact

with the frame a second time, Tr. Vol. VIII, pg. 1319, and a second contact was more likely to occur if

the mark was caused by scraping rather than an impact.  Tr. Vol. Pg. 1322.  During his test firings, the

barrel never came into contact with the frame more than once.  Tr. Vol. VIII, pg. 1321.

To summarize, Peterson testified that the mark could not have been made as a result of the shot

because: 1) it was a striated mark and not an impressed mark; 2) the gun was facing a different angle

when the gun was fired from when the shot was made; 3) there must have been more than one contact

with the frame because of the presence of brown paint on top of the aluminum; and 4) he did not see

the brown paint and aluminum when he first examined the gun in 1983.  All this of course leads to the

_____

[10]  Agent Wilkes testified that the angle of the mark did not eliminate the possibility of it being
made by recoil.  T. Vol. X, pg. 1870, but he did not conduct any firings to test his hypothesis.

conclusion that the mark on the window frame was placed there by the police sometime after the

shooting. As Mr. Peterson noted: "if the mark cannot be reproduced by test firing, then, you have to

start looking at how the mark was made by something other than recoil." Tr. Vol. XI, pg. 1729.   It

should be recalled that Mr. Peterson was the state's witness at trial.

Gerald Wilkes, an FBI agent, also conducted tests of the weapons and disagreed with Mr.

Peterson about the necessity of testing the weapons by firing them under the same conditions as at the

crime scene. Tr. Vol. VIII, pg. 1491. It was also Agent Wilkes's opinion that "there is no scientific

basis to eliminate a 12-gauge shotgun from having produced the shot pattern in this particular case."

Tr. Vol. VIII, 1499. Thus, Petitioner's shotgun was only one of all the 12 gauge shotguns in the world

which could have fired the shot. Finally, he testified that his test firing had "very little significance in

terms of this particular case." Tr. Vol VIII, pg 1502.

FBI Agent John Riley testified that he compared shotgun pellets taken from the crime scene to

those taken from Petitioner's shotgun shells. He concluded that "the composition of the elements found

at the crime scene . . . were pretty much the same as the pellets from [Petitioner's] shot shells." Tr.

Vol. IX, pg 1525. Thus, "they all could have been manufactured by Remington-Peters on or about the

same date. " Tr. Vol. IX, pg 1526. That being so, it was possible that "they could have come from the

same box of ammunition." Tr. Vol. IX, pg. 1528. However, there was no way of knowing how many

shotgun shells were manufactured with the same characteristics, but '[i]t could have been several

hundred thousand up to a million." Tr. Vol. IX, pg. 1533. He also testified that Remington-Peters is a

common brand of shells and that it was true that shotgun shells manufactured on the same day would be

packaged together and shipped to the same location. Tr. Vol. IX, pg 1534. Thus, other people buying

shotgun shells in the area could also have shells made on the same day as those found at the crime scene. Tr. Vol. IX, pg. 1535.

A tape recording of a police interview with Petitioner was played for the jury. Exhibit 37. The interview took place on January 25, 1991, and lasted for over two hours. Investigator Russ Rencau advised Petitioner of his *Miranda* rights, which Petitioner waived. During the interview Petitioner told the police that he had placed the shotgun in the garage attic to hide it from his father. And, later, when he could not find it up there, he reported it missing to Officer Perez. He did not know that his father had the shotgun until after his dad had given it to the police.

Petitioner also told the police that he had gone to bed around 10:30 or 11:00 on June 3rd because he needed to get up early to go to a softball tournament with his brother and father. He said that the whole family had watched "Taxi" on Channel 3 and then he went to bed. He woke up the next morning at about 6:30.

Petitioner told the police he knew Amy Hossner. Amy's cousin, Todd Hossner, was on the debate team with Petitioner. The Grubes also went to the same church as the Hossners. He had never been inside Amy's house, nor did he know where Amy's bedroom was located. He also told the police that he did not speak to Amy on the night of her death.

Petitioner also told the police that he never took the shotgun over to Amy's house.

Petitioner, as previously noted, admitted telling Ms. Briggs that he had spoken to Amy and that he and Amy had planned to meet at the church the next morning, but he admitted that he had lied about all that to Ms. Briggs because he wanted to get attention from her.

The police officers then confronted Petitioner with photographs of the marks on the window

frame and told him that they were made by Petitioner's shotgun. Reneau said: "I think what's going to happen is that when the experts look at this they're going to say that your shotgun made that mark."

At this point Petitioner says that he thinks "it would be wise to get an attorney right now," but when the investigator says he is going to stop the interview, Petitioner says not to because "he wants to cooperate the best way I can." He then told them again that he did not kill Amy and that he didn't know how the marks could have gotten on the shotgun.

Petitioner presented a two-part defense. First, he could not have been the shooter because his father had hidden the shotgun from him. Second, he was at home with his family at the time of the shooting. The statements in his interview with the police about his whereabouts were corroborated by his family at trial.

Petitioner lived at home with his father, mother, sister and three brothers. Rulon Grube ("Mr. Grube"), Petitioner's father, did not approve of firearms and they were not allowed in his home. In late April or early May of 1983, Rulon Grube came home unexpectedly early from work and saw Petitioner holding a gun. Tr. Vol. IX, pg. 1583. He confronted the Petitioner and told him to get rid of the gun. Tr. Vol. IX, pg. 1584.

When his father returned to work, Petitioner hid the Shotgun in the attic of the garage. The attic was used for storage. Tr. Vol. IX, pg 1585.

A couple weeks later, *i.e.*, early-late May, Mr. Grube was looking in the attic for an innertube and he found the shotgun. Tr. Vol. IX, pg. 1586; 1591. He was upset because his son had disobeyed him, so he took the shotgun and hid it in the crawl space underneath the back porch. Tr. Vol. IX, pg. 1587. He did not tell anyone where he had hidden the gun. Tr. Vol. IX, pg. 1591.

After the shooting, Derek Grube, Petitioner's brother, told Mr. Grube that Petitioner's gun was missing and that Petitioner had reported it stolen to the police. Tr. Vol., 1592-93. Mr. Grube told Derek that he had hidden the gun under the back porch. This was the first time Mr. Grube had told anyone about the location of the shotgun. Tr. Vol. IX, pg 1593. Thus, the shotgun was hidden from Petitioner at the time of the shooting.

The evidence also showed that Petitioner did not find the hidden shotgun because Petitioner told his brother in mid-May that the gun was in the attic. Sometime between May 14th-20th, (about two-three weeks before the shooting) John Grube and his friend, Tracy Gudgel, told Petitioner that they were going up into the attic to get a raft and innertubes to float the river. Petitioner must have believed his gun was still up there because he told them to be careful as the gun was wrapped up in the raft. Tr. Vol. IX, pg 1626; 1629. However, when John Grube and Mr. Gudgel got the raft from the attic, the gun was not there. John Grube assumed that Petitioner had gone up before him and moved the gun. Tr. Vol. IX, pg. 1628. John Grube and Mr. Gudgel went back into the attic on June 17th (two weeks after the shooting) to look for the gun, but it still wasn't there.

On July 16, 1983, after Ed Sebek asked to see the gun, Mr. Grube retrieved the gun from under the porch and turned it over to the police. Tr. Vol. IX, pg. 1594.

Mr. Grube also testified that Petitioner was at home at the time of the shooting. June 4, 1983 was a Saturday and the plan was for Mr. Grube, Derek and Petitioner to go to Rexburg in the morning to play in a softball tournament. Tr. Vol. IX, pg. 1595. The evening before, Mr. Grube went to bed about 11:00 p.m., after he finished watching a situation comedy on the television and Petitioner had already gone to bed by then. *Id.* All the bedrooms in the house are on the second floor and Mr. Grube

saw Petitioner walk up the stairs on his way to his bedroom. That staircase is the only way to get to the second story. Tr. Vol. IX, pg. 1595; 1598-99. Mr. Grube is a light and fitful sleeper, so he arose around 3:00-4:00 a.m. and left the house for the softball tournament around 7:00 a.m. *Id.*

Derek Grube, Petitioner's older brother, shared his bedroom with Petitioner and his other brother, John. Tr. Vol. IX, pg. 1645. On the night before the shooting, both Petitioner and John were in bed asleep when Derek Grube went to bed at 11:15. Tr. Vol. IX, pg. 1646-47. Derek testified that it would be "almost impossible" for someone to leave the room in the middle of the night without waking someone up because: 1) the house was built in 1905 and the "floors creak"; 2) the brothers kept the bedroom door shut and it "makes a loud pop" when it is opened as it was not hung straight, and 3) both his parents and sister also had bedrooms upstairs. Petitioner was still asleep when Derek got up the next morning at about 6:00 a.m. Tr. Vol. IX, pg. 1648.

Petitioner's mother, Doris Grube, testified that she went to bed a little before 11:30 and that her daughter, Sharla Grube, arrived home from work a few minutes later. Tr. Vol. IX, pg. 1664. At about 7:00 a.m. Petitioner's employer telephoned and told her that Petitioner needed to come into work even though it was his day off. Petitioner was already up, looked rested and was excited to be going to the tournament. She passed on the message from his employer and Petitioner went to work at 8:00 a.m. Tr. Vol. IX, pg. 1666-68.

## B. *New or Wrongfully Excluded Evidence.*

After the trial the Petitioner found additional evidence, set forth below, which when considered with the evidence wrongfully excluded from his trial would have led to his acquittal.

1. New evidence of Mr. Grube's surprise and distress upon hearing that Amy Hossner had been shot.

Lynn Gifford testified at the hearing on Petitioner's state conviction petition. Mr. Gifford has known Petitioner for "[m]ost of [his] life." Transcript of Post-Conviction Proceeding ("PC") pg. 26. And, they worked together at the potato warehouse in Ashton. On June 4, 1983, he arrived at work at about a half an hour before Petitioner. When Petitioner arrived at work, he appeared normal to Mr. Gifford. Petitioner was not tired, upset or distraught. PC pg. 26.

At about 10 a.m., work had to stop because of a break down, PC 51, so Mr. Gifford went to the Circle K store in Ashton to get donuts for the workers. When he arrived at the Circle K he saw Steve Brood pulling out of the parking lot. Inside the store, the clerk told Mr. Gifford that Amy Hossner had been shot. He went back to work and told everybody there what he had heard. PC pg. 26.

When Mr. Gifford told Petitioner, Petitioner became very upset. According to Mr. Gifford:

Q: Can you describe to the Court in detail how he reacted?
A: Oh, he said, "Oh, my God" and dropped down to his knees. He got really upset and he started wandering around the place. And then I guess he got sick and went home."
Q. Did he appear like he already knew that she was dead?
A. No, he did not.
Q: Based upon your observations, did his response seem sincere to you?
A: Yes, it did ----

PC pg. 27.

This evidence is important in two respects. First, Petitioner's reaction of shock at the news shows that Petitioner did not know that Amy was dead for approximately eight hours after the estimated time of her death. Second, his reaction of grief shows that he was not the one who killed her.

It is impossible to believe that Petitioner would have reacted in the way described if the state's theory of the case were true.

Remember, according to the state, Petitioner had gotten up at 2:30 in the morning, dressed, and opened the noisy bedroom door--all without waking up either of his two brothers who were sleeping in the same room  then sneaked down the creaky hall and stairway and out of the house--without waking his light-sleeping father, mother or sister.  He then retrieved the shotgun from its hiding place under the porch, loaded it and then walked to Amy's house, where he shut off the power and intentionally killed her.  He then would have had to walk back home while carrying the shotgun, replace the gun in its hiding place, sneak back in the house, go back up the stairs, down the hallway and back into his bedroom, undress and then go to sleep.  (As impossible as the state's scenario sounds it doesn't even account for the 45 minutes that the power was out at the Hossner's house.  So Petitioner must have gotten up again, returned to the Hossner's house, turned the power back on, being careful not to leave any fingerprints on the power box, and then returned home a second time.)

No one who went to such effort and planning, would have reacted in the way Petitioner acted.

Moreover, even if one assumes, *arguendo*, that there was substantial evidence linking Petitioner to the shooting, this new evidence also shows lack of intent.  If, as was suggested, the shooter only intended to scare Amy and her shooting was an accident, he would only be guilty of involuntary manslaughter, *see*, Idaho Code § 18-4406(2), the maximum punishment for which is ten years.  Idaho Code § 18-4007(2).  Thus, Gifford's testimony shows actual innocence of pre-mediated/intentional murder.

At trial, Amy's father testified that Amy had rearranged her room so that the bed was directly

25 •    PETITIONER'S BRIEF RE: ACTUAL INNOCENCE

under the window not more than a week before the shooting. Tr. Vol.V, pg. 794. Thus, the shooter

might not have known where Amy was within the room and could not see in as the curtains were

drawn, thus mistakenly believing he was firing at unoccupied space within the room when he fired

directly under the window. The state recognized this weakness in its case because it asked, along with

the Petitioner, that the trial court give a voluntary manslaughter instruction. Tr. Vol. XI, pg. 1902-03.

The trial court denied the joint request for the instruction, but would have given that instruction had it

heard the Gifford testimony.

   2.  New evidence of Officer Brood being out in his patrol car at 2:30 a.m. near Amy
      Hossner's home.

Steve Brood was the original suspect in this case. He told the police that he was off duty that

day and was with his girlfriend Tawna Solomon, from 10:00 p.m. until 1:00 a.m., when he left. He rode

his motorcycle home and stayed there the rest of the night. He stayed at home until he was called to

assist in the investigation at the Hossner home. Exhibit A to the Affidavit of Counsel in Support of

Petitioner's Brief Re: Actual Innocence. ("Affidavit of Counsel") Both Ms. Solomon and Officer

Brood lived in Ashton.

However, Lynn Gifford also testified at the state post-conviction proceeding that he saw Officer

Brood at about 2:30 a.m. on Main Street in Ashton driving a police car. PC pg. 12-13. Mr. Gifford

saw Officer Brood turning off of Idaho Street in Ashton onto Seventh Street. PC pg. 18-20; *see also,*

Petitioner's Exhibit D (map of Ashton). Mr. Gifford's testimony contradicts Officer Brood's testimony

that he was at home at 2:30 a.m. and also places him only about a block away from the Hossner

residence at approximately the same time as the shooting.

Mr. Gifford was confident that it was Officer Brood driving the patrol car. He got a good look at Officer Brood and further, Ed Sebek, the only other Ashton police officer, is quite a bit larger than Officer Brood. CP pg. 19; 24. Sebek testified that he is 6'1" and weighed 245-250 pounds in 1984 while Brood is about 5'-6" and weighed about 180-185. PC pg. 226.

3. New evidence which shows Brood knew about the murder before it was reported.

Mr. Gifford also testified that he saw Officer Brood leaving the Circle K at about 10:00 a.m. PC pg. 51-52 He then went into the store and was told by the clerk that Amy Hossner had been killed. This is important because Amy's body was not discovered by her father until 11:00 a.m.

4. New evidence of Brood tampering with police duty logs.

The Ashton Police Department Daily Logs became important during the post-conviction petition proceedings because they purported to show that Police Chief Ed Sebek was on duty until 2:30 a.m. on June 4, 1983. This would, of course, discredit Lynn Gifford's testimony about having seen Officer Brood in a police car at the same time. Further, it would undermine the general believability of Gifford's testimony about seeing Brood at 10:00 a.m. and of Petitioner's reaction to the news of Amy's death. However, it became clear that the logs had been altered.

The sequence of events here is important. As alleged in the petition, Mr. Gifford was shown copies of the logs during an interview by law enforcement agents. PC, pg. 57-58. When the logs were examined by Petitioner's counsel, they noted the logs appeared to be altered. Petitioner's counsel asked to examine the original logs, but were told by the state that they were lost. The original logs were then found, just before a scheduled hearing on the state post-conviction. In light of the discovery, the state court granted a continuance and permission to have the documents inspected by a documents

examiner.

As explained by the Idaho Supreme Court:

> Examination by forensic document experts revealed a number of discrepancies and notably, that at least two persons had recorded information on the log for the night of the murder. The defense expert, Mr. Hale, concluded that the mileage total for the night of the murder appeared to have been written by Brood and not Chief Sebek who testified that he was on duty and that he completed the log record for the night in question. Unique to this night's log, the final time entry "2:30" appeared to be written so that the last two digits avoided a hole which was punched in the document; all other entries by a hole show that the hole punch went through the entries.

*Grube v. State*, 134 Idaho 24, 30, 995 P.2d 794 (2000).

This evidence of tampering with state duty logs bolsters Lynn Gifford's testimony that he saw Officer Brood driving near the Hossner home at the time of the shooting. Officer Brood would not need to tamper with Chief Sebek's log book if he did not have something to hide. However, Brood needed to account for the additional mileage he put on the vehicle and therefore had to alter Sebek's records to cover his use of the car. *See*, Exhibit B-1 to Petition.

Additionally, Police Chief Sebek's entry that he was on duty until "2:30" was added at a later time and written around the hole made by the three-hole punch. *See*, Exhibit B-2 to Petition. This, of course, strongly suggested that Ed Sebek was helping Brood cover-up. Further, Ed Sebek's insistence that only he had access to his police logs was contradicted by both forensic examiners.

This indicates that he is engaged in a cover-up on behalf of Officer Brood. This would also explain why Sebek testified at the post-conviction hearing that he logged off his shift at 2:30 a.m., PC pg. 205, even though he told Investigator Watts in 1983 that he went home early that evening. PC pg. 95. This evidence of a cover-up gives further support to the belief that the state manipulated other

evidence as well.

### 5. New evidence of Police Chief Ed Sebek's subsequent conviction for Lewd and Lascivious Conduct with a Minor.

At the post-conviction hearing, Ed Sebek's credibility as a witness was impeached by an admitted conviction for "aggravated assault and battery." PC pg. 276. Subsequent to his testimony, however, Sebek has also been convicted of two counts of lewd and lascivious conduct with a minor. Exhibit B to Counsel's Affidavit. These offenses occurred in Ashton and they involved young girls about the same age as Amy Hossner. These convictions further impeach Sebek's testimony regarding his activities on June 3, 1983 and the police logs.

### 6. Wrongfully excluded Brood's polygraph results

During the trial, Deputy Hillman made an unresponsive answer to a question which informed the jury of two things: 1) that Petitioner had taken a polygraph examination and 2) that it had come back "inconclusive." Tr. Vol. VII, pg. 1133.

Petitioner immediately objected and then argued that the trial court should let in the results of Stephan Brood's polygraph examination. Tr. Vol. VII, pg 1133-1134; Vol. IX, p. 1680-82. The trial court instead instructed the jury to disregard Deputy Hillman's testimony.

This evidence was wrongfully excluded because the state's witness opened the door to polygraph evidence when he slipped it in using a non-responsive answer. In fact, two polygraph examiners, Investigator Steve Watts and Cleve Backster, review Officer Brood's polygraph charts and both concluded that he was being deceptive. Exhibit C to Counsel's Affidavit.

7. Wrongfully excluded evidence of Brood's incriminating statements made during a police interview.

It is clear under Idaho law that an accused can present evidence that another person might have committed the crime. *State v. Larsen*, 91 Idaho 42, 415 P.2d 685, 690 (1966). And, some evidence linking Officer Brood to the crime was admitted at trial. For example, there was testimony that Brood was a primary suspect in the crime. Tr. Vol. VI, pg. 1975, 1076, 1080. There was evidence that the shot pattern of the fatal wound was consistent with that of a sawed-off shotgun, Tr. Vol. VII, pg. 1269, and that Brood owned an illegal sawed-off shotgun. Tr. Vol. VI, pg. 997. Furthermore, it was determined that the last shot fired from the sawed-off shotgun was consistent with the shell that killed Amy Hossner. Tr. Vol. VIII, p. 1356-1357.

However, the trial court refused to permit Investigator Steve Watts to testify abut incriminating statements made by Officer Brood during an interview. Tr. Vol. IX, pg. 1694. These statements were improperly excluded by the trial court and should be considered by the Court in determining whether the *Schlup* standard has been met.

During an interview with Investigator Watts, which was part of the polygraph examination, Officer Brood made several incriminating statements. First, when he was told that he failed the polygraph test, Brood said, "I'm a dead man" and "They've got me." Exhibit D to Counsel's Affidavit, pg . 89-90. He also wondered out loud if he could be "schizophrenic." *Id*, at 91. Further he admitted looking into windows while on patrol and that he has "seen dirty things, people standing in their windows." *Id*, pg. 96. This comment is especially telling because early in the interview, Investigator Watts asks Officer Brood what he thinks happened and Brood says that it could have been a peeping

tom.

> A: . . . . There's ones that wonder if it was some guy that was just weird, you know, watching her bedroom window, whatever.
> Q: Then why would he kill her?
> A: The one that we've been thinking of, I've been thinking, is this guy's peeking in through her bedroom window and she sees him, you know, slams the curtains shut.
> Q: That makes sense to you?
> A: Yes.

*Id.*, at 28.

Officer Brood also admitted that he likes to "tease" young girls, *Id.*, pg. 97, but claimed not to

know Amy. *Id.*, pg. 59; 95.

### 8. Wrongfully excluded evidence of Brood's sexual misconduct and, in particular, his sexual desires towards Amy Hossner.

During the investigation of Officer Brood, numerous female witnesses told the police about

sexual misconduct by him. Examples of this misconduct include: a report from a woman in a close

relationship with Officer Brood that Brood had tied her up and raped her. Exhibits E and F to

Counsel's Affidavit, pg. 2. A 17-year-old Ashton woman reported that every time she saw Brood he

would make a V sign with his fingers and then dart his tongue in and out of the V, indicating his desire

to have oral sex with her. Exhibit G to Counsel's Affidavit. One woman reported that Officer Brood

offered not to write her a traffic ticket in exchange for sexual favors. Another woman said that Officer

Brood told her during a traffic stop to "Throw your keys out the window, then get out, bend over, and

pick them up, I want to see your ass." Exhibit H to Counsel's Affidavit. During another traffic stop,

Officer Brood got into the car and told the female driver that he'd had wet dreams about her and that

she made him "horny." Then he put his arms around her and kissed her on the lips. Exhibit I to

Counsel's Affidavit. Several women said that Brood seemed very interested in juvenile girls and once bragged to a woman about having sex with juvenile girls. Exhibit J to Counsel's Affidavit.

Finally, notwithstanding his denial to Investigator Watts, there is also evidence that Officer Brood not only knew who Amy Hossner was, but had expressed sexual desires for her. Morgan Meacham reported that he knew Brood because he was good friends with Brood's brother-in-law. Once Meacham and Brood were at a basketball game in St. Anthony when Amy Hossner walked by them. Brood said to Meacham that "I'd like to fuck her eyes out." When Investigator Watts told Meacham that Brood claimed that he didn't even know Amy Hossner, Meacham said that Brood knew the names of all the girls and it would have been impossible for him not to know Amy's name. Exhibit K to Counsel's Affidavit..

### C. The Court Should Deny the Respondent's Motion to Dismiss.

As Idaho Supreme Court Justice Kidwell wrote:

In light of the weak evidence linking Grube to the shooting, the State's suppression of Gifford's testimony, along with the newly discovered evidence uncovered as a result of his testimony, was prejudicial to Grube. Gifford's testimony placed Brood near the scene shortly before the shooting. It directly contradicted the alibi that had Brood leaving his girlfriend's house at 1:00 a.m. and spending the rest of the evening at home, far removed from the Hossners' house. More importantly, however, Gifford's testimony directly supported the defense's theory of a police coverup. It directly contradicted Chief Sebek's testimony about his activities on the night of the shooting. Gifford's information led directly to the discovery that the Ashton police patrol logs for the night of the shooting had been deliberately altered. The doctored logs lend substantial credence to the defense's assertion that the police manufactured the tool mark and transfer evidence directly linking Grube's shotgun to the window of Amy's bedroom.

In conclusion, it is my opinion that Rauland Grube was convicted of murder based on possibly doctored physical evidence, on inconclusive test-firing evidence, and on evidence that Grube had an unhealthy obsession with Amy after her death. Gifford's direct evidence impeached several key prosecution witnesses, put another suspect, who

was a policeman, near the murder scene, and led to the discovery that the police logs
for the night of the shooting had been doctored. The possibility that police lied on the
witness stand and doctored the police logs undermines the validity of the physical
evidence linking Grube to the shooting. Combined with the weakness of the other
evidence presented in the trial, this is enough to undermine confidence in the original
verdict.

*Grube v. State,* 134 Idaho at 34, 995 P.3d at 804 (Kidwell, J. dissenting; Schroeder, J. joining).

Thus, two members of the Idaho Supreme Court held that just the *Brady* evidence in this case
was enough to undermine confidence in the verdict given the circumstantial evidence presented at trial.

This Court, however, can and should also consider the evidence which was wrongly excluded
from consideration at trial: the evidence that Officer Brood was shown to be deceptive on his polygraph
examination, *i.e.,* the evidence of the incriminating statements made by Officer Brood during that
interview; the evidence of Officer Brood's attraction to young women and of the numerous examples of
sexual misconduct while he was on duty and, finally, the evidence that Officer Brood knew who Amy
Hossner was and had sexual desires for her.

In light of all the evidence, including the evidence "tenably claimed to have been wrongly
excluded or to have become available only after trial" *Schlup* at 328, no juror, acting reasonably,
would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329, 115 S.Ct.
851. Therefore, Petitioner has made a showing of actual innocence and should be excused from his
attorney's untimely filing of his habeas petition.

### III. CONCLUSION

For all the reasons above the Court should deny the Respondent's motion to dismiss.

Alternatively it should grant the Petitioner additional time to conduct discovery and investigation and

then set the matter for an evidentiary hearing before making a final ruling on the motion.

Respectfully submitted this 20th day of May 2003.

Dennis Benjamin
Attorney for Rauland Grube

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of May  2003, I caused a true and correct copy of the foregoing document to be

X mailed

___ hand delivered

___ faxed

to:    L. LaMont Anderson
Chief, Capital Litigation Unit
Criminal Law Division
P.O. Box 83720
Boise, ID  83720-0010

Dennis Benjamin

35 •   PETITIONER'S BRIEF RE: ACTUAL INNOCENCE