IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RAULAND J. GRUBE, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV01-357-S-BLW |
| | ) | |
| vs. | ) | **MEMORANDUM ORDER** |
| | ) | |
| RANDY BLADES,[1] et al., | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

Pending before the Court are Respondents' Motion for Summary Judgment (Docket No. 73) and Petitioner's Cross-Motion for Summary Judgment (Docket No. 91). The Court has determined that oral argument is unnecessary. Having reviewed the record and having considered the arguments of the parties, the Court enters the following Order granting Petitioner's Cross-Motion for Summary Judgment on his *Brady* claim.

---

[1]Randy Blades was substituted for former respondent Joe Klauser (Docket No. 95).

**MEMORANDUM ORDER  1**

# I.

## INTRODUCTION

In the early morning hours of June 4, 1983, fifteen-year-old Amy Hossner was killed by a singe shotgun blast through the bedroom window of her Ashton, Idaho home. The initial primary suspect in the case was Ashton police officer Stephan Brood.

Petitioner was not initially a suspect in the Amy Hossner case. However, Petitioner called police in July of 1983 to report that his shotgun was missing, that several of his shot from his can of ammunition were missing, and that he feared the gun had been used in Amy's murder. Later, it was determined that Petitioner's father had found the gun and hidden it from Petitioner because Petitioner's father did not like guns in his household. When the gun was found, it was turned over to police.

Police sent Petitioner's shot gun, as well as two shotguns owned by Brood, to Ed Peterson, an ATF[2] firearms expert, to be examined as possible murder weapons. Peterson performed test-firings of the weapons and eliminated Petitioner's shotgun as a possible murder weapon. Amy's murder remained unsolved for the next eight years.

---

[2]Bureau of Alcohol, Tobacco and Firearms.

**MEMORANDUM ORDER  2**

In 1991, police began investigating Petitioner again because Brenda Briggs had come forward and stated that, shortly after the murder, Petitioner had confided in her that he had spoken to Amy through her bedroom window the night she was murdered, that Amy had agreed to meet him the next day at the Methodist Church, that Amy had failed to arrive, that Petitioner returned to Amy's to see why she had not arrived, and that he had peered through her window, had seen her body, and had "never seen so much blood in his life."  Petitioner was subsequently arrested on murder charges.

The evidence at trial included several witnesses who, like Briggs, testified that, after Amy's death, Petitioner had expressed a great interest in Amy and her murder.  One witness testified that Petitioner had told her he was a police officer and wanted to avenge Amy's death, that Amy had rearranged her furniture just prior to her death, and that the shooter had not meant to kill her; the witness also testified that Petitioner later called her on repeated occasions and told her she knew too much about the murder.

Two of the State's experts, Gerald Wilkes and Martin Ols, concluded that Petitioner's shotgun could not be eliminated as a possible murder weapon; Ed Peterson changed his earlier opinion and agreed.  Defense firearms expert Jim Mason testified that he thought it was unlikely that petitioner's shotgun was the

**MEMORANDUM ORDER  3**

murder weapon and that the test-firings indicated that the shot pattern on Amy's neck more closely matched the firing pattern of Brood's gun.

A key part of the prosecution's case linking Petitioner to the murder was evidence that ten grooves found on the gun bore some of the brown paint from Amy's window frame; the window frame also bore a corresponding mark from the gun.  The defense, supported by expert testimony that the marks were made by manual scraping rather than recoil, showed that no investigator or expert had seen the marks on the gun or the marks on the window in 1983.  The defense argued that the marks mysteriously appeared in 1991, after Petitioner became a suspect again, and that the marks had been manufactured by investigators.

On October 1, 1991, a jury convicted Petitioner of the first degree murder of Amy Hossner.  On March 27, 1992, the state district court imposed a sentence of life imprisonment without the possibility of parole.  On September 7, 1994, the Idaho Supreme Court upheld the judgment of conviction and sentence on direct appeal.  *See State's Exhibit B-5.*

In 1994, while Petitioner's direct appeal was pending, Lynn Gifford approached defense counsel.  Gifford informed counsel that he was the person who first told Grube that Amy Hossner had been murdered.  In conversations with Gifford, defense counsel learned that Grube had reacted with shock to the news of

**MEMORANDUM ORDER  4**

Amy's death, and that Gifford had reported seeing Stephan Brood driving a police car within a few blocks of her house at approximately 2:30 a.m. on the morning of the murder. Police had interviewed Gifford and recorded the interview in 1991, but had failed to disclose the interview to the defense. Gifford's testimony prompted defense counsel to file a post-conviction petition in September of 1995.

The information Gifford provided led to defense counsel's discovery of other evidence, specifically logs detailing the whereabouts of Ashton police officers during the night and early morning hours of Amy's murder. The logs had obviously been altered. At the post-conviction hearing, defense counsel presented expert testimony showing that two different types of handwriting appeared on the logs, and that Brood could not be ruled out as the person who altered the logs. Chief Sebek and Brood were the only Ashton police officers at that time. Gifford's testimony placed Brood in the police car at 2:30 a.m. Gifford also testified that he saw Brood leaving Circle K at 10:00 a.m. the morning of the murder, one hour before Amy's body was discovered by her father, and that Brood had informed the store clerk that Amy had been killed.

After the hearing, the district court denied post-conviction relief. The Idaho Supreme Court affirmed on January 7, 2000, in a 3-2 decision. *Grube v. Idaho*, 995 P.2d 794 (Idaho 2000). The Idaho Supreme Court denied Grube's Petition for

**MEMORANDUM ORDER  5**

Rehearing, and a Remittitur issued on March 3, 2000.

On July 20, 2001, Grube filed his federal Petition for Writ of Habeas Corpus (Docket No. 3).  After an initial review, this Court concluded that Grube's Petition was untimely, but appointed counsel and provided him the opportunity to demonstrate that the one-year limitations period should be tolled.  *See Order of November 5, 2001* (Docket No. 8).  The Court later ordered the Clerk to serve the Petition on Respondent, who filed a Motion for Summary Dismissal arguing that Grube's Petition was barred by the statute of limitations and that he had failed to demonstrate circumstances sufficient to warrant equitable tolling of the limitations period (Docket No. 14).  Grube argued in response that he was actually innocent of the crime, and that actual innocence warranted equitable tolling.  Prior to the hearing, Respondent waived the statute of limitations defense, allowing the case to proceed to the merits on summary judgment (Docket No. 86).

Grube's Petition contains the following claims: (1) withholding of exculpatory evidence by the state in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) sufficiency of the evidence under *Jackson v. Virginia*, 443 U.S. 307 (1979); (3) freestanding actual innocence based upon newly discovered evidence; (4) the trial court's failure to instruct on included offenses of manslaughter; and (5) withholding of exculpatory evidence by the state in violation of *Brady*, requiring a

**MEMORANDUM ORDER  6**

new sentencing hearing.  *See Petition* (Docket No. 3).

## II.

## SUMMARY JUDGMENT

### A.    Standard of Law for Habeas Corpus Summary Judgment Motions

The Federal Rules of Civil Procedure apply to habeas corpus actions except

where application of the rules would be inconsistent with established habeas

practice and procedure.  *See* Rule 11 of the Rules Governing Section 2254 Cases;

*Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).  Under the Federal Rules of Civil

Procedure, summary judgment is appropriate where there is no genuine issue as to

any material fact and the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). The summary judgment standards must be applied in light of

the substantive law governing habeas proceedings.

Petitioner's case was filed after April 24, 1996, making it subject to the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  In order to

obtain federal habeas corpus relief from a state court judgment under AEDPA, the

petitioner must show that the state court's adjudication of the merits of his federal

claim either:

> (1)    resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

**MEMORANDUM ORDER  7**

(2)     resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
        State court proceeding.

28 U.S.C. § 2254(d).

1.     <u>"Contrary to"</u>

In explaining how to apply § 2254(d)(1), the United States Supreme Court,

in *Williams v. Taylor*, 529 U.S. 362, 405 (2000) explained that relief under the

"contrary to" standard could be afforded in two ways: (1) "if the state court arrives

at a conclusion opposite to that reached by this Court on a question of law," or (2)

"if the state court confronts facts that are materially indistinguishable from a

relevant Supreme Court precedent and arrives at a result opposite to ours."  The

Court further defined "contrary to" as "'diametrically different,' 'opposite in

character or nature,' or 'mutually opposed.'"  *Id*.  In other words, a state court

decision is "contrary to" federal law as established by the Supreme Court if it is

"substantially different from the relevant precedent of this court."  *Id*.

Applying an incorrect standard of law makes a decision "contrary to" federal

law established by the Supreme Court.  *Id*.; *see also Cooper-Smith v. Palmateer*,

397 F.3d 1236, 1243 (9th Cir. 2005).  In this situation, the decision whether to

grant the writ is determined by reviewing the constitutional issue "de novo,

applying the correct constitutional analysis."  *Barker v. Fleming*, – F.3d –, 2005

**MEMORANDUM ORDER  8**

WL 2159082, at *7 (9th Cir. 2005).  In other words, the federal court need not

defer to the state court's conclusions of law, but it is free to determine its own

conclusions of law based on the state court findings of fact.  *See Williams,* 529

U.S. at 406 (where a decision is contrary to federal law, "a federal court will be

unconstrained by §2254(d)(1)").

      2.    <u>"Unreasonable Application"</u>

     A state court decision can be "an unreasonable application" of federal law in

two ways: (1) where a "state court identifies the correct governing legal rule from

this Court's cases but unreasonably applies it to the facts of the particular state

prisoner's case," or (2) where the state court either unreasonably extends a legal

principle from our precedent to a new context where it should not apply or

unreasonably extends a legal principle from our precedent to a new context where

it should apply."  *Id.* at 407.  A petitioner cannot prevail under the unreasonable

application clause "simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal

law erroneously or incorrectly."  *Id*. at 411.  Rather, the state court decision must

be "objectively unreasonable."   *Id.* at 409.

**MEMORANDUM ORDER  9**

**B.     Standard of Law Governing *Brady v. Maryland* Claims**

Because the Idaho Supreme Court issued its opinion in this matter on January 7, 2000, the Court relies upon United States Supreme Court precedent which existed at that time to review the Idaho Supreme Court's decision.  In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In *United States v. Bagley*, 473 U.S. 667, 676 (1985), the United States Supreme Court clarified that "impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule."   The Supreme Court also clearly abandoned the practice that a different standard of law should be applied depending upon whether the defense had requested the information.  *Id*. at 683 (disavowing distinctions stated in *United States v. Agurs*, 427 U.S. 97 (1976)).

The *Bagley* decision also clarified that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id*. at 682.  In other words, a "'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id*.

**MEMORANDUM ORDER  10**

In *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), the United States Supreme Court held that impeachment evidence known only to the police but unknown to the prosecutor was subject to *Brady* disclosure.  The *Kyles* Court also emphasized that the *Bagley* materiality test requires the court to consider the suppressed evidence "collectively, not item by item."  *Id.* at 436.  Particularly, the *Kyles* Court explained:

> [Courts] should evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion.

*Id.* at 436 n.10.

Where a state court analyzes the suppressed evidence item by item, but fails to analyze the cumulative effect of all of the suppressed evidence, "its decision [is] contrary to clearly established Federal law as set forth in *Kyles*."  *Barker v. Fleming*, – F.3d –, 2005 WL 2159082, at *6 (9th Cir. 2005).  Where the state court "did not conduct the proper analysis, AEDPA's restrictions . . . do not apply," and the federal habeas court conducts a de novo review.  *Id.* at *7.  If a court determines that a constitutional violation occurred under the *Brady* test, the court need not conduct a harmless error analysis.  *Kyles*, 514 U.S. at 435.

**MEMORANDUM ORDER  11**

C.      **Statement of Petitioner's *Brady* Claims**

The Idaho Supreme Court summarized Petitioner's *Brady* claim as follows:

> In 1994, while Grube's appeal from the judgment of conviction
> was pending, Lynn Gifford approached defense counsel.  Gifford
> indicated that he was the person who had first told Grube that Amy
> Hossman had been murdered, that although he had been interviewed
> by the police in 1991, he had not been called to testify at Grube's trial.
> In their conversation with Gifford, defense counsel learned
> information (1) that Grube had reacted with genuine surprise and
> sadness to the news of Amy Hossner's death, and (2) that Gifford had
> reported seeing Ashton police officer Stephen Brood – an early
> suspect in this crime – driving a police car within a few blocks of
> Amy Hossner's house at approximately 2:30 a.m. on the night of the
> murder.  The information had been communicated to the police
> investigator in 1991 but was never disclosed by the state to the
> defense, prompting counsel to seek post-conviction relief on Grube's
> behalf from the district court.
>
> In his application for post-conviction relief, Grube asserted that
> he was entitled to a new trial because he had been denied due process
> by the state's failure to disclose exculpatory information contained in
> Gifford's interview with the investigator in 1991.  The Gifford
> information led defense counsel to discover that Ashton police logs
> recording activity the night of the murder appeared to have been
> altered.

*Grube v. Idaho*, 995 P.2d 794, 796 (Idaho 2000).  Petitioner argued that the Gifford

information "put into question the alibi of the other suspect (Brood), and supported

Grube's defense that someone else had killed Amy Hossner."  *Id.* at 797.

D.      **Summary of this Court's Decision on the *Brady* Claims**

Three *Brady* claims are at issue: (1) Gifford's testimony of his observation

**MEMORANDUM ORDER  12**

of Petitioner's reaction to Amy's death, (2) Gifford's testimony of his observation of Officer Brood at 2:30 a.m. on the night of Amy's murder, and (3) the altered police logs.  The Idaho Supreme Court determined that Gifford's observation of the Petitioner's reaction was exculpatory evidence and had not been disclosed. However, the Court deemed the evidence immaterial, using, in part, an outdated legal standard.  The court determined that the Gifford's observation of Officer Brood was also exculpatory and undisclosed.  But, the Court again deemed the evidence immaterial, using, in part, an outdated and incorrect legal standard.   The court determined that the altered police logs were neither exculpatory nor undisclosed; therefore, the court did not reach the materiality issue.

The organization and language of the state court's analysis of the three *Brady* claim sections suggests that the Court did not conduct a cumulative effect analysis.  In fact, the state court notes, "We *complete our analysis* of the claimed *Brady* violation by addressing whether with due diligence the defense could have obtained Gifford's testimony."  *Grube*, 995 P.2d at 800.  Nowhere prior to, or after, this statement is there a cumulative effect analysis.   Rather, at the end of the opinion, the Court makes a conclusory statement that "the Gifford testimony" (apparently meaning claims one and two) did not meet the materiality standard. Again, an outdated standard and an incorrect standard are cited in its conclusion.

**MEMORANDUM ORDER  13**

Because the Idaho Supreme Court's decision did not include an analysis of the cumulative effect of the *Brady* claims,  this Court concludes that the Idaho Supreme Court did not perform the required *Kyles* materiality analysis.  Therefore, its *Brady* analysis is contrary to *Kyles*.[3]  The opinion is also contrary to *Bagley*, because the opinion consistently applies a different standard of law abandoned in *Bagley*.  As a result, the Court reviews the *Brady* claims de novo.  In its cumulative materiality analysis, the Court includes the third *Brady* claim because the Court concludes that the Idaho Supreme Court's analysis determining that the police logs were neither exculpatory nor suppressed is also contrary to *Brady*, *Bagley*, and *Kyles* in that the court arrived at a conclusion on a question of law which is wholly inconsistent to those decisions.

Based upon its de novo analysis of the *Brady* claims, including its cumulative effect analysis, the Court concludes that the three *Brady* claims,

---

[3]The Court has considered whether to use the "contrary to" standard or the "unreasonable application" standard of § 2254(d)(1) on the third *Brady* claim. While claims one and two were decided on the materiality factor, claim three was decided on whether it was exculpatory and suppressed, and the Idaho Supreme Court did not reach materiality, and, thus, it did not proceed to make the *Agurs* and cumulation analysis on that claim, which was part of the overall *Brady* issue.  However, because the state court decision that the police logs were not exculpatory and suppressed is "diametrically different," "opposite in character or nature," or "mutually opposed" to *Brady* and its progeny, *see Williams*, 529 U.S. at 405, the Court concludes that the state court's decision on the third claim is also "contrary to" governing precedent.  Alternatively, under the same reasoning and comparison cases used in the Court's decision, the Court would conclude that the state court's decision on the third claim was not merely erroneous, but objectively unreasonable, under the "unreasonable application" standard.

**MEMORANDUM ORDER  14**

together, meet the *Brady* materiality test and warrant habeas relief.

The following sections are the Court's detailed analysis of the Idaho

Supreme Court opinion and the *Brady* claims.

### E.     Idaho Supreme Court's Statement of the Law

In the section of its opinion setting forth the applicable standards of the law,

the Idaho Supreme Court begins with a correct standard of law, recognizing that

*Brady* requires disclosure of "all exculpatory evidence known to the state or in its

possession," and that the duty "encompasses impeachment as well as exculpatory

evidence."  *Id*. at 797.  The Idaho Supreme Court then states an outdated standard

of law from *United States v. Agurs*, 427 U.S. 97 (1976): "In the situation where a

general request for *Brady* materials is made and when the exculpatory information

in the possession of the prosecutor may be unknown to the defense, the reviewing

court must look to the whole record and determine whether 'the omitted evidence

creates a reasonable doubt that did not otherwise exist.'" *Id*. at 797 (citing *Agurs*,

427 U.S. at 112).  Prior to *Bagley*, the United States Supreme Court applied

different standards of law depending on whether the suppressed evidence was not

requested by the defense, was generally requested by the defense, or was

specifically requested by the defense.  *See Agurs*, 427 U.S. at 106-113; *Bagley*, 473

U.S. at 682.  The standard "whether the omitted evidence creates a reasonable

**MEMORANDUM ORDER  15**

doubt that did not otherwise exist" corresponded to the factual situation in which a general request or no request has been made.  The *Agurs* court suggested that the standard to be used when no request or only a general request was made should be higher than the standard required when a specific request had been made.  427 U.S. at 106.  The *Agurs* decision does not use the term "reasonable probability," which became the current standard of law after 1985 when *Bagley* was issued. [4]

In *Bagley*, the Court noted that the standard for all situations, regardless of the nature or absence of a request, is the same: "Evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682; *see also Kyles*, 514 U.S. at 433-34.  Moreover, this standard is significantly more expansive than the "creation of reasonable doubt" standard articulated in *Agurs* which the Idaho Supreme Court relied upon.

Returning to the Idaho Supreme Court's opinion in Petitioner's case, the Court notes that after its statement of the outdated *Agurs* standard, the Idaho Supreme Court set forth the correct standard of materiality from *Bagley,* quoted directly above.  *Grube*, 995 P.2d at 797.  It further correctly defined "reasonable

---

[4]*See Strickler v. Greene*, 527 U.S. 263, 299 (1999) (Souter, J., concurring in part and dissenting in part), for a detailed recitation of the development of the "reasonable probability" standard.

**MEMORANDUM ORDER  16**

probability" as "a probability sufficient to undermine confidence in the outcome." *Id*. (relying on *Bagley* and *Kyles*). The Idaho Supreme Court then correctly restated the standard as "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id*. at 798 (citing *Strickler v. Greene*, 527 U.S. 263 (1999)).

The Idaho Supreme Court identified its task as one of "examin[ing] the withheld evidence in Grube's case to determine whether it substantially undermined confidence in the outcome of the jury's verdict, thus entitling Grube to a reversal of his conviction and a new trial. *Id*. Nowhere in its statement of law does the Idaho Supreme Court mention the requirement found in *Kyles* that, as part of the materiality analysis, it is required to determine whether all of the withheld evidence, considered cumulatively, would have created a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Kyles*, 514 U.S. at 436 & 436 n.10.

**F.     Discussion of *Brady* Claims**

        1.    Grube's Reaction to Amy's Death

The Idaho Supreme Court first analyzed Gifford's testimony of Petitioner's reaction to news of the death of Amy Hossner. *Id*. It concluded that the evidence was cumulative:

**MEMORANDUM ORDER  17**

> The information contained in the statement from Gifford that was withheld from Grube was information which the jury had already heard when the tape of Grube's interview with the police was played during the trial.  On the tape, Grube indicated that it was Gifford who had told him about the murder and that the news had made him sick such that he did not return to work after his break.  For Gifford to testify to these same observations would present cumulative evidence.  When nondisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs.  This evidence from Gifford, had it been disclosed, would not have led to a different result and would not have cast the entire case in such a different light as to undermine confidence in the verdict.

*Id*. (citations omitted).

This paragraph is the court's analysis and conclusion that testimony about Petitioner's reaction was not material, the final step in the *Brady* analysis; apparently, the court did not take issue with Petitioner's assertion that the testimony was exculpatory or suppressed.  Here, it is difficult to determine whether the Idaho Supreme Court applied the correct standard of law.  Its conclusion appears to be a blend of an incorrect standard – whether the evidence would have "led to a different result" – and a correct standard – that the evidence would not have "put the whole case in such a different light as to undermine confidence in the verdict."  Because of the Idaho Supreme Court's failure to clearly apply the correct standard and because of the failure to perform a cumulative materiality analysis, its decision is contrary to United States Supreme Court precedent.  *See Barker*, 2005 WL 2159082, at *6.  Therefore, this Court reviews this claim de novo

**MEMORANDUM ORDER  18**

in light of the facts found by the state court.

Gifford's testimony is both exculpatory and it was suppressed.   It is not cumulative, because a defendant's own words that he reacted by becoming sick and going home from work is not the equivalent of an independent witness stating that Petitioner reacted with genuine sadness and surprise.  *See Grube*, 995 P.2d at 796.

Respondent argues that the statement was not suppressed, because Petitioner himself knew that Gifford had first told him the news.  However, Petitioner's knowledge that Gifford was the individual who first informed him of the murder is not the same as being aware of Gifford's opinion about the genuineness of Grube's reaction.  Further, the prosecution had Gifford's written statement in their possession, and Petitioner did not.  The Court defers to the Idaho Supreme Court's finding that "there is no evidence in the record to suggest that Grube had any knowledge that Gifford had been questioned and the interview recorded by the state investigator."  *Grube*, 995 P.2d at 800.  *See Gantt v. Roe*, 389 F.3d 908, 912-913 (9th Cir. 2004).[5]

---

[5]In *Gantt*, the only evidence linking the defendant to the victim was a "Shalimar restaurant" matchbook found on the defendant; the matchbook had a Bangladesh telephone number handwritten on the inside cover.  The prosecutor had disclosed the matchbook, and also the fact that a call to the number reached a person who did not know the victim.  The prosecutor did not disclose that a facsimile of a photograph of the victim was sent to authorities in Bangladesh, who in turn showed it to the proprietor of the house where the phone was connected, and that person had not recognized the victim.  In addition, authorities learned that the proprietor's son lived in Los Angeles and worked at the Shalimar restaurant.  A subsequent interview with the son revealed that the son did not know the victim, either. 389 F.3d at 910-11.

**MEMORANDUM ORDER  19**

2.      Seeing Officer Brood at 2:30 a.m.

The Idaho Supreme Court next reviewed Gifford's testimony that he saw

Officer Brood in the patrol car about 2:30 a.m. on the night of the murder.  The

Idaho Supreme Court examined the Gifford testimony about Brood in light of all of

the other evidence at trial:

> The district court concluded that the information from Gifford, which
> the court found had been suppressed by the state, was not material in
> view of the other evidence upon which Grube was convicted. Even if
> believed, Gifford's observations only established that Officer Brood
> was out later the night of the murder than he claimed and that he and
> Chief Sebek either were mistaken or lied about their activities that
> night.  Although the defense argued that the jury could have inferred
> from Gifford's testimony that Officer Brood was involved in the
> murder, *the testimony does not exonerate Grube*. Gifford's testimony
> does not significantly impeach the truthfulness of any prosecution
> witness who provided incriminating evidence against Grube at his
> trial, nor does it impair the incriminating quality of such testimony.
> Gifford's testimony did not contradict the physical evidence of tool
> marks on Grube's gun and the window through which the fatal shot
> was fired or the pellets in Amy's body that came from the same batch
> as the unfired shells that were found in Grube's possession. Those
> items of evidence do not change regardless of Gifford's version of the
> events and any records shown in the police logs. Nor does the Gifford
> testimony weaken the overall case against Grube, which included
> testimony from a parade of witnesses about Grube's obsession with

---

On these facts, the Ninth Circuit reasoned:

> The district court concluded that the evidence was not "suppressed" within
> the meaning of *Brady*, because the defense could and should have discovered it
> itself.  While the defense could have been more diligent . . . this does not absolve
> the prosecution of its *Brady* responsibilities.  As the Supreme Court reiterated just
> last Term, "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is
> not tenable in a system constitutionally bound to accord defendants due process."

389 F.3d at 912-913.

**MEMORANDUM ORDER  20**

> Amy Hossner and statements made by Grube that Amy had rearranged
> the furniture in her bedroom and that the shooter never meant to kill
> her.

*Id*. at 799 (emphasis added).

The Idaho Supreme Court then concluded:

> The evidence from Gifford, which was withheld, does not as a
> matter of law raise a reasonable doubt as to Grube's guilt that did not
> otherwise exist in the evidence presented at Grube's trial, *see United
> States v. Buchanan*, 891 F.2d 1436, 1445 (10th Cir. 1989), which
> compels us to uphold the district court's ruling on materiality.
> Accordingly, the nondisclosure of the Gifford testimony, because it
> was not material and would not have changed the outcome of the trial,
> does not entitle Grube to post-conviction relief for the alleged *Brady*
> violation.

*Id*. at 799.

Here, the court again uses the out-of-date *Agurs* standard – a reasonable

doubt as to guilt that did not otherwise exist – to "compel" it to conclude that the

testimony was not material.  The state court further concludes that the testimony

does not entitle Petitioner to relief, "because it was not material and would not

have changed the outcome of the trial."  That, again, is not a correct statement of

the standard – all that is required is a *reasonable probability* that the result of the

proceeding would have been different.

While the language of the analysis seems somewhat like a cumulative effect

assessment because it mentions the police logs, the organization of the opinion

**MEMORANDUM ORDER  21**

shows otherwise.  This discussion was within the section discussing Gifford's

testimony about seeing Brood the night of the murder, and the court had not yet

discussed the police logs.  Accordingly, because the Idaho Supreme Court relied on

the wrong standard of law, and because it did not perform a cumulative effect

analysis, this Court performs a de novo review using the facts found by the state

court record.

     3.    <u>The Police Logs</u>

The third and final *Brady* claim is that prosecutors and investigators should

have produced the police logs for the evening of Amy's murder because Brood was

the initial chief suspect in the crime, and because it is obvious that the logs had

been altered.  The Idaho Supreme Court's analysis of this claim was as follows:

> Until the Gifford testimony was developed, the relevance of the
> police logs for the night of Amy Hossner's murder was not readily
> apparent.  The logs were examined to verify which officer was on
> duty and which officer had filled in the daily log and could have been
> used to argue to the jury that not only did Officer Brood commit the
> murder, but he was involved in a coverup to hide his involvement.
> The state argues that only the testimony of the forensic expert who
> examined the police logs, not the logs themselves, could be
> considered exculpatory.  Since the expert testimony that related to the
> police logs was not in the possession of the prosecution, the state
> properly asserts that such evidence could not be deemed withheld or
> in any way suppressed by the state in contravention of *Brady*
> principles.

*Id*. at 800.

**MEMORANDUM ORDER  22**

The state court did not reach the materiality issue as to the police logs, but instead determined that the logs themselves were neither exculpatory nor suppressed.   The core of the state court's decision was that the police logs had no exculpatory value without the expert testimony, and that the expert testimony could not have been "withheld."   This Court concludes otherwise.

The United States Supreme Court has made it clear that exculpatory evidence need not be evidence that "would have resulted ultimately in the defendant's acquittal."   *Kyles*, 514 U.S. at 434.  It need only be evidence "favorable to the accused,"  *Brady*, 373 U.S. at 87, and of the nature that it creates a "reasonable probability" that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 681.  "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . ." *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 682. Stated simply, "[s]uch evidence is favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676.

Here, the police logs were exculpatory because the log corresponding to the night of the murder was obviously altered and because one of the only two police

**MEMORANDUM ORDER  23**

officers who had access to the logs was the initial primary suspect in the case.  The Idaho Supreme Court's decision that the logs were not exculpatory, and only the expert testimony explaining that the handwritten changes were from two different people, is contrary to *Brady* and *Bagley*.

The expert testimony would be an example of defense counsel's "effective use" of evidence, *id.*, but it does not nullify the inherent exculpatory nature of the logs themselves.  Obtaining an expert is not the only thing defense counsel could have done with the logs.  Counsel could have investigated and discovered witnesses who saw the police officers out that night, including Gifford.  In addition, defense could have presented the logs to the jury and argued that the alterations supported the theory that investigators tampered with other evidence, as well, including the marks on the gun and window frame for the purpose of protecting Brood.  The logs are *not* like DNA evidence, where defense counsel cannot simply present a blood sample to a jury without the opinion of an expert to test it and interpret it.

Further, Petitioner persuasively argues that "it is clear that Brood and Sebek knew of the exculpatory nature of the police logs."  *Petitioner's Brief*, at p. 34 (Docket No. 92).  Under *Brady,* law enforcement officials have the same duty as the prosecutors to produce exculpatory evidence.  *See Kyles*, 514 U.S. at 438

**MEMORANDUM ORDER  24**

(*Brady* rule encompasses evidence "known only to police investigators.").  The Court agrees that Brood and Sebek both knew of the significance of the logs relative to Brood being a suspect – without the necessity of any expert opinion.

In addition, during the initial investigation, Sebek had told Officer Watts that he had gone home "earlier that night and was not out."  *See State's Exhibit C-2*, Post-conviction Transcript, at p. 95.  The logs clearly contradicted his earlier statement to Officer Watts, because the logs showed him having been out until 2:30 a.m.

Because the Idaho Supreme Court failed to find the evidence exculpatory when the evidence obviously and directly related to Brood's alibi, and because it failed to hold Brood and Sebek, who investigated the crime, to the *Brady* standard, and applied it only to the prosecution, the Court concludes that the decision is contrary to *Kyles*.

The Court's survey of similar cases from federal and state jurisdictions bolsters it conclusion that the Idaho Supreme Court's decision is contrary to United States Supreme Court precedent.  *Cf. Duhaime v. Ducharme,* 200 F.3d 597 (9th Cir. 1999) (a federal court can use circuit case law for the limited purpose of determining whether a state court decision is within the scope of "reasonable" applications of Supreme Court law).

**MEMORANDUM ORDER  25**

In *Gantt v. Roe*, the court noted: "*Brady* is not confined to evidence that affirmatively proves a defendant innocent: Even if evidence is merely 'favorable to the accused,' its suppression violates *Brady* if prejudice results." 389 F.3d at 912. In *Gantt,* the Ninth Circuit Court emphasized that evidence is still deemed " exculpatory" even where the prosecutor fails to connect pieces of evidence together or fails to grasp the significance of the evidence. "*Brady* has no good faith or inadvertence defense," the court noted. *Id*. at 912. In other words, the standard is whether the evidence is exculpatory, not whether the prosecutor recognized it as excupatory at the time it was withheld.

In *Oklahoma v. Munson*, 886 P.2d 999 (Okla. Crim. App. 1994), the court held that photographs challenging the State's theory of who murdered the victim could be considered exculpatory. *Id*. at 1003. In addition, the court concluded that "[e]vidence which placed two other men in the convenience store at or near the time of the abduction and robbery would be critical to the defense of this case and could have been used to discredit the police investigation and the State's theory of the case." *Id*. at 1004. *See also U.S. v. Robinson*, 39 F.3d 1115 (10th Cir. 1994) (evidence tending to identify someone else as the perpetrator is exculpatory and material). *See also Boyette v. LeFevre*, 246 F.3d 76 (2d Cir. 2001) (evidence is exculpatory if it "could have helped the defense suggest an alternative

**MEMORANDUM ORDER  26**

perpetrator").

4.      Cumulation of the Brady Claims

It is clear from the record that the Idaho Supreme Court did not perform a

cumulative effect analysis under *Kyles*.  Having discussed the three items relevant

to the *Brady* claims, the Idaho Supreme Court then concluded its analysis as

follows:

> We *complete our analysis of the claimed Brady violation* by
> addressing whether with due diligence the defense could have
> obtained Gifford's testimony.  The state argues that because Grube
> had mentioned Gifford in his interview with the police in January of
> 1991, the defense could have obtained Gifford's testimony through
> the exercise of due diligence.   Although the state is not required to furnish a defendant wi
> through the exercise of due diligence by the defendant, *United States v. McMahon*,
> 715 F.2d 498, 501 (11th Cir. 1983), there is no evidence in the record to suggest
> that Grube  had any knowledge that Gifford had been questioned and the interview
> recorded by the state investigator.  The state's excuse for not providing Grube with
> the Gifford interview is, therefore, without merit.

995 P.2d at 800 (emphasis added).

After this discussion, the Idaho Supreme Court then turned to a new, non-

*Brady* claim – newly discovered evidence.  Therefore, it is evident from the court's

own words indicating that the analysis is "complete" and from the court's

organizational format of its decision that it concluded its *Brady* analysis without

analyzing the cumulative effect of the *Brady* claims.  The Idaho Supreme Court

**MEMORANDUM ORDER  27**

also referred to its earlier *Brady* conclusion later in the decision, stating, "[h]aving

affirmed the district court's materiality finding under the *Brady* analysis above

. . . ." *Id.*  This shows that no cumulative effect analysis was done.

The "Conclusion" section of the Idaho Supreme Court's opinion contains the

following statement:

> Lynn Gifford's interview with the state investigator in 1991
> was improperly withheld by the state in response to the defense's
> request for exculpatory information under *Brady*.  The withheld
> evidence, however, does not raise a reasonable doubt about Grube's
> guilt that did not previously exist and would not, as required for newly
> discovered evidence, likely produce an acquittal.  Therefore the
> district court properly concluded that Grube was not entitled to relief
> under the standards applicable to undisclosed evidence or newly
> discovered evidence.

*Grube*, 995 P.2d at 801.

This "conclusion" cites the outdated *Agurs* standard of law.[6]  While it

---

[6]The *Bagley* Court explained that the *Agurs* opinion provided that: "The standard of materiality applicable in the absence of a specific *Brady* request is therefore stricter than the harmless-error standard but more lenient to the defense than the newly-discovered evidence standard." *Bagley*, 473 U.S. at 680-81.  *Agurs* had suggested that the standard to be used when the defense made a specific request "might be more lenient to the defense than in the situation in which the defense makes no request or only a general request." *Id.* at 681.  The Idaho Supreme Court relied on the part of the *Agurs* opinion that related to "the situation where a general request is made," *Grube*, 995 P.2d at 797, which the *Bagley* court characterized as a higher standard than harmless error, and, which, in any event, the *Bagley* court rejected.  *Bagley*, 473 U.S. at 680.

Justice Stevens, in his *Bagley* dissent, also points out that the Agurs standard was intended to be a different standard because it was factually distinct from Brady:

> We noted in *Agurs*, however, that because there had been no specific
> defense request for the later-discovered evidence, there was no notice to the
> prosecution that the defense did not already have that evidence or that it
> considered the evidence to be of particular value.  427 U.S. at 106-107.
> Consequently, we stated that in the absence of a request the prosecution has a

**MEMORANDUM ORDER  28**

clearly contains a "conclusion" about the Gifford testimony, it certainly does not

contain any cumulative effect analysis.[7]

In addition, because the Idaho Supreme Court did not find the third *Brady*

claim exculpatory or suppressed, the Idaho Supreme Court failed to include the

---

constitutional duty to volunteer only "obviously exculpatory . . . evidence." Id. at 107. Because this constitutional duty to disclose is different from the duty described in *Brady*, it is not surprising that we developed a different standard of materiality in the *Agurs* context.

*Bagley*, 473 U.S. at 711 (Stevens, J., dissenting). In *Bagley*, the majority opinion rejected the distinctions, and therefore implicitly rejected the *Agurs* standard used by the Idaho Supreme throughout its opinion and its conclusion.

[7]This Court also finds that the Idaho Supreme Court's analysis nearly mirrors the type of lower-court analysis found lacking in cumulative effect analysis in *Kyles*:

There is room to debate whether the two judges in the majority in the Court of Appeals made an assessment of the cumulative effect of the evidence. Although the majority's *Brady* discussion concludes with the statement that the court was not persuaded of the reasonable probability that Kyles would have obtained a favorable verdict if the jury had been "exposed to any or all of the undisclosed materials," 5 F.3d at 817, the opinion also contains repeated references dismissing particular items of evidence as immaterial and so suggesting that cumulative materiality was not the touchstone. *See, e.g., id.* at 812 ("We do not agree that this statement made the transcript material and so mandated disclosure. . . . Beanie's statement . . . is itself not decisive"), 814 ("The nondisclosure of this much of the transcript was insignificant"), 815 ("Kyles has not shown on this basis that the three statements were material"), 815 ("In light of the entire record . . . we cannot conclude that [police reports relating to discovery of the purse in the trash] would, in reasonable probability, have moved the jury to embrace the theory it otherwise discounted"), 816 ("We are not persuaded that these notes [relating to discovery of the gun] were material"), 816 ("[W]e are not persuaded that [the printout of the license plate numbers] would, in reasonable probability, have induced reasonable doubt where the jury did not find it. . . . the rebuttal of the photograph would have made no difference." The result reached by the Fifth Circuit majority is compatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by *Bagley*.
. . .

*Kyles*, 514 U.S. at 440-41.

**MEMORANDUM ORDER  29**

third claim in any analysis or conclusion about materiality.  The "conclusion" section of the Idaho Supreme Court's opinion lends further support to this Court's conclusion that it is contrary to *Brady*, *Bagley*, and *Kyles*.

Based upon all of the foregoing, the Court concludes that the Idaho Supreme Court consistently applied a standard different from the *Bagley* standard and failed to perform a cumulative effect analysis of the *Brady* claims.  The Court also concludes that the Idaho Supreme Court's decision that the police logs were neither exculpatory nor suppressed was contrary to United States Supreme Court precedent.  Therefore, the third *Brady* claim should have been included in any cumulative effect analysis of the materiality question.  As a result of these failures, the Idaho Supreme Court's decision is contrary to *Kyles*.  Therefore, the Court must  perform a de novo review of the *Brady* cumulative materiality issue based on the facts found by the state court.

In *Kyles*, the Supreme Court noted that "[t]he likely damage [of the suppressed evidence] is best understood by taking the word of the prosecutor." 514 U.S. at 444.  *See also Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005) ("The prosecutor's emphasis on the importance of McLaurin's testimony bolsters the conclusion that disclosure of the deal may have significantly damaged the prosecution's case."); *Gantt*, 389 F.3d at 915 (noting that the prosecutor "spent a

**MEMORANDUM ORDER  30**

good part of his summation arguing the importance of the matchbook).

The prosecution's closing argument makes clear that the jury in this case had to decide between whether (1) Grube killed Amy; or (2) whether the police engaged in a cover-up to protect Amy's true killer.  The withheld evidence goes to exactly that issue.

In the following passages from the prosecutor's closing argument, the prosecutor emphasized the fact that the defense did not have enough evidence to support its defense theory that the police framed Petitioner.  Gifford's testimony and the police logs would have been two additional facts upon which the jury could have determined whether police were involved in a cover-up.

> But probably the most important thing, the most important thing about this issue is that what they are suggesting is impossible because the forensic evidence shows that this is the gun that killed Amy Hossner because this is the mark that left its mark on the window trim on the day of the killing which, basically, brings us to our second question.  That's the frame, the defense frame.  Now, nobody from the Defense has actually come out and said, "We have been framed."  But they have beaten that drum continuously in this trial over and over again through one innuendo after another.  They, basically, tried to hint around the Defendant has been framed by the police.  for example, asking Kurt Hillman, "You are a friend of Steve Brood," and then just leaving it hang.  If that was a good enough reason for Kurt Hillman to frame this Defendant.  Obviously, the time for innuendo is over.  Let's talk about reality.  Let's address this issue head on here.

*State's Exhibit A-17*, at 7.

**MEMORANDUM ORDER  31**

Now, we know that the mark was caused by that gun. You've seen the evidence. You will have that back in the jury room. The question then is, if this mark was caused by that gun, when did it happen? There can be no question that these two items match. This is like a fingerprint, but it is better than a finger print. It is like taking your finger and putting it on wet paint and then coming away. You leave your mark on the paint and then paint leaves its mark on you. That is not open to question.

So, it's an either/or question. Was the mark manufactured by the police or was it there on the morning of the killing and had been there ever since? There is no in between here.

*Id*. at 9.

If they wanted to frame somebody, why didn't they frame Steve Brood? He was a suspect. Why didn't they frame some other party? What's the point of framing this Defendant? The point is, because of the mark on the gun and the mark on the window, the only way you can acquit this man is to say to this sheriff, we believe you framed this Defendant.

*Id*. at 11.

Ultimately, what you are going to have to decide here is the only way you can do it is determine that this sheriff or one of his deputies, Kurt Hillman, framed the Defendant by manufacturing that mark. If you can't do that, I submit that there is no evidence of that at all. You have to find the Defendant guilty because he did it.

*Id*. at 20.

The evidence shows, the evidence shows that that's what is right, that this Defendant killed Amy Hossner. If all a person has to do is say, "The police framed me," in the face of this kind of evidence, if that's all it takes, and if you walk out of the courtroom after killing someone, then, whose life is safe? Whose child's life is safe if that's all it is going to take?

**MEMORANDUM ORDER  32**

*Id.* at 21.

Without the withheld evidence, it is apparent from the jury's verdict that defense counsel did not have enough ammunition to persuade the jury of its theory that the murder had been committed by Officer Brood and the evidence altered.  If defense counsel had been able to refer to the Gifford testimony and the altered police logs, the defense would have been materially strengthened.  The most critical evidence in the whole trial was the corresponding paint and scrape marks on the gun and window frame.  Additional evidence calling the authenticity of those marks and the good faith of the investigating officers into question may have made the difference for one or more jurors.

The defense argued at closing:

> We also heard some other evidence, which the State hasn't wanted to talk about very much, but evidence concerning another suspect.  In fact, the man who was the main suspect in the case up until 1991.  That is a man by the name of Steve Brood who was a police officer with the Ashton Police Department.  That is what their own witnesses testified in the way of evidence against him.  They testified that the night of the murder, he was out some time after 1:00 a.m.  That's more than any witness can say about the Defendant.  They also testified that he had been driving on the back roads of Ashton, police officer driving on the back roads.  They mentioned that he came by, drove by Amy Hossner's house that morning.  Despite the fact there were police cars out front, he didn't stop to see what was going on.  In fact, he didn't come by until several hours later.  When he did come by, he said some interesting things.  He was the one that offered the theory, the theory that the gun that was used to kill her was a sawed-off shotgun.  Later we know that he went up to Fred Hossner,

"You watch,  I'm going to be a suspect in this case, but I didn't do it."
Strange comments coming from anyone, especially coming from a
police officer.

*Id.* at 35.

The State asked, "Why do you think something like this would
have happened to Mr. Grube?  We know that the major suspect in the
case for years was an officer of the police department.  There's no
question that would be very embarrassing and raise a lot of questions.
Certainly if would be much easier to accuse this man and convict him
than try to prove a fellow police officer did something like that.

*Id.* at 52.

In the next part of defense counsel's closing argument, defense counsel

argued that the entrance wound supported the theory that Brood committed the

crime.  Evidence that Brood was out near the time of the murder, that Sebek had

told Watts that he had gone home early, that the police logs had been changed to

show Sebek out until 2:30 a.m., and that Brood was the only other person to have

access to the police logs would have bolstered the evidence the defense did

provide:

The important thing that the autopsy report says is there was no
central entry wound.  As all the cardboard tests and other tests have
shown, [Defendant's shotgun] makes a real, tight, big pattern.  Dr.
Fantelli, when he testified, made it clear that the pattern on the
victim's body was, in fact, individual holes that you could see.  No
test ever done on the Defendant's gun recreated such a wound.
However, tests done with Steve Brood's sawed-off shotgun have
created such a mark.  In 1983, Ed Peterson's test showed that Steve
Brood's gun could have made that pattern.  Furthermore, if you look

**MEMORANDUM ORDER  34**

> at the videotape provided by the State, the very first one done, they
> fired his shotgun – not through glass – when they fired it not through
> glass, it made a disbursed pattern very similar to the pattern on Amy
> Hossner's body.

*Id.* at 31.

All of these defense argument passages underscore that defense counsel

could have used the additional evidence they might have obtained to help them

prove their theory that Steve Brood was the perpetrator and that the investigators

tampered with the evidence.

To further emphasize the importance of the gun and window marks – which

the defense asserted were manufactured by police and which are called into

question by other evidence of police tampering – the Court points to the following

rebuttal argument by the prosecution:

> The bottom line is, we didn't bring Brenda Fredickson on the
> stand, we didn't bring Johnna Sans on the stand to assassinate his
> character, he told them things.  He's the one that said he was there the
> night of the killing.  He's the one that said he had a relationship with
> Amy Hossner.  He's the one that said he was the first person to find
> her dead.  He's the one that said he wasn't going to go to the police.
> *The point is, those statements alone certainly do not mean this*
> *Defendant is guilty.  The point is when you take those statements and*
> *compare them to the shotgun, that's when it becomes relevant*.  That's
> when the evidence, basically, falls together.
>         Mr. Moeller in one breath tells you that we don't know
> how this mark got on the shotgun and how the mark got on the trim,
> could have been an accident.  Then, in the next breath tells you it has
> to be done manually and forcefully.  Remember the demonstration
> that Ed Peterson showed you, he took the gun, and basically, jammed

**MEMORANDUM ORDER  35**

it along the trim.  *In order to acquit this man, you are going to have to find that a police officer did that.*  It wasn't done by accident.  It was either done by recoil or somebody manually and forcefully did it.

*Id*. at 62-63 (emphasis added).

Ultimately you are going to have to decide as to who of the various experts have made a more reasonable explanation about the shotgun.  You are going to have to decide for yourselves who is better qualified and you have heard them testify.  But remember, please, if you find that Ed Peterson is right and that gun should [have] been eliminated, *you must also find that the mark was put on later on by someone deliberately trying to frame this Defendant. And that makes no sense at all that just flat didn't happen.*

*Id*. at 65 (emphasis added).

Let me say one last thing.  *There is absolutely no way that you can acquit this man with these findings unless you find one of the police specifically came in and made that mark on that rim in order to frame that man right there.  There is no evidence of that at all.*  All of the evidence shows is that this gun was fired, killed Amy, made the mark, taken, sat in the ATF vault for years and later examined and shown what you have found to be the truth in this courtroom.

*Id*. at 67.

When the Court considers the cumulative effect of the three *Brady* items, the

compelling conclusion about the withheld evidence is that it all corroborates the

same point: that Brood may have killed Amy Hossner and that a police cover-up

may have ensued to try to protect him.  As shown, from the evidence above, the

prosecution argued that the jury had only two choices: one was to believe that

Petitioner killed Amy, and the other was to believe that there was a police cover-up

**MEMORANDUM ORDER  36**

because someone else killed Amy.  Each point of withheld evidence supports the

theory that someone else killed Amy, and the last two most significant pieces of

evidence, support the theory that Brood killed Amy: (1) Petitioner's reaction to the

news of her death; (2) an eyewitness placing Brood in the police car, doing

something other than his regular routine, at 2:30 a.m. the night of the killing; and

(3) police logs showing that the mileage from the night of the murder was altered,

with the jury knowing that Brood was one of only two Ashton police officers.

As the prosecution acknowledged in closing argument, the odd, obsessive

statements about Amy after her death were not enough to convict him of murder.

Most of the expert testimony was inconclusive.  The additional piece of evidence

necessary was the gun, and the ultimate question was whether the police made the

mark or the mark was made during the murder.  The prosecution argued that there

was *no* evidence of police tampering.  Certainly, the police logs would have been

evidence to show that tampering did occur with the logs on that critical night and

would have suggested that the gun may have been tampered with, as well.  Because

of the particular emphasis on this factor at trial, evidence showing police tampering

is sufficient to undermine the outcome of the trial.

Another important point about the two most critical pieces of *Brady*

evidence is that this situation is *not* the withholding of evidence regarding a third

**MEMORANDUM ORDER  37**

party witness or random circumstantial evidence, as in many cases.  Rather, this is evidence directly implicating, as the perpetrator of the murder, one of the police officers who conducted the investigation.  Therefore, the very foundational reasons for *Brady* are invoked.  *See Bagley*, 473 U.S. at 675 ("The Court has recognized . . . that the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'") (internal citation omitted).

"A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. at 683.  The court's task is to determine whether "there is a reasonable probability that, had the [withheld evidence] been disclosed to the defense, the result of the trial would have been different."  *Id*. at 685.   In this case, as the prosecution emphasized so many times in closing argument, the jury had to choose either the theory that police tampered with the evidence, or the theory that Petitioner killed Amy Hossner.  Three new pieces of evidence pointing to another suspect – two of which implicated a police officer and/or a police cover-up – are enough to create a reasonable probability sufficient to undermine confidence in the outcome and to create a reasonable probability that had the evidence been disclosed to the defense, the result of the

**MEMORANDUM ORDER  38**

trial would have been different.  It is not required that the result of the trial *would have been* different, but that there is a "reasonable probability" it would have been different.  The cumulative effect of the withheld evidence meets this standard.

The habeas statute "is clear that habeas may issue under § 2254(d)(1) if a state-court 'decision' is 'contrary to . . . clearly established Federal law." *Williams*, 529 U.S. at 385-86.  Here, the Court concludes that the Idaho Supreme Court's decision is contrary to *Brady*, *Bagley*, and *Kyles*.   The Court therefore concludes that Petitioner is entitled to summary judgment, that his conviction and sentence should be vacated, and that the writ should issue.

## G.    Petitioner's *Brady* Sentencing Claim

As a result of the foregoing conclusion that the writ should issue and Petitioner's conviction and sentence vacated, Petitioner's fifth claim, that a *Brady* violation occurred in sentencing, is moot.

## H.    Standard of Law Governing Insufficiency of Evidence Claims

Sufficient evidence supports a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319.  Further, "all of the evidence is to be considered in the light most favorable to the prosecution."  However,  "if the historical facts would support conflicting inferences, the federal court 'must

**MEMORANDUM ORDER  39**

presume  – even if it does not affirmatively appear in the record – that the trier of

fact resolved any such conflict in favor of the prosecution, and must defer to that

resolution.'"  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (citing *Jackson v.*

*Virginia*, 443 U.S. 307, 324 (1979)).

Only if the Idaho Supreme Court's opinion is contrary to, or an unreasonable

application of *Jackson*, may a writ of habeas corpus issue for evidentiary

insufficiency.  *See Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005)

(applying AEDPA deference to a *Jackson* claim).

## I.    Discussion of Insufficiency of Evidence Claims

Respondent first argues that Petitioner's insufficiency of the evidence claim

is procedurally defaulted because he presented it as a state law motion for acquittal

under Idaho Criminal Rule 29(a).  On appeal, Petitioner argued that the State failed

to establish a prima facie case against him, and did not present enough evidence to

show that he was guilty of the crime beyond a reasonable doubt.  Petitioner now

argues that his claim is not defaulted because the Idaho Supreme Court uses the

*Jackson* standard to determine both the federal and state issues.

The Court need not resolve the procedural default issue because Petitioner is

not entitled to relief on the merits.   In an insufficiency of the evidence claim, the

Court looks at only what was before the jury, not what was withheld under *Brady*,

**MEMORANDUM ORDER  40**

or what can be considered new evidence.  Considering the evidence heard by the jury, the Court concludes that the Idaho Supreme Court's decision to deny relief is not contrary to, or an unreasonable application of, *Jackson*.  The Court must consider all of the evidence in the light most favorable to the prosecution and must presume that the trier of fact resolved any conflicts in favor of the prosecution.

The following evidence supporting conviction was presented at trial: (1) Brenda Briggs's testimony that places him at the scene of the crime before and after the murder; (2) Juliette Bruner's testimony that Petitioner was interested in Amy Hossman; (3) Johnna Sans's testimony that Petitioner told her (a) that the killer had only intended to scare Amy but he did not know that Amy had rearranged her furniture just prior to her death, (b), that he was a police officer and wanted to avenge her death, and (c) that he repeatedly called Johnna and said she knew too much about the murder; (4) Chad Perry's testimony that Petitioner had contacted him in 1990 and requested that Chad ask his girlfriend to contact another girl on behalf of Petitioner and identify herself as "Amy"; (5) Amy's mother's testimony that she had received some pointless calls from Grube about 6 months prior to Amy's murder, and that Amy and her father had received strange calls from an anonymous caller about the same time period; (6)  Petitioner reporting his shotgun and some of his ammunition missing and speculating that it could have

**MEMORANDUM ORDER  41**

been used to kill Amy; (7) expert testimony that the paint mark on the gun matched the scratch mark on the window frame; (8) expert testimony that his gun could not be ruled out as a possible murder weapon; (9) expert testimony that the shot that killed Amy could have come from the same batch of shot in Grube's possession.

While the evidence of Petitioner's statements to witnesses after the murder do not directly demonstrate that Petitioner committed the murder, the jury obviously resolved the issue about the matching marks on the gun and window frame in the prosecution's favor, which clearly connected Petitioner to the crime. Absent any other compelling evidence of police tampering with the evidence, the marks were strong evidence that it was Petitioner's gun that killed Amy.  The statements provide some indication of motive.  The remaining expert evidence is weak, but it provided evidence that Petitioner could not be ruled out as the murderer.  On the foregoing, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Accordingly, Petitioner is not entitled to relief on this claim.

**J.     Standard of Law Governing Claims Barred by *Teague***

Respondent asserts that Petitioner's third and fourth claims are barred by *Teague*.  The United States Supreme Court has instructed federal district courts to first consider the *Teague* question before considering the merits of a claim.  *Horn*

**MEMORANDUM ORDER  42**

*v. Banks*, 536 U.S. 266 (2002).

To determine whether a claim is barred by the non-retroactivity principles set forth in *Teague v. Lane*, 489 U.S. 288 (1989), a reviewing court engages in a three-step process.  First, the court must determine the date the defendant's conviction and sentence became final.  *Caspari v Bohlen*, 510 U.S. 383, 390 (1994).  Second, the court must survey "the legal landscape as it then existed" to determine whether existing precedent compelled a finding that the rule at issue "was required by the Constitution."  *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997).  If the rule is considered "new," the court must proceed to the third step and determine whether either of two exceptions applies*.  Teague*, 489 U.S. at 307.  The presumption against retroactivity is overcome only if (1) the new rule prohibits "a certain category of punishment for a class of defendants because of their status or offense," *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989),[8] or (2) the case presents a new "watershed rule of criminal procedure" that enhances accuracy and alters our understanding of bedrock procedural elements essential to the fairness of a conviction.  *Teague*, 489 U.S. at 311.  *Teague* applies to procedural rules, not substantive claims.  *Bousley v. United States*, 523 U.S. 614, 620 (1998).

**K.    Discussion of Claims Alleged to be Barred by *Teague***

---

[8]*Penry* was abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304 (2002)

**MEMORANDUM ORDER  43**

1.     Discussion of Claim Three

Petitioner's third claim is that he is actually innocent of his conviction and sentence.  The United States Supreme Court has noted that a claim of actual innocence is not cognizable on collateral review in a federal habeas corpus action. *Herrera v. Collins*, 506 U.S. 390 (1993).  A noncognizable claim is different from a claim barred by *Teague*.  A freestanding actual innocence claim is a substantive claim.  Therefore, it is not barred by *Teague*, which affects only procedural rules.  However, it is presently barred by *Herrera*.[9]

2.     Discussion of Claim Four

Petitioner's fourth claim is that the trial court violated his constitutional rights by failing to instruct on the lesser-included offenses of manslaughter.  In *Beck v. Alabama*, 447 U.S. 625, 638 (1980), the United States Supreme Court determined that it was a due process violation for a court *not* to instruct a jury on lesser-included offenses in a *capital* case.  *Id*. at 638.  The Court then noted, "We need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case."  *Id*. at 638 n.14.

Respondent argues that *Teague* bars a *Beck* claim in a noncapital case

---

[9]The Court notes that the United States Supreme Court may address the freestanding actual innocence issue in the capital case context in *House v. Bell*, 386 F.3d 668 (6th Cir. 2004), *cert. granted*, 125 S.Ct. 2991 (2005).

**MEMORANDUM ORDER  44**

because the United States Supreme Court has not yet addressed this issue in the noncapital context.  In *Turner v. Marshall*, 63 F.3d 807 (9th Cir. 1995),[10] the Ninth Circuit noted that "[t]here is no settled rule of law on whether [this principle] applies to noncapital cases," and, as a result, such a claim is *Teague*-barred.  *Id*. at 818-19.  The Second and Tenth Circuits have also held that a *Beck* claim is barred in a noncapital case.  *See Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996); *Johnson v. Puckett*, 176 F.3d 809, 819 (5th Cir. 1999).  The Third Circuit, on the other hand, has extended the *Beck* rule to noncapital cases.  *See Vujosevic v. Rafferty*, 844 F.2d 1023, 1027 (3d Cir. 1988).  In *Carriger v. Lewis*, 948 F.2d 588 (9th Cir. 1991), a capital case, the Ninth Circuit held that the *Teague* exceptions do not apply to the *Beck* rule.  *Id*. at 597.

As a result of the foregoing law, the Court concludes that, absent a United States Supreme Court case holding that the *Beck* rule is applicable in a noncapital context, this claim is barred by *Teague*, and that no exception to *Teague* applies.  Consequently, Respondent is entitled to summary judgment on this claim.

## III.

## ORDER

---

[10]*Turner* was overruled on other grounds by *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999).

**MEMORANDUM ORDER  45**

NOW THEREFORE IT IS HEREBY ORDERED that Respondents' Motion for Summary Judgment (Docket No. 73) is GRANTED in part as to Petitioner's second, third, and fourth claims.  It is DENIED in part as to Petitioner's first claim, and deemed MOOT as to Petitioner's fifth claim.

IT IS FURTHER HEREBY ORDERED that Petitioner's Cross-Motion for Summary Judgment (Docket No. 91) is GRANTED as to Petitioner's first claim. Petitioner's Petition for Writ of Habeas Corpus (Docket No. 3) is GRANTED. Respondent shall either retry Petitioner or release him within 120 days.

DATED:  **September 30, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court

**MEMORANDUM ORDER  46**