IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RAULAND J. GRUBE, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV-01-357-S-BLW |
| | ) | |
| vs. | ) | **AMENDED** |
| | ) | **MEMORANDUM** |
| RANDY BLADES, and the Attorney | ) | **ORDER** |
| General of the State of Idaho, ALAN G. | ) | |
| LANCE, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

The Court previously granted in part and denied in part Respondents'

Motion for Summary Judgment (Docket No. 73), and granted Petitioner Grube's

Cross-Motion for Summary Judgment on his *Brady* claim (Docket No. 91). As a

result, the Court granted Grube's Petition for a Writ of Habeas Corpus and ordered

the State to release Grube or retry him within 120 days.

After the Court issued its Order and Judgment, Respondents filed a Motion

to Stay Order to Release or Retry Petitioner while Motion for Reconsideration is

Pending (Docket No. 105), which the Court has granted, and a Motion to Alter or

Amend Memorandum Order (Docket No. 104), which is pending.

The Court heard oral argument on the Motion to Alter or Amend on

**AMENDED MEMORANDUM ORDER  1**

December 13, 2005.  Having reviewed the record and having considered the arguments of the parties, the Court grants the Motion to Alter or Amend to the extent that the September 30, 2005 Order is amended and superceded by this Order, but denies it insofar as the Court concludes that it remains appropriate to grant the Petition and issue the Writ in this case.  The Court has also concluded that the record will be clearer if the Court reissues its Memorandum Order rather than simply amending it; therefore, this Order amends and supercedes the Memorandum Order issued on September 30, 2005.

## INTRODUCTION

In the early morning hours of June 4, 1983, fifteen-year-old Amy Hossner was killed by a single shotgun blast through the bedroom window of her Ashton, Idaho home.  During the early stages of the investigation, the investigators' initial attention was focused on Ashton police officer Stephan Brood as a prime suspect.

Rauland Grube was not initially a suspect in the Amy Hossner case.  However, Grube called police in July of 1983 to report that his shotgun was missing, that several of his shot from his can of ammunition were missing, and that he feared the gun had been used in Amy's murder.  Later, to explain the missing shotgun, Grube's father said that he had found the gun and hidden it from Grube because Grube's father did not like guns in his household.  Grube's father

**AMENDED MEMORANDUM ORDER  2**

produced the gun and turned it over to police.

Police sent Grube's shot gun and two of Brood's shotguns to Ed Peterson, an ATF firearms expert, to be examined as possible murder weapons. Peterson performed test-firings of the weapons and eliminated Grube's shotgun as a possible murder weapon. Amy's murder remained unsolved for the next eight years.

In 1991, police began investigating Grube again because Brenda Briggs had come forward and stated that, shortly after the murder, Grube had confided in her the following: that he had spoken to Amy through her bedroom window the night she was murdered; that Amy had agreed to meet him the next day at the Methodist Church; that Amy had failed to arrive; that Grube returned to Amy's to see why she had not arrived; and that he had peered through her window, had seen her body, and had "never seen so much blood in his life." When police questioned Grube about these statements, Grube stated that he had lied to Brenda because he was seeking attention. Grube was subsequently arrested on murder charges.

On May 23, 1991, prior to the murder trial, the State provided the defense with a "Response to Discovery." The Response included the daily logs of the Ashton Police Department, Officer Steve Brood and Ashton Chief of Police Ed Sebek. Prior to trial, the defense counsel, the prosecutor, and the outside investigators all failed to notice that Chief Sebek's log for the night of the murder

**AMENDED MEMORANDUM ORDER  3**

had been altered.  The State's "Response to Discovery" did not list Lynn Gifford as an interviewee and did not list or provide a copy of his statement to the defense. *See State's Exhibit C-16.*

At trial, the State produced several witnesses who, like Brenda Briggs, testified that after Amy's death Grube expressed a great interest in Amy and her murder.  Johnna Sans testified that Grube had told her he was a police officer and wanted to avenge Amy's death, that Amy had rearranged her furniture just prior to her death, and that the shooter had not meant to kill her; the witness also testified that Grube later called her on repeated occasions and told her she knew too much about the murder.  Chad Perry testified that Grube had contacted him in 1990 and requested that Chad ask his girlfriend to contact another girl on behalf of Grube and identify herself as "Amy."

Juliette Bruner testified that Grube had been interested in Amy before her death.  Several times Grube had asked Juliette how Amy was doing, and asked Juliette to mention his name to Amy.  Grube also indicated to Juliette that he thought Amy was a cute girl.  Two years after Amy's death, Grube called Juliette twice to discuss Amy.

Amy's mother's testified at trial that she had received some pointless calls from Grube about six months prior to Amy's murder, and that Amy had received

**AMENDED MEMORANDUM ORDER  4**

some distressing calls from an unidentified man at the same time period.  Amy's

father testified that he had received strange calls from an anonymous caller about

the same time period.

Contrary to the earlier firearms test conclusions of Ed Peterson, two of the

State's trial experts, Gerald Wilkes and Martin Ols, concluded that Grube's

shotgun could not be eliminated as a possible murder weapon; Ed Peterson

changed his earlier opinion and agreed.  Defense firearms expert Jim Mason

testified that he thought it was unlikely that Grube's shotgun was the murder

weapon and that the test-firings indicated that the shot pattern on Amy's neck more

closely matched the firing pattern of Brood's gun.

FBI Agent John Riley testified that he compared shot gun pellets taken from

the crime scene to pellets taken from Grube's shells.  He testified that "the

compositions of the elements found at the crime scene  . . . were pretty much the

same as the pellets from [Grube's] shot shells."  *State's Exhibit* A-14, at p. 1525.

He concluded that "they all could have been manufactured by Remington-Peters on

or about the same date[,]"  *id*. at 1526, and "could have come from the same box of

ammunition."  *Id*. at 1528.  On cross-examination, he testified that Remington-

Peters could have manufactured several hundred thousand to a million shells in a

day and that it is possible that other shells from the same lot were shipped to and

**AMENDED MEMORANDUM ORDER  5**

sold to other people in the St. Anthony-Rexburg area.  *Id.* at 1534-35.[1]

A key part of the prosecution's case linking Grube to the murder was evidence that there were traces of brown paint from Amy's window frame found in ten grooves on Grube's gun, and that the window frame also bore a mark corresponding to the ten grooves on the gun.  Grube introduced expert testimony that the marks were made by manual scraping rather than recoil.  Grube also showed that no investigator or expert had seen the marks on the gun or the marks on the window in 1983.  The defense argued that the marks mysteriously appeared in 1991, after Grube became a suspect again, and that the marks had been manufactured by investigators.

On October 1, 1991, a jury convicted Grube of the first degree murder of Amy Hossner.  On March 27, 1992, the state district court imposed a sentence of life imprisonment without the possibility of parole.  On September 7, 1994, the Idaho Supreme Court upheld the judgment of conviction and sentence on direct appeal.  *See State's Exhibit B-5.*

In 1994, while Grube's direct appeal was pending, Lynn Gifford approached defense counsel.  In conversations with Gifford, defense counsel learned that

---

[1]In support of his assertion of actual innocence, Grube submitted recent scientific articles published after 2001 that comparative bullet lead analysis is scientifically unreliable.  *See Petitioner's Reply Brief and Declaration of Counsel* (Docket Nos. 46 and 47).  The Court has not considered this new evidence in assessing any of Grube's claims in his Petition.

**AMENDED MEMORANDUM ORDER  6**

Gifford was the person who first told Grube that Amy Hossner had been murdered.

Gifford indicated that Grube had reacted with what appeared to be genuine shock

at the news of Amy's murder.   Gifford also told defense counsel he had reported

to the police that he had seen Stephan Brood driving a police car within a few

blocks of her house at approximately 2:30 a.m. on the morning of the murder.

Police had interviewed Gifford and recorded the interview in 1991, but the

prosecutor had failed to disclose the interview to the defense.  Gifford's testimony

prompted defense counsel to file a post-conviction action in September of 1995.

In 1996, in preparation for cross-examination of Gifford at the post-

conviction trial, the State's attorneys met with Gifford at defense counsel's office

to interview him.[2]  During the course of the interview, they showed Gifford a copy

of the police log from the night of the murder in an attempt to convince Gifford

that it was Ed Sebek, not Stephan Brood, on patrol in the police car that night.

During that interview, defense counsel noticed that the police log appeared to have

---

[2]The Idaho Supreme Court decision states that "[t]he police logs were shown to Gifford at the time of his 1991 interview in order to impeach his observation of Officer Brood in the police car between 2:00 and 2:30 a.m. the night of the murder in the vicinity of the Hossner home."  *State's Exhibit D-4*, at p. 9.  The source of this factual information is unclear. (The record *does* show that the State attempted to impeach Gifford with the police log in 1996 during post-conviction proceedings.)  The Idaho Supreme Court did not rely on this fact in its analysis of the *Brady* claim or the newly-discovered evidence claim; rather, it merely concluded that the evidence was immaterial under either standard.  In any event, even if police officers showed Gifford the logs in 1991, that fact is not material to the issue at hand, because *defense counsel* first learned of the Gifford interview in 1994, three years after Grube's conviction.  *See State's Exhibit C-1*, at p. 8.

**AMENDED MEMORANDUM ORDER  7**

been altered.  They requested that the State produce the original log.  The State

represented that the original log was lost.[3]

On the day before the post-conviction trial, the State found the original logs

and notified defense counsel.  Defense counsel inspected the original logs,

determined that the log for the night of the murder had been altered, and sought a

continuance and appointment of a handwriting expert.  At the post-conviction trial,

James Hale testified as a handwriting expert for the defense, and Gregory Floyd

testified as a handwriting expert for the State.

-------

[3]One of the purposes in filing this Amended Memorandum Order is to correct a statement
made in the original Memorandum Order concerning whether the police logs were disclosed
prior to the criminal trial.  The briefing contained in the state court record and in this case led
this Court to believe that the police logs had not been produced to defense counsel in 1991.
However, it now appears that the police logs themselves had been produced, but the information
that the logs were altered by police officers was not disclosed.  During the appeal of the post-
conviction decision, the State did not argue, as it does here, that there was no suppression under
*Brady* because prosecutors produced the police logs to defense counsel prior to the 1991 criminal
trial.  Rather, on post-conviction appeal the State argued, and the Idaho Supreme Court agreed,
that there was no suppression under *Brady* because the only exculpatory information was the
later-developed forensic expert testimony, and that expert testimony could not have been
suppressed because it was not in the State's possession.  In their Motion for Summary Judgment
in this case, Respondents argued that "there is little evidence establishing when Grube became
aware of the logs," rather than arguing that the police logs had been produced to defense counsel
as part of the State's discovery responses prior to the 1991 Grube trial.  *Respondent's Brief*, at p.
21 (Docket No. 85).  It was not until Respondents filed their Brief in Support of Motion to Alter
or Amend (Docket No. 104, at p.5), that Respondents clearly pointed to evidence in the state
court record showing that the police logs had been produced to Grube's counsel prior to the 1991
trial.
    That defense counsel had the police logs in their possession prior to trial does not change
the Court's ultimate conclusion.  As discussed more fully below, the relevant exculpatory
evidence withheld by the State was the *information* –  known to police officers who have the
same duty of disclosure as the prosecutor – that Sebek's log on the night of the murder had been
altered several weeks after the log was originally completed by Sebek.  The production of the
police logs does not remedy the withholding of this information.

**AMENDED MEMORANDUM ORDER  8**

A summary of the experts' testimony at the post-conviction trial, taken from

Grube's appellate brief in the post-conviction matter, is as follows:

> Mr. Hale concluded, and the State's expert agreed, that the end mileage contained on the June 3, 1983 Sebek log (Exhibit M) had been changed from a five to a six, thereby adding ten miles to the total traveled that night.  Hale testified that the change from a five to a six had been done very carefully, unlike any of the other changes contained in the other police logs (Exhibits M and N).  *Grube II*, Tr. Vol I, p. 132, L. 24-25; p. 133, L. 1-13.[4] He explained this provided strong evidence of an intent to deceive.

> Mr. Hale further concluded that the total mileage contained on the June 3, 1983 Sebek log had not been written by Sebek, but appeared to be written in the handwriting of Brood.  *Grube II*, Tr. Vol I, p. 120, L. 2-6.  While the State's expert, Gregory Floyd, could not positively say that Brood wrote the questioned "41," in his examination notes he clearly admits that the "41" appears to more closely resemble Brood's handwriting than that of any other potential known writers.  *Grube II*, Tr. Vol. I, p. 262, L. 19-24.

> Mr. Hale also noted another highly relevant peculiarity in Sebek's June 3, 1983 log.  The final time entry "2:30" appears to be written so that the last two digits avoided a hole which was punched in the document.  *Grube II*, Tr. Vol I, p. 130, L. 4-9.  Hale testified that this was unique in all of the logs located in Exhibits M and N.  All other entries by a hole show that the hole punch went through the entries.  This is the only instance in which it appears that an entry was written after the holes were punched in a conscious effort to avoid the hole.  This becomes important because of Sebek's testimony that only after the logs were completed and later placed in a three-ring binder for review by the City Council a month later, would the holes be punched in those documents.  *Grube II*, Vol. I, p. 206, L. 1-7.  If that is true, this strong evidence that the 2:30 a.m. entry by Sebek was

---

[4]In this case, the transcript is found in State's Exhibit C-2.

**AMENDED MEMORANDUM ORDER  9**

written much later than June 3 or 4, 1983.

*State's Exhibit D-1*, at pp. 20-21 (Grube's Appellate Brief on Post-Conviction

Review).

Chief Sebek and Officer Brood were the only Ashton police officers on the

date of the murder.  Gifford's testimony placed Brood in the police car at 2:30 a.m.

Gifford also testified that he saw Brood leaving Circle K at 10:00 a.m. the morning

of the murder, one hour before Amy's body was discovered by her father, and that

Brood had informed the store clerk that Amy had been killed.

After the hearing, the district court denied post-conviction relief.  The Idaho

Supreme Court affirmed on January 7, 2000, in a 3-2 decision.  *Grube v. Idaho*,

995 P.2d 794 (Idaho 2000).  The Idaho Supreme Court denied Grube's petition for

rehearing, and a remittitur issued on March 3, 2000.

On July 20, 2001, Grube filed his federal Petition for Writ of Habeas Corpus

(Docket No. 3).  After an initial review, this Court concluded that Grube's Petition

was untimely, but appointed counsel and provided him the opportunity to

demonstrate that the one-year limitations period should be tolled.  *See Order of*

*November 5, 2001* (Docket No. 8).  The Court later ordered the Clerk to serve the

Petition on Respondents, who filed a Motion for Summary Dismissal arguing that

Grube's Petition was barred by the statute of limitations and that he had failed to

**AMENDED MEMORANDUM ORDER  10**

demonstrate circumstances sufficient to warrant equitable tolling of the limitations

period (Docket No. 14).  Grube argued in response that he was actually innocent of

the conviction, and that actual innocence warranted equitable tolling.  Prior to the

hearing, Respondents waived the statute of limitations defense, allowing the case

to proceed to the merits on summary judgment (Docket No. 86).

Grube's Petition contains the following claims: (1) withholding of

exculpatory evidence by the state in violation of *Brady v. Maryland*, 373 U.S. 83

(1963); (2) sufficiency of the evidence under *Jackson v. Virginia*, 443 U.S. 307

(1979); (3) freestanding actual innocence based upon newly discovered evidence;

(4) the trial court's failure to instruct on included offenses of manslaughter; and (5)

withholding of exculpatory evidence by the state in violation of *Brady*, requiring a

new sentencing hearing.  *See Petition* (Docket No. 3).

## SUMMARY JUDGMENT

### A.    Standard of Law for Habeas Corpus Summary Judgment Motions

The Federal Rules of Civil Procedure apply to habeas corpus actions except

where application of the rules would be inconsistent with established habeas

practice and procedure.  *See* Rule 11 of the Rules Governing Section 2254 Cases;

*Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).  Under the Federal Rules of Civil

Procedure, summary judgment is appropriate where there is no genuine issue as to

**AMENDED MEMORANDUM ORDER  11**

any material fact and the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). The summary judgment standards must be applied in light of

the substantive law governing habeas proceedings.

Grube's case was filed after April 24, 1996, making it subject to the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  In order to

obtain federal habeas corpus relief from a state court judgment under AEDPA, the

petitioner must show that the state court's adjudication of the merits of his federal

claim either:

> (1)    resulted in a decision that was contrary to, or involved an
>        unreasonable application of, clearly established Federal law, as
>        determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable
>        determination of the facts in light of the evidence presented in the
>        State court proceeding.

28 U.S.C. § 2254(d).

1.    "Contrary to"

In explaining how to apply § 2254(d)(1), the United States Supreme Court,

in *Williams v. Taylor*, 529 U.S. 362 (2000), explained that relief under the

"contrary to" standard could be afforded in two ways: (1) "if the state court arrives

at a conclusion opposite to that reached by this Court on a question of law," or (2)

"if the state court confronts facts that are materially indistinguishable from a

**AMENDED MEMORANDUM ORDER  12**

relevant Supreme Court precedent and arrives at a result opposite to ours." *Id*. at

405.  The Court further defined "contrary to" as "'diametrically different,'

'opposite in character or nature,' or 'mutually opposed.'" *Id*.  In other words, a

state court decision is "contrary to" federal law as established by the Supreme

Court if it is "substantially different from the relevant precedent of this court." *Id*.

Applying an incorrect standard of law makes a decision "contrary to" federal

law established by the Supreme Court. *Id*.; *see also Cooper-Smith v. Palmateer*,

397 F.3d 1236, 1243 (9th Cir. 2005).  In this situation, the decision whether to

grant the writ is determined by reviewing the constitutional issue "de novo,

applying the correct constitutional analysis." *Barker v. Fleming*, 423 F.3d 1085,

1094 (9th Cir. 2005).  In other words, the federal court need not defer to the state

court's conclusions of law, but it is free to determine its own conclusions of law

based on the state court findings of fact.  *See Williams,* 529 U.S. at 406 (where a

decision is contrary to federal law, "a federal court will be unconstrained by

§2254(d)(1)").

2.    <u>"Unreasonable Application"</u>

A state court decision can be "an unreasonable application" of federal law in

two ways: (1) where a "state court identifies the correct governing legal rule from

this Court's cases but unreasonably applies it to the facts of the particular state

**AMENDED MEMORANDUM ORDER  13**

prisoner's case," or (2) where the state court either unreasonably extends a legal

principle from our precedent to a new context where it should not apply or

unreasonably refuses to extend a legal principle from our precedent to a new

context where it should apply." *Id.* at 407.  A petitioner cannot prevail under the

unreasonable application clause "simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly." *Id*. at 411.  Rather, the state

court decision must be "objectively unreasonable." *Id.* at 409.

**B.     Standard of Law Governing *Brady v. Maryland* Claims**

Because the Idaho Supreme Court issued its opinion in this matter on

January 7, 2000, the Court relies upon United States Supreme Court precedent

which existed at that time to review the Idaho Supreme Court's decision.  In *Brady*

*v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that

"the suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution."  In

*United States v. Bagley*, 473 U.S. 667, 676 (1985), the United States Supreme

Court clarified that "impeachment evidence . . . as well as exculpatory evidence,

falls within the *Brady* rule."   The Supreme Court also clearly abandoned the

**AMENDED MEMORANDUM ORDER  14**

practice that a different standard of law should be applied depending upon whether the defense had requested the information.  *Id*. at 683 (disavowing distinctions stated in *United States v. Agurs*, 427 U.S. 97 (1976)).

The *Bagley* decision also clarified that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id*. at 682.  In other words, a "'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id*.

In *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), the United States Supreme Court held that impeachment evidence known only to the police but unknown to the prosecutor was subject to *Brady* disclosure.  The *Kyles* Court also emphasized that the *Bagley* materiality test requires the court to consider the suppressed evidence "collectively, not item by item."  *Id*. at 436.  Particularly, the *Kyles* Court explained:

> [Courts] should evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion.

*Id*. at 436 n.10.

Where a state court analyzes the suppressed evidence item by item, but fails to analyze the cumulative effect of all of the suppressed evidence, "its decision [is]

**AMENDED MEMORANDUM ORDER  15**

contrary to clearly established Federal law as set forth in *Kyles*." *Barker v. Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005).  Where the state court "did not conduct the proper analysis, AEDPA's restrictions . . . do not apply," and the federal habeas court conducts a de novo review.  *Id*. at *7.  If a court  determines that a constitutional violation occurred under the *Brady* test, the court need not conduct a harmless error analysis.  *Kyles*, 514 U.S. at 435.

## C.    Statement of Grube's *Brady* Claims

The Idaho Supreme Court summarized Grube's *Brady* claim as follows:

> In 1994, while Grube's appeal from the judgment of conviction was pending, Lynn Gifford approached defense counsel.  Gifford indicated that he was the person who had first told Grube that Amy Hossman had been murdered, that although he had been interviewed by the police in 1991, he had not been called to testify at Grube's trial. In their conversation with Gifford, defense counsel learned information (1) that Grube had reacted with genuine surprise and sadness to the news of Amy Hossner's death, and (2) that Gifford had reported seeing Ashton police officer Stephen Brood – an early suspect in this crime – driving a police car within a few blocks of Amy Hossner's house at approximately 2:30 a.m. on the night of the murder.  The information had been communicated to the police investigator in 1991 but was never disclosed by the state to the defense, prompting counsel to seek post-conviction relief on Grube's behalf from the district court.
>
> In his application for post-conviction relief, Grube asserted that he was entitled to a new trial because he had been denied due process by the state's failure to disclose exculpatory information contained in Gifford's interview with the investigator in 1991.  The Gifford information led defense counsel to discover that Ashton police logs recording activity the night of the murder appeared to have been altered.

**AMENDED MEMORANDUM ORDER  16**

*Grube v. Idaho*, 995 P.2d 794, 796 (Idaho 2000).  Grube argued that the Gifford

information "put into question the alibi of the other suspect (Brood), and supported

Grube's defense that someone else had killed Amy Hossner."  *Id.* at 797.

**D.     Summary of this Court's Decision on the *Brady* Claims**

Three *Brady* claims are at issue: (1) Gifford's testimony of his observation

of Grube's reaction to Amy's death, (2) Gifford's testimony of his observation of

Officer Brood at 2:30 a.m. on the night of Amy's murder, and (3) the alterations to

the police log corresponding to the night of the murder.  The Idaho Supreme Court

determined that Gifford's observation of Grube's reaction was exculpatory and had

not been disclosed.  However, the court deemed the evidence immaterial, using, in

part, an outdated legal standard.  The court determined that Gifford's observation

of Officer Brood was also exculpatory and undisclosed.  But the Court again

deemed the evidence immaterial, using, in part, an outdated and incorrect legal

standard.  The court determined that the altered police logs were neither

exculpatory nor undisclosed, and therefore the court did not reach the materiality

issue.

The organization and language of the state court's analysis of the three

*Brady* claim sections suggests that the Court did not conduct a cumulative effect

analysis.  In fact, the state court notes, "We *complete our analysis* of the claimed

**AMENDED MEMORANDUM ORDER  17**

*Brady* violation by addressing whether with due diligence the defense could have obtained Gifford's testimony." *Grube*, 995 P.2d at 800.  Nowhere prior to, or after, this statement is there a cumulative effect analysis.   Rather, at the end of the opinion, the Court makes a conclusory statement that "the Gifford testimony" (apparently meaning claims one and two) did not meet the materiality standard. Again, an outdated standard and an incorrect standard are cited in its conclusion.

Because a cumulative effect analysis of the *Brady* claims is not found in the Idaho Supreme Court's decision, this Court concludes that the Idaho Supreme Court did not perform the required *Kyles* materiality analysis.  Therefore, its *Brady* analysis is contrary to *Kyles*.[5]  The opinion is also contrary to *Bagley*, because the opinion consistently applies an outdated standard of law abandoned in *Bagley*.

As a result, this Court reviews the *Brady* claims de novo.  In its cumulative effect analysis, the Court includes the third *Brady* claim.  The Court does so

_____

[5]The Court has considered whether to use the "contrary to" standard or the "unreasonable application" standard of § 2254(d)(1) on the third *Brady* claim. While claims one and two were decided on the materiality factor, claim three was decided on whether it was exculpatory and suppressed, and the Idaho Supreme Court did not reach materiality, and, thus, it did not proceed to make the *Agurs* and cumulation errors on that claim, which was part of the overall *Brady* issue.  However, because the state court decision that the police logs were not exculpatory and suppressed is "diametrically different," "opposite in character or nature," or "mutually opposed" to *Brady* and its progeny, *see Williams*, 529 U.S. at 405, the Court concludes that the state court's decision on the third claim is also "contrary to" governing precedent.  Alternatively, under the same reasoning and comparison cases used in the Court's decision, the Court would conclude that the state court's decision on the third claim was not merely erroneous, but objectively unreasonable, under the "unreasonable application" standard.

**AMENDED MEMORANDUM ORDER  18**

because it concludes that the Idaho Supreme Court's determination that the altered police logs were neither exculpatory nor suppressed is contrary to *Brady*, *Bagley*, and *Kyles* in that the court arrived at a conclusion of law that is wholly inconsistent with those decisions.

Based upon the following de novo analysis of the *Brady* claims, including its cumulative effect analysis, the Court concludes that the *Brady* claims meet the *Brady* materiality test and warrant habeas relief.

**E.     Idaho Supreme Court's Statement of the Law**

In the section of its opinion setting forth the applicable standards of the law, the Idaho Supreme Court begins with a correct standard of law, recognizing that *Brady* requires disclosure of "all exculpatory evidence known to the state or in its possession," and that the duty "encompasses impeachment as well as exculpatory evidence." *Id*. at 797.  The Idaho Supreme Court then recites an outdated standard of law from *United States v. Agurs*, 427 U.S. 97 (1976): "In the situation where a general request for *Brady* materials is made and when the exculpatory information in the possession of the prosecutor may be unknown to the defense, the reviewing court must look to the whole record and determine whether 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Id*. at 797 (citing *Agurs*, 427 U.S. at 112).  Prior to its 1985 decision in *Bagley*, the United States Supreme

**AMENDED MEMORANDUM ORDER  19**

Court applied different standards of law depending on whether the suppressed evidence was not requested by the defense, was generally requested by the defense, or was specifically requested by the defense. *See Agurs*, 427 U.S. at 106-113; *Bagley*, 473 U.S. at 682. The standard "whether the omitted evidence creates a reasonable doubt that did not otherwise exist" corresponded to the factual situation in which a general request or no request has been made. The *Agurs* court suggested that the standard to be used when no request or only a general request was made should be higher than the standard required when a specific request had been made. 427 U.S. at 106. The *Agurs* decision does not use the term "reasonable probability," which became the standard of law after 1985 when *Bagley* was issued,[6] and continues to be the governing standard.

In *Bagley*, the court noted that the standard for all situations, regardless of the nature or absence of a request, is the same: "Evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Kyles*, 514 U.S. at 433-34. This standard appears to be more expansive than the "creation of reasonable doubt" standard articulated in *Agurs* that the Idaho

---

[6]*See Strickler v. Greene*, 527 U.S. 263, 299 (1999) (Souter, J., concurring in part and dissenting in part), for an detailed recitation of the development of the "reasonable probability" standard.

**AMENDED MEMORANDUM ORDER  20**

Supreme Court relied upon,

Returning to the Idaho Supreme Court's opinion in Grube's case, the Court notes that after the Idaho Supreme Court stated the outdated *Agurs* standard, it set forth the correct standard of materiality from *Bagley,* quoted directly above. *Grube*, 995 P.2d at 797.  It further correctly defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* (relying on *Bagley* and *Kyles*).  The Idaho Supreme Court then correctly restated the standard as "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* at 798 (citing *Strickler v. Greene*, 527 U.S. 263 (1999)).

The Idaho Supreme Court identified its task as one of  "examin[ing] the withheld evidence in Grube's case to determine whether it substantially undermined confidence in the outcome of the jury's verdict, thus entitling Grube to a reversal of his conviction and a new trial. *Id.* Nowhere in its statement of law does the Idaho Supreme Court mention the requirement found in *Kyles* that, as part of the materiality analysis, it is required to determine whether all of the withheld evidence, considered cumulatively, would have created a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Kyles*, 514 U.S. at 436 & 436 n.10.

**AMENDED MEMORANDUM ORDER  21**

**F.     Discussion of *Brady* Claims**

1.     <u>Grube's Reaction to Amy's Death</u>

The Idaho Supreme Court first analyzed Gifford's testimony of Grube's reaction to news of the death of Amy Hossner.  *Id.*  It concluded that the evidence was cumulative:

> The information contained in the statement from Gifford that was withheld from Grube was information which the jury had already heard when the tape of Grube's interview with the police was played during the trial.  On the tape, Grube indicated that it was Gifford who had told him about the murder and that the news had made him sick such that he did not return to work after his break.  For Gifford to testify to these same observations would present cumulative evidence.  When nondisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs.  This evidence from Gifford, had it been disclosed, would not have led to a different result and would not have cast the entire case in such a different light as to undermine confidence in the verdict.

*Id.* (citations omitted).

This paragraph is the court's analysis and conclusion that testimony about Grube's reaction was not material, the final step in the *Brady* analysis prior to a cumulative effect analysis, Apparently, the court did not take issue with Grube's assertion that the testimony was exculpatory or suppressed.  Here, it is difficult to determine whether the Idaho Supreme Court applied the correct standard of law.  Its conclusion appears to be a blend of an incorrect standard – whether the evidence would have "led to a different result" – and a correct standard – that the

**AMENDED MEMORANDUM ORDER  22**

evidence would not have "put the whole case in such a different light as to undermine confidence in the verdict."   Because of the Idaho Supreme Court's failure to clearly apply the correct standard and failure to perform a cumulative materiality analysis, its decision is contrary to United States Supreme Court precedent.  *See Barker*, 423 F.3d at 1094.  Therefore, this Court reviews this claim de novo in light of the facts found by the state court.

The Court concludes that Gifford's testimony is exculpatory and was suppressed.   It is not cumulative, because a defendant's own words that he reacted by becoming sick and going home from work is not the equivalent of an independent witness's observation that Grube "fell to his knees, exclaiming "Oh God!," and that he appeared to be sincerely upset and sad upon learning of Amy's death."  *See State's Exhibit D-4*, at p. 6.

Respondents argue that the statement was not suppressed, because Grube himself knew that Gifford had first told him the news.  However, Grube's knowledge that Gifford was the individual who first informed him of the murder is not the same as knowledge of Gifford's observation about the genuineness  of Grube's reaction.  The prosecution had Gifford's written statement containing this relevant, exculpatory information in their possession, and Grube did not.  *Brady* and *Strickler* require that the statement be given up to the defense.  *See Strickler*,

**AMENDED MEMORANDUM ORDER  23**

527 U.S. at 285 ("Although it is true that petitioner's lawyers . . . must have known that Stoltzfus had had multiple interviews with the police, it by no means follows that they would have known that records pertaining to those interviews . . . existed and had been suppressed.").

The Court agrees with the Idaho Supreme Court's finding that "there is no evidence in the record to suggest that Grube had any knowledge that Gifford had been questioned and the interview recorded by the state investigator." *Grube*, 995 P.2d at 800. This Court agrees with the Idaho Supreme Court's conclusion that "[t]he State's excuse for not providing Grube with the Gifford interview is . . . without merit." *Id. See Gantt v. Roe*, 389 F.3d 908, 912-913 (9th Cir. 2004).[7]

Respondents also argue that the state district court determined that Gifford's

---

[7]In *Gantt*, the only evidence linking the defendant to the victim was a "Shalimar Restaurant" matchbook found on the defendant; the matchbook had a Bangladesh telephone number handwritten on the inside cover. The prosecutor had disclosed the matchbook, and also the fact that a call to the number reached a person who did not know the victim. The prosecutor did not disclose that a facsimile of a photograph of the victim was sent to authorities in Bangladesh, who in turn showed it to the proprietor of the house where the phone was connected, and that person had not recognized the victim. In addition, authorities learned that the proprietor's son lived in Los Angeles and worked at the Shalimar restaurant. A subsequent interview with the son revealed that the son did not know the victim, either. 389 F.3d at 910-11.
On these facts, the Ninth Circuit reasoned:

> The district court concluded that the evidence was not "suppressed" within the meaning of *Brady*, because the defense could and should have discovered it itself. While the defense could have been more diligent . . . this does not absolve the prosecution of its *Brady* responsibilities. As the Supreme Court reiterated just last Term, "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."

389 F.3d at 912-913.

**AMENDED MEMORANDUM ORDER  24**

testimony about Grube's reaction was an inadmissible opinion under Idaho state law, and that this Court must defer to that conclusion.  The Court disagrees with Respondents' assessment.  The Idaho Supreme Court did not conclude that Gifford's testimony was inadmissible, but concluded that it was cumulative and not material under *Brady.*  The court agrees with Grube that the Idaho Supreme Court implicitly considered the admissibility question when it went beyond that issue and determined the issues of whether the evidence was cumulative and material.  The Idaho Supreme Court's decision is consistent with Idaho case law showing that the evidence would likely have been admissible at trial.  *See State v. Drennon*, 883 P.2d 704 (Idaho Ct. App. 1994); *Dawson v. Olson*, 543 P.2d 499 (1975).  This Court is not required to defer to the lower state court's conclusion that the evidence was inadmissible under Idaho law when the Idaho Supreme Court disregarded that conclusion on appeal.

      2.      <u>Seeing Officer Brood at 2:30 a.m.</u>

The Idaho Supreme Court next reviewed Gifford's testimony that he saw Officer Brood in the patrol car about 2:30 a.m. on the night of the murder.  The Idaho Supreme Court examined the Gifford testimony about Brood in light of all of the other evidence at trial:

> The district court concluded that the information from Gifford, which the court found had been suppressed by the state, was not material in

**AMENDED MEMORANDUM ORDER  25**

view of the other evidence upon which Grube was convicted. Even if believed, Gifford's observations only established that Officer Brood was out later the night of the murder than he claimed and that he and Chief Sebek either were mistaken or lied about their activities that night.  Although the defense argued that the jury could have inferred from Gifford's testimony that Officer Brood was involved in the murder, *the testimony does not exonerate Grube*. Gifford's testimony does not significantly impeach the truthfulness of any prosecution witness who provided incriminating evidence against Grube at his trial, nor does it impair the incriminating quality of such testimony. Gifford's testimony did not contradict the physical evidence of tool marks on Grube's gun and the window through which the fatal shot was fired or the pellets in Amy's body that came from the same batch as the unfired shells that were found in Grube's possession. Those items of evidence do not change regardless of Gifford's version of the events and any records shown in the police logs. Nor does the Gifford testimony weaken the overall case against Grube, which included testimony from a parade of witnesses about Grube's obsession with Amy Hossner and statements made by Grube that Amy had rearranged the furniture in her bedroom and that the shooter never meant to kill her.

*Id*. at 799 (emphasis added).

The Idaho Supreme Court then concluded:

The evidence from Gifford, which was withheld, does not as a matter of law raise a reasonable doubt as to Grube's guilt that did not otherwise exist in the evidence presented at Grube's trial, *see United States v. Buchanan*, 891 F.2d 1436, 1445 (10th Cir. 1989), which compels us to uphold the district court's ruling on materiality. Accordingly, the nondisclosure of the Gifford testimony, because it was not material and would not have changed the outcome of the trial, does not entitle Grube to post-conviction relief for the alleged *Brady* violation.

*Id*. at 799.

**AMENDED MEMORANDUM ORDER  26**

Here, the court again uses the out-of-date *Agurs* standard – a reasonable doubt as to guilt that did not otherwise exist – to "compel" it to conclude that the testimony was not material. The state court further concludes that the testimony does not entitle Grube to relief, "because it was not material and would not have changed the outcome of the trial." That, again, is not a correct statement of the standard – all that is required is a *reasonable probability* that the result of the proceeding would have been different.

While the language of the analysis seems somewhat like a cumulative effect assessment because it mentions the police logs, the organization of the opinion shows otherwise. This discussion was within the section discussing Gifford's testimony about seeing Brood the night of the murder, and the court had not yet discussed the police logs. Accordingly, because the Idaho Supreme Court relied on the wrong standard of law, and because it did not perform a cumulative effect analysis, this Court performs a de novo review using the facts found by the state court record.

Respondents argue that the Court overlooked the state court's "finding of fact" that Brood was not the driver of the police vehicle on the night of Amy's murder. To the contrary, the state district court did not make a factual finding that Brood was not the driver of the police car. Such a "finding" is conspicuously

**AMENDED MEMORANDUM ORDER  27**

absent from its "Findings of Fact" section, which appears to be merely a recitation of all of the conflicting evidence presented at the hearing.

Rather, in its Conclusions of Law, the Court stated:

> Mr. Gifford observed a police car on June 4th at approximately 2:00-2:30 a.m.  but this Court is unable to conclude, on the evidence submitted, that Steven Brood was the officer driving that vehicle. Even assuming Mr. Gifford's observation of Officer Brood was accurate it is only marginally relevant in view of the other evidence presented at trial. . . .

*State's Exhibit C-1*, at 243.

Given the lack of a factual finding in the "Findings of Fact" section that Brood was not the officer driving the car, and given the state district court's inclusion of the phrase that "even assuming Mr. Gifford's observation of Officer Brood was accurate," this Court concludes that the state district court was unwilling to make such a factual finding.  Instead, the state court side-stepped the issue by adopting a conclusion of law that assumed Grube's facts were true, and then weighed that new evidence against the evidence presented at trial.  *State's Exhibit C-1*, at p. 243.

Later in the opinion, the state district court noted, "[i]n view of the evidence at trial Mr. Gifford's testimony, even combined with the log changes, fails to cast any different light on the trial which would undermine confidence in the jury's original verdict."  This statement further shows that the court did not make specific

**AMENDED MEMORANDUM ORDER  28**

findings about whether Gifford or Sebek was credible, but again, noted that its

decision was based on weighing the new evidence – assuming its truth for

argument's sake – against the evidence presented to the jury.

The Idaho Supreme Court interpreted the state district court's statement

about Gifford's testimony that Brood was the driver of the car in the same way:

> The district court concluded that the information from Gifford,
> which the court found had been suppressed by the state, *was not*
> *material* in view of the other evidence upon which Grube was
> convicted.  *Even if believed*, Gifford's observations only established
> that Officer Brood was out later the night of the murder than he claims
> and that he and Chief Sebek either were mistaken or lied about their
> activities that night.

*State's Exhibit D-4*, at 7-8 (emphasis added).

Based upon all of the foregoing, the Court concludes that there is no finding

of fact that Gifford's testimony was not credible.  Therefore, no deference is owed.

Because the Idaho Supreme Court failed to determine the cumulative effect of all

of the *Brady* evidence, this Court does so below.

>       3.       The Police Logs

The third and final *Brady* claim is that prosecutors and investigators should

have disclosed the information that the police log for the night of murder had been

altered.  The Idaho Supreme Court's analysis of this claim was as follows:

> Until the Gifford testimony was developed, the relevance of the
> police logs for the night of Amy Hossner's murder was not readily

**AMENDED MEMORANDUM ORDER  29**

apparent.  The logs were examined to verify which officer was on
duty and which officer had filled in the daily log and could have been
used to argue to the jury that not only did Officer Brood commit the
murder, but he was involved in a coverup to hide his involvement.
The state argues that only the testimony of the forensic expert who
examined the police logs, not the logs themselves, could be
considered exculpatory.  Since the expert testimony that related to the
police logs was not in the possession of the prosecution, the state
properly asserts that such evidence could not be deemed withheld or
in any way suppressed by the state in contravention of *Brady*
principles.

*Id*. at 800.

The state court did not reach the materiality issue as to the police logs, but

instead determined that the logs themselves were neither exculpatory nor

suppressed.  The core of the state court's decision was that the police logs had no

exculpatory value in themselves without the expert testimony, and that the expert

testimony could not have been "withheld."  This Court concludes otherwise.

The United States Supreme Court has made it clear that exculpatory

evidence need not be evidence that would have produced an acquittal.  *Kyles*, 514

U.S. at 434.  It need only be evidence "favorable to the accused,"  *Brady*, 373 U.S.

at 87, and of the nature that it creates a "reasonable probability" that had the

evidence been disclosed to the defense, the result of the proceeding would have

been different." *Bagley*, 473 U.S. at 681.  "[A] showing of materiality does not

require demonstration by a preponderance that disclosure of the suppressed

**AMENDED MEMORANDUM ORDER  30**

evidence would have resulted ultimately in the defendant's acquittal. . . ." *Kyles*,

514 U.S. at 434 (citing *Bagley*, 473 U.S. at 682).    Stated simply, "[s]uch evidence

is favorable to an accused . . . so that, if disclosed and used effectively, it may

make the difference between conviction and acquittal."  *Bagley*, 473 U.S. at 676.

     *Brady* requires disclosure of exculpatory information, not just exculpatory

documents and tangible things.  *See Bagley*, 473 U.S. at 677 ("The constitutional

error, if any, in this case was the Government's failure to assist the defense by

disclosing information that might have been helpful in conducting the cross-

examination").  In *Bagley*, the prosecution disclosed *misleading* information or

what might be deemed "half-truths"; the United States Supreme Court concluded

that such a disclosure violated *Brady*.   The defense counsel had asked for

disclosure of any inducements made to witnesses, and the prosecutor failed to

disclose that the *possibility* of a reward had been held out to the witnesses.  The

prosecution had provided affidavits from the witnesses stating that they had

received no *promises* of reward in return for the information provided, but the

affidavits made no mention that the possibility of a reward had been held out to

them.

     The *Bagley* Court disagreed that such a disclosure was sufficient:  "While

the government is technically correct that the blank contracts did not constitute a

**AMENDED MEMORANDUM ORDER  31**

'promise of reward,' the natural effect of these affidavits would be misleadingly to induce defense counsel to believe that O'Connor and Mitchell provided the [inculpatory] information . . .  without any "inducements."  *Id*. at 684.

*Bagley* made it clear in 1985 (well before Grube's *Brady* issues came before the Idaho Supreme Court) that *Brady* is violated when the prosecution makes a partial disclosure that misleads defense counsel into believing that no further exculpatory evidence as to a certain issue exists.  That principle applies here, where the prosecution disclosed 40 pages of police logs, but failed to disclose the information that the police log for the day of the murder had been altered by police weeks after the log was originally completed.

If one closely examines the copy of the altered police log, it is fairly obvious that the  number "5" has been carefully made into a "6" in the tens position as to quantity of miles traveled on the date of the murder; however, the mileage adds up correctly, to 41 miles traveled that night.  At the time of trial, defense counsel would probably have concluded that the alteration was simply the writer's corrected mistake.  It would not have been obvious to counsel that the mileage total was written by a person different from the person who completed the log; however, *that* information was particularly within the knowledge of the police officer who altered the log, and that information was undisclosed.

**AMENDED MEMORANDUM ORDER  32**

The second alteration is evident only if one knows, as the police officers did, that the holes were not punched in the logs until weeks after the logs are completed. *Id.* at pp. 215-16. Therefore, the time "2:30" written to avoid a hole punch, rather than written in its regular position that would have been obscured by the hole punch, would not have been considered an alteration made for an ulterior motive. *See State's Exhibit C-2*, at pp. 128 & 133. Without disclosure of the alterations, the logs corroborate the alibi of Officer Brood; with disclosure of the alterations, the logs raise serious doubts as to Brood's alibi.

The Court rejects Respondents' argument that defense counsel were not diligent in discovering the alterations because they were "obvious."[8] Noticing an obvious mistake that appears corrected in the text of the log is far different from reviewing a log with the information in hand that the police officers altered the logs weeks after the log was originally prepared, and that they were altered by a person other than Officer Sebek. Further, the State cannot absolve itself of the duty to disclose its own wrongdoing by throwing the mantle of responsibility on

---

[8]Contrary to Respondents' assertion, the Affidavit of Attorney Moeller does *not* state that Grube's attorneys realized that the logs had been altered prior to Grube's 1991 criminal trial; rather, it states that Grube's attorneys had the copies prior to the post-conviction trial, first scheduled to proceed in 1996, although it was not held until 1998. Gifford was interviewed by State investigators at Grube's counsel's office in 1996 in preparation for the post-conviction trial. At that time, State investigators confronted Gifford with the police logs showing that Sebek was on duty until 2:30 in the morning. At that point, Grube's attorneys noticed the police log alterations. *State's Exhibit C-1*, at 185.

**AMENDED MEMORANDUM ORDER  33**

defense counsel to detect carefully altered police logs.  Disclosing a log that appears to have a mere mistake on it is *not* disclosure of exculpatory information; disclosing information that the government's own agents, one of whom was the initial primary suspect, altered the police log for the night of the murder several weeks after the log was originally prepared would have been a proper disclosure of exculpatory information.

If the log alterations were obvious, as Respondents argue, the other investigators and the prosecutors should have noticed them.  The Court can draw from these circumstances one of two conclusions: either (1) the alterations were noted by the government and information was not disclosed, or (2) the alterations were not noted because they were not obvious even to those trying to investigate, solve, and prosecute the case.  Neither conclusion supports Respondents' assertions that defense counsel were not diligent or that the exculpatory information was disclosed by the State prior to trial.

The Court finds this case distinguishable from *United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002), and *United States v. Mulderig*, 120 F.3d 534 (5th Cir. 1997), upon which Respondents rely.  In both cases, the withheld information was about a third party unrelated to the government.  Here, the government withheld information created by government agents directly relating to the culpability of one

**AMENDED MEMORANDUM ORDER  34**

of the government agents.

In summary, because the exculpatory information or exculpatory nature of the police logs was withheld from Grube, a *Brady* violation resulted, as in *Bagley*. However, Grube's case is more egregious than *Bagley*'s because police officers actually manufactured false evidence and submitted it to Grube's attorneys as true evidence. Therefore, while Grube's attorneys did receive copies of the police logs, they did not receive notice of the exculpatory information that they had been altered. That information was in the exclusive possession of police officers. For purposes of *Brady,* the law is clear that the "individual prosecutor has a duty to learn of any favorable evidence known to the other acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S. at 437.

The Idaho Supreme Court's decision did not address whether the information about the alterations was exculpatory, but only whether the expert testimony about the logs was exculpatory. The Idaho Supreme Court's decision – that only the expert testimony explaining that the handwritten changes were from two different people was exculpatory – is contrary to *Brady* and *Bagley*. While the expert testimony would be an example of defense counsel's "effective use" of evidence, *Kyles*, 514 U.S. at 437, it does not nullify the inherent exculpatory nature of the information that police altered the log from the night of the murder, and the

**AMENDED MEMORANDUM ORDER  35**

alteration called into question Officer Brood's alibi.  Further, Grube persuasively argues that "it is clear that Brood and Sebek knew of the exculpatory nature of the police logs" without the need for expert testimony.  *Petitioner's Brief*, at p. 34 (Docket No. 92).  Under *Brady,* law enforcement officials have the same duty as the prosecutors to produce exculpatory evidence.  *See Kyles*, 514 U.S. at 438 (*Brady* rule encompasses evidence "known only to police investigators.")

Because the Idaho Supreme Court failed to find the evidence exculpatory when the evidence obviously and directly related to Brood's alibi, and because it failed to hold Brood and Sebek, who investigated the crime, to the *Brady* standard, and applied it only to the prosecution, the Court concludes that the decision is contrary to *Kyles*.

The Court's survey of similar cases from federal and state jurisdictions bolsters its conclusion that the Idaho Supreme Court's decision is contrary to United States Supreme Court precedent.  *Cf. Duhaime v. Ducharme,* 200 F.3d 597 (9th Cir. 1999) (a federal court can use circuit case law for the limited purpose of determining whether a state court decision is within the scope of "reasonable" applications of Supreme Court law).

In *Gantt v. Roe*, F.3d 908, 912-913 (9th Cir. 2004) the Court noted: "*Brady* is not confined to evidence that affirmatively proves a defendant innocent: Even if

**AMENDED MEMORANDUM ORDER  36**

evidence is merely 'favorable to the accused,' its suppression violates *Brady* if

prejudice results." 389 F.3d at 912. In *Gantt,* the Ninth Circuit Court emphasized

that evidence is still deemed "exculpatory" even where the prosecutor fails to

connect pieces of evidence together or fails to grasp the significance of the

evidence. "*Brady* has no good faith or inadvertence defense," the court noted. *Id*.

at 912. In other words, the standard is whether the evidence is exculpatory, not

whether the prosecutor recognized it as exculpatory at the time it was withheld.[9]

---

[9]Respondents also argue that the Court violates *Teague v. Lane*, 489 U.S. 288 (1989), by its citation to *Gantt v. Roe*, 389 F.3d 908, 912-13 (9th Cir. 2004). The Court disagrees. *Gantt* is merely an example of a lower court case that has reasonably applied the *Brady* principle. Respondent's *Teague* argument is too narrowly drawn. *Gantt* provides an analogous set of circumstances in which the prosecution failed to disclose information and a court found a *Brady* violation in the federal habeas corpus context; it does not establish a new principle, but follows *Brady*, *Bagley*, *Kyles*, and *Strickler*.

    *Brady*, *Bagley*, *Kyles*, and *Strickler* all existed when the Idaho Supreme Court decided the *Brady* issue in 2000. Respondents particularly argue that in order to meet the requirements of *Teague*, *Strickler* had to be available at the time of Grube's direct appeal. However, the *Brady* issue was not known or addressed on direct appeal, and thus *Strickler* merely had to be available to the Idaho Supreme Court when it had occasion to review the *Brady* question, which was in 2000. To the extent that Respondents are arguing that the prosecutor did not know of his *Brady* duty in 1991 and should not be held to the *Strickler* standard from 1999, the *Bagley* case from 1985 renders that argument null.

    The Court rejects Respondents' argument that the facts of Grube's case break new ground such that relief on the *Brady* claims is barred by *Teague*. In *Banks v. Dretke*, 540 U.S. 668 (2004), a habeas corpus case, the United States Supreme Court relied on the same decisions – ending with *Strickler* in 1999 – to condemn the same type of argument Respondents assert here. In *Banks*, the Court noted:

> Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. As we observed in *Strickler*, defense counsel has no "procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred."

540 U.S. at 695-96.

    The *Banks* Court further observed:

**AMENDED MEMORANDUM ORDER  37**

In *Oklahoma v. Munson*, 886 P.2d 999 (Okla. Crim. App. 1994), the court held that photographs challenging the State's theory of who murdered the victim could be considered exculpatory. *Id*. at 1003. In addition, the court concluded that "[e]vidence which placed two other men in the convenience store at or near the time of the abduction and robbery would be critical to the defense of this case and could have been used to discredit the police investigation and the State's theory of the case." *Id*. at 1004. *See also U.S. v. Robinson*, 39 F.3d 1115 (10th Cir. 1994) (evidence tending to identify someone else as the perpetrator is exculpatory and material). *See also Boyette v. LeFevre*, 246 F.3d 76 (2d Cir. 2001) (evidence is exculpatory if it "could have helped the defense suggest an alternative perpetrator").

    4.    <u>Cumulative Effect Analysis of the *Brady* Claims</u>

It is clear from the record that the Idaho Supreme Court did not perform a cumulative effect analysis under *Kyles*. Having discussed the three items relevant to the *Brady* claims, the Idaho Supreme Court then concluded its analysis as

---

        The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence," . . . so long as the "potential existence" of a prosecutorial misconduct claim might have been detected. . . . A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *United States v. Chemical Foundation, Inc*., 272 U.S. 1, 14-15 (1926)).
540 U.S. at 696. Again, these principles are not new, but were well-developed by 1999.

**AMENDED MEMORANDUM ORDER  38**

follows:

> We *complete our analysis of the claimed Brady violation* by addressing whether with due diligence the defense could have obtained Gifford's testimony.  The state argues that because Grube had mentioned Gifford in his interview with the police in January of 1991, the defense could have obtained Gifford's testimony through the exercise of due diligence.   Although the state is not required to furnish a defendant wi[th] through the exercise of due diligence by the defendant, *United States v. McMahon*, 715 F.2d 498, 501 (11th Cir. 1983), there is no evidence in the record to suggest that Grube  had any knowledge that Gifford had been questioned and the interview recorded by the state investigator.  The state's excuse for not providing Grube with the Gifford interview is, therefore, without merit.

995 P.2d at 800 (emphasis added).

After this discussion, the Idaho Supreme Court then turned to a new, non-*Brady* claim – newly discovered evidence.  Therefore, it is evident from the court's own words indicating that the analysis is "complete" and from the court's organizational format of its decision that it concluded its *Brady* analysis without analyzing the cumulative effect of the *Brady* claims.  The Idaho Supreme Court also referred to its earlier *Brady* conclusion later in the decision, stating, "[h]aving affirmed the district court's materiality finding under the *Brady* analysis above. . . ."  *Id.*  This shows that no cumulative effect analysis was done.

The "Conclusion" section of the Idaho Supreme Court's opinion contains the following statement:

> Lynn Gifford's interview with the state investigator in 1991 was improperly withheld by the state in response to the defense's

**AMENDED MEMORANDUM ORDER  39**

request for exculpatory information under *Brady*.  The withheld evidence, however, does not raise a reasonable doubt about Grube's guilt that did not previously exist and would not, as required for newly discovered evidence, likely produce an acquittal.  Therefore the district court properly concluded that Grube was not entitled to relief under the standards applicable to undisclosed evidence or newly discovered evidence.

*Grube*, 995 P.2d at 801.  This "conclusion" cites the outdated *Agurs* standard of

law.[10]  While it clearly contains a "conclusion" about the Gifford testimony, it

certainly does not contain any cumulative effect analysis.[11]

------

[10]The *Bagley* Court explained that the *Agurs* opinion provided: "The standard of materiality applicable in the absence of a specific *Brady* request is therefore stricter than the harmless-error standard but more lenient to the defense than the newly-discovered evidence standard."  *Bagley*, 473 U.S. at 680-81.  *Agurs* had suggested that the standard to be used when the defense made a specific request "might be more lenient to the defense than in the situation in which the defense makes no request or only a general request."  *Id.* at 681.  The Idaho Supreme Court relied on the part of the *Agurs* opinion that related to "the situation where a general request is made," *Grube*, 995 P.2d at 797, which the *Bagley* court characterized as a higher standard than harmless error, and, which, in any event, the *Bagley* court rejected.  *Bagley*, 473 U.S. at 680.

Justice Stevens, in his *Bagley* dissent, also points out that the Agurs standard was intended to be a different standard because it was factually distinct from Brady:

   We noted in *Agurs*, however, that because there had been no specific defense request for the later-discovered evidence, there was no notice to the prosecution that the defense did not already have that evidence or that it considered the evidence to be of particular value.  427 U.S. at 106-107.  Consequently, we stated that in the absence of a request the prosecution has a constitutional duty to volunteer only "obviously exculpatory . . . evidence."  Id. at 107.  Because this constitutional duty to disclose is different from the duty described in *Brady*, it is not surprising that we developed a different standard of materiality in the *Agurs* context.

*Bagley*, 473 U.S. at 711 (Stevens, J., dissenting).  In *Bagley*, the majority opinion rejected the distinctions, and therefore implicitly rejected the *Agurs* standard used by the Idaho Supreme throughout its opinion and its conclusion.

[11]This Court also finds that the Idaho Supreme Court's analysis nearly mirrors the type of lower-court analysis found lacking in cumulative analysis in *Kyles*:

   There is room to debate whether the two judges in the majority in the Court of Appeals made an assessment of the cumulative effect of the evidence.

**AMENDED MEMORANDUM ORDER  40**

In addition, because the Idaho Supreme Court did not find the third *Brady*

claim exculpatory or suppressed, the Idaho Supreme Court failed to include the

third claim in any analysis or conclusion about materiality.  The "conclusion"

section of the Idaho Supreme Court's opinion lends further support to this Court's

conclusion that it is contrary to *Brady*, *Bagley*, and *Kyles*.

Based upon all of the foregoing, the Court concludes that the Idaho Supreme

Court consistently applied a standard different from the *Bagley* standard and failed

to perform a cumulative effect analysis of the of the *Brady* claims.  The Court also

concludes that the Idaho Supreme Court's decision that the alterations to the police

---

Although the majority's *Brady* discussion concludes with the statement that the
court was not persuaded of the reasonable probability that Kyles would have
obtained a favorable verdict if the jury had been "exposed to any or all of the
undisclosed materials," 5 F.3d at 817, the opinion also contains repeated
references dismissing particular items of evidence as immaterial and so
suggesting that cumulative materiality was not the touchstone.  *See, e.g., id.* at
812 ("We do not agree that this statement made the transcript material and so
mandated disclosure. . . . Beanie's statement . . . is itself not decisive"), 814 ("The
nondisclosure of this much of the transcript was insignificant"), 815 ("Kyles has
not shown on this basis that the three statements were material"), 815 ("In light of
the entire record . . . we cannot conclude that [police reports relating to discovery
of the purse in the trash] would, in reasonable probability, have moved the jury to
embrace the theory it otherwise discounted"), 816 ("We are not persuaded that
these notes [relating to discovery of the gun] were material"), 816 ("[W]e are not
persuaded that [the printout of the license plate numbers] would, in reasonable
probability, have induced reasonable doubt where the jury did not find it. . . . the
rebuttal of the photograph would have made no difference."  The result reached
by the Fifth Circuit majority is compatible with a series of independent
materiality evaluations, rather than the cumulative evaluation required by *Bagley*.
. . .

*Kyles*, 514 U.S. at 440-41.

**AMENDED MEMORANDUM ORDER  41**

logs were neither exculpatory nor suppressed was contrary to United States
Supreme Court precedent.  Therefore, the third *Brady* claim should have been
included in any cumulative effect analysis of the materiality question.  As a result
of these failures, the Idaho Supreme Court's decision is contrary to *Kyles*.
Therefore, the Court must perform a de novo review of the *Brady* cumulative
materiality issue based on the facts found by the state court.

In *Kyles*, the Supreme Court noted that "[t]he likely damage [of the
suppressed evidence] is best understood by taking the word of the prosecutor."
514 U.S. at 444.  *See also Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005) ("The
prosecutor's emphasis on the importance of McLaurin's testimony bolsters the
conclusion that disclosure of the deal may have significantly damaged the
prosecution's case."); *Gantt*, 389 F.3d at 915 (noting that the prosecutor "spent a
good part of his summation arguing the importance of the matchbook).

The prosecution's closing argument makes clear that the jury in this case had
to decide between whether (1) Grube killed Amy; or (2) whether the police
engaged in a cover-up to protect Amy's true killer.  The withheld evidence goes to
exactly that issue.

The following passages from the prosecutor's closing argument underscores
the significance of the suppressed evidence:

**AMENDED MEMORANDUM ORDER  42**

But probably the most important thing, the most important thing about this issue is that what they are suggesting is impossible because the forensic evidence shows that this is the gun that killed Amy Hossner because this is the mark that left its mark on the window trim on the day of the killing which, basically, brings us to our second question.  That's the frame, the defense frame.  Now, nobody from the Defense has actually come out and said, "We have been framed."  But they have beaten that drum continuously in this trial over and over again through one innuendo after another.  They, basically, tried to hint around the Defendant has been framed by the police.  for example, asking Kurt Hillman, "You are a friend of Steve Brood," and then just leaving it hang.  If that was a good enough reason for Kurt Hillman to frame this Defendant.  Obviously, the time for innuendo is over.  Let's talk about reality.  Let's address this issue had on here.

*State's Exhibit A-17*, at 7.

Now, we know that the mark was caused by that gun.  You've seen the evidence.  You will have that back in the jury room.  The question then is, if this mark was caused by that gun, when did it happen?  There can be no question that these two items match.  This is like a fingerprint, but it is better than a finger print.  It is like taking your finger and putting it on wet paint and then coming away.  You leave your mark on the paint and then paint leaves its mark on you.  That is not open to question.

So, it's an either/or question.  Was the mark manufactured by the police or was it there on the morning of the killing and had been there ever since?  There is no in between here.

*Id*. at 9.

If they wanted to frame somebody, why didn't they frame Steve Brood?  He was a suspect.  Why didn't they frame some other party?  What's the point of framing this Defendant?  The point is, because of the mark on the gun and the mark on the window, the only way you can acquit this man is to say this sheriff, we believe you framed this Defendant.

**AMENDED MEMORANDUM ORDER  43**

*Id*. at 11.

>        Ultimately, what you are going to have to decide here is the only way you can do it is determine that this sheriff or one of his deputies, Kurt Hillman, framed the Defendant by manufacturing that mark.  If you can't do that, I submit that there is no evidence of that at all.  You have to find the Defendant guilty because he did it.

*Id*. at 20.

>        The evidence shows, the evidence shows that that's what is right, that this Defendant killed Amy Hossner.  If all a person has to do is say, "The police framed me," in the face of this kind of evidence, if that's all it takes, and if you walk out of the courtroom after killing someone, then, whose life is safe?  Whose child's life is safe if that's all it is going to take?

*Id.* at 21.   Clearly, a central theme of the prosecutor's closing argument is that the

defense did not have enough evidence to support its theory that the police framed

Grube.   Gifford's testimony and the police logs would have been two additional

facts upon which the jury could have determined whether police were involved in a

cover-up.

        Without the withheld evidence, it is apparent from the jury's verdict that

defense counsel did not have enough ammunition to persuade the jury of its theory

that the murder had been committed by Officer Brood and the evidence altered.  If

defense counsel had been able to refer to the Gifford testimony and the altered

police logs, the defense would have been materially strengthened.  The most

critical evidence in the whole trial was the corresponding paint and scrape marks

**AMENDED MEMORANDUM ORDER  44**

on the gun and window frame.  Additional evidence calling the authenticity of

those marks and the good faith of the investigating officers into question may have

made the difference for one or more jurors.

The defense argued at closing:

> We also heard some other evidence, which the State hasn't wanted to talk about very much, but evidence concerning another suspect.  In fact, the man who was the main suspect in the case up until 1991.  That is a man by the name of Steve Brood who was a police officer with the Ashton Police Department.  That is what their own witnesses testified in the way of evidence against him.  They testified that the night of the murder, he was out some time after 1:00 a.m.  That's more than any witness can say about the Defendant.  They also testified that he had been driving on the back roads of Ashton, police officer driving on the back roads.  They mentioned that he came by, drove by Amy Hossner's house that morning.  Despite the fact there were police cars out front, he didn't stop to see what was going on.  In fact, he didn't come by until several hours later.  When he did come by, he said some interesting things.  He was the one that offered the theory, the theory that the gun that was used to kill her was a sawed-off shotgun.  later we know that he went up to Fred Hossner, "You watch,  I'm going to be a suspect in this case, but I didn't do it."  Strange comments coming from anyone, especially coming from a police officer.

*Id*. at 35.

> The State asked, "Why do you think something like this would have happened to Mr. Grube?  We know that the major suspect in the case for years was an officer of the police department.  There's no question that would be very embarrassing and raise a lot of questions.  Certainly if would be much easier to accuse this man and convict him than try to prove a fellow police officer did something like that.

*Id*. at 52.

**AMENDED MEMORANDUM ORDER  45**

In the next part of defense counsel's closing argument, defense counsel argued that the entrance wound supported the theory that Brood committed the crime.  Evidence that Brood was out near the time of the murder, that Sebek had told Watts that he had gone home early, that the police logs had been changed to show Sebek out until 2:30 a.m., and that Brood was the only other person to have access to the police logs would have bolstered the evidence the defense did provide:

> The important thing that the autopsy report says is there was no central entry wound.  As all the cardboard tests and other tests have shown, [Defendant's shotgun] makes a real, tight, big pattern.  Dr. Fantelli, when he testified, made it clear that the pattern on the victim's body was, in fact, individual holes that you could see.  No test every done on the Defendant's gun recreated such a wound.  However, tests done with Steve Brood's sawed-off shotgun have created such a mark.  In 1983, Ed Peterson's test showed that Steve Brood's gun could have made that pattern.  Furthermore, if you look at the videotape provided by the State, the very first one done, they fired his shotgun – not through glass – when they fired it not through glass, it made a disbursed pattern very similar to the pattern on Amy Hossner's body.

*Id.* at 31.

All of these defense argument passages underscore the defense's need for any additional evidence they might have obtained to help them prove their theory that Officer Brood was the perpetrator and that the investigators tampered with the evidence.

**AMENDED MEMORANDUM ORDER  46**

To further emphasize the importance of the gun and window marks – which the defense asserted were manufactured by police and which are called into question by other evidence of police tampering – the Court points to the following rebuttal argument by the prosecution:

> The bottom line is, we didn't bring Brenda Fredickson on the stand, we didn't bring Johnna Sans on the stand to assassinate his character, he told them things. He's the one that said he was there the night of the killing. He's the one that said he had a relationship with Amy Hossner. He's the one that said he was the first person to find her dead. He's the one that said he wasn't going to go to the police. *The point is, those statements alone certainly do not mean this Defendant is guilty. The point is when you take those statements and compare them to the shotgun, that's when it becomes relevant.* That's when the evidence, basically, falls together.
> 	Mr. Moeller in one breath tells you that we don't know how this mark got on the shotgun and how the mark got on the trim, could have been an accident. Then, in the next breath tells you it has to be done manually and forcefully. Remember the demonstration that Ed Peterson showed you, he took the gun, and basically, jammed it along the trim. *In order to acquit this man, you are going to have to find that a police officer did that.* It wasn't done by accident. It was either done by recoil or somebody manually and forcefully did it.

*Id*. at 62-63 (emphasis added).

> Ultimately you are going to have to decide as to who of the various experts have made a more reasonable explanation about the shotgun. You are going to have to decide for yourselves who is better qualified and you have heard them testify. But remember, please, if you find that Ed Peterson is right and that gun should [have] been eliminated, *you must also find that the mark was put on later on by someone deliberately trying to frame this Defendant. And that makes no sense at all that just flat didn't happen*.

**AMENDED MEMORANDUM ORDER  47**

*Id*. at 65 (emphasis added).

> Let me say one last thing.  *There is absolutely no way that you can acquit this man with these findings unless you find one of the police specifically came in and made that mark on that rim in order to frame that man right there.  There is no evidence of that at all.*  All of the evidence shows is that this gun was fired, killed Amy, made the mark, taken, sat in the ATF vault for years and later examined and shown what you have found to be the truth in this courtroom.

*Id*. at 67.

When the Court considers the cumulative effect of the three *Brady* items, the compelling conclusion about the withheld evidence is that it all corroborates the same point: that Brood may have killed Amy Hossner and that a police cover-up may have ensued to try to protect him.  As shown, from the evidence above, the prosecution argued that the jury had only two choices: one was to believe that Grube killed Amy, and the other was to believe that there was a police cover-up because someone else killed Amy.  Each point of withheld evidence supports the theory that someone other than Grube killed Amy: (1) Grube's reaction to the news of her death; (2) an eyewitness placing Brood in the police car, doing something other than his regular routine, at 2:30 a.m. on the night of the killing; and (3) police logs from the night of the murder showing that officers altered the mileage and the ending time of the patrol, with the jury knowing that Ashton had only two police officers, one of whom was Brood.

**AMENDED MEMORANDUM ORDER  48**

As the prosecution acknowledged in closing argument, Grube's odd, obsessive statements about Amy after her death were not enough to convict him of murder. In all of his statements, Grube never admitted firing the shot that killed Amy. The expert testimony was contradictory and inconclusive. The additional piece of evidence necessary was the gun, and the ultimate question was whether the police made the mark or the mark was made during the murder. The prosecution argued that there was *no* evidence of police tampering. Certainly, the information about the altered police logs would have shown that police tampering did occur and would have suggested that the gun may have been tampered with, as well. Because of the particular emphasis on this factor at trial, evidence showing police tampering is sufficient to undermine the outcome of the trial. In arriving at this conclusion, the Court has considered all of the evidence set forth in the Introduction section of this Order, though it has not restated it here.

Another important point about the two most critical pieces of *Brady* evidence is that this situation is *not* the withholding of evidence regarding a third party witness or random circumstantial evidence, as in many cases. Rather, this is evidence directly implicating as the perpetrator of the murder one of the police officers who conducted the investigation. Therefore, the very foundational reasons for *Brady* are invoked. *See Bagley*, 473 U.S. at 675 ("The Court has recognized . .

**AMENDED MEMORANDUM ORDER  49**

. that the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'") (internal citation omitted).

"A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 683.  The Court's task is to determine whether "there is a reasonable probability that, had the [withheld evidence] been disclosed to the defense, the result of the trial would have been different." *Id*. at 685.   In this case, as the prosecution emphasized so many times in closing argument, the jury had to choose either the theory that police tampered with the evidence, or the theory that Grube killed Amy Hossner.  Three new pieces of evidence pointing to another suspect – two of which implicated a police officer and/or a police cover-up – are enough to create a reasonable probability sufficient to undermine confidence in the outcome and to create a reasonable probability that had the evidence been disclosed to the defense, the result of the trial would have been different.  It is not required that the result of the trial *would have been* different, but that there is a "reasonable probability" it would have been different. The cumulative effect of the withheld evidence meets this standard.[12]

_____

[12]The Court clarifies that the evidence of Gifford's observation of Grube's reaction at the news of Amy's death is the least important evidence in the *Brady* cumulative effect analysis, and

**AMENDED MEMORANDUM ORDER  50**

The habeas statute "is clear that the writ may issue under § 2254(d)(1) if a state-court 'decision' is 'contrary to . . . clearly established Federal law." *Williams*, 529 U.S. at 385-86.  Here, the Court concludes that the Idaho Supreme Court's decision is contrary to *Brady*, *Bagley*, and *Kyles*.   The Court therefore concludes that Grube is entitled to summary judgment and that the writ should issue.

**G.      Grube's *Brady* Sentencing Claim**

As a result of the foregoing conclusion that the writ should issue and Grube's conviction and sentence vacated, Grube's fifth claim, that a *Brady* violation occurred in sentencing, is moot.

**H.      Standard of Law Governing Insufficiency of Evidence Claims**

Sufficient evidence supports a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Further, "all of the evidence is to be considered in the light most favorable to the prosecution."  However,  "if the historical facts would support conflicting inferences, the federal court 'must presume  – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution.'"  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (citing *Jackson v.*

---

that the two other pieces of withheld evidence suffice to meet the cumulative effect analysis even without the reaction evidence.

**AMENDED MEMORANDUM ORDER  51**

*Virginia*, 443 U.S. at 324).

Only if the Idaho Supreme Court's opinion is contrary to, or an unreasonable application of *Jackson*, may a writ of habeas corpus issue for evidentiary insufficiency. *See Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (applying AEDPA deference to a *Jackson* claim).

I.     **Discussion of Insufficiency of Evidence Claims**

Respondents first argue that Grube's insufficiency of the evidence claim is procedurally defaulted because he presented it as a state law motion for acquittal under Idaho Criminal Rule 29(a).  On appeal, Grube argued that the State failed to establish a prima facie case against him, and did not present enough evidence to show that he was guilty of the crime beyond a reasonable doubt.  Grube now argues that his claim is not defaulted because the Idaho Supreme Court uses the *Jackson* standard to determine both the federal and state issues.

The Court need not resolve the procedural default issue because Grube is not entitled to relief on the merits considering the evidence presented at trial.   In an insufficiency of the evidence claim, the Court looks at only what was before the jury, not what was withheld under *Brady*, or what can be considered new evidence. Considering the evidence heard by the jury, the Court concludes that the Idaho Supreme Court's decision to deny relief is not contrary to, or an unreasonable

**AMENDED MEMORANDUM ORDER  52**

application of, *Jackson*. The Court must consider all of the evidence in the light most favorable to the prosecution and must presume that the trier of fact resolved any conflicts in favor of the prosecution.

The following evidence supporting conviction was presented at trial: (1) Brenda Briggs's testimony that places him at the scene of the crime before and after the murder; (2) Juliette Bruner's testimony that Grube talked to her about his interest in Amy before and after Amy's death; (3) Johnna Sans's testimony that Grube told her (a) that the killer had only intended to scare Amy but he did not know that Amy had rearranged her furniture just prior to her death, (b), that he told her that he was a police officer and wanted to avenge her death, and (c) that he repeatedly called Johnna and said she knew too much about the murder; (4) Chad Perry's testimony that Grube had contacted him in 1990 and requested that Chad ask his girlfriend to contact another girl on behalf of Grube and identify herself as "Amy"; (5) Amy's mother's testimony that she had received some pointless calls from Grube about six months prior to Amy's murder, and that Amy and her father had received strange calls from an anonymous caller about the same time period; (6) Grube reporting his shotgun and some of his ammunition missing and speculating that it could have been used to kill Amy; (7) expert testimony that the paint mark on the gun matched the scratch mark on the window frame; (8) expert

**AMENDED MEMORANDUM ORDER  53**

testimony that his gun could not be ruled out as a possible murder weapon; (9) expert testimony that the shot that killed Amy could have come from the same batch of shot in Grube's possession.

While the evidence of Grube's statements to witnesses does not directly demonstrate that Grube committed the murder, the jury obviously resolved the issue about the matching marks on the gun and window frame in the prosecution's favor, which clearly connected Grube to the crime.  Absent any other compelling evidence of police tampering with the evidence, the marks were strong evidence that it was Grube's gun that killed Amy.  The statements provide some indication of motive.  The remaining expert evidence is weak, but it provided evidence that Grube could not ruled out as the murderer.  On the foregoing, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Accordingly, Grube is not entitled to relief on this claim.

## J.    Standard of Law Governing Claims Barred by *Teague*

Respondents assert that Grube's third and fourth claims are barred by *Teague*.  The United States Supreme Court has instructed federal district courts to first consider the *Teague* question before considering the merits of a claim.  *Horn v. Banks*, 536 U.S. 266 (2002).

To determine whether a claim is barred by the non-retroactivity principles

**AMENDED MEMORANDUM ORDER  54**

set forth in *Teague v. Lane*, 489 U.S. 288 (1989), a reviewing court engages in a

three-step process. First, the court must determine the date the defendant's

conviction and sentence became final. *Caspari v Bohlen*, 510 U.S. 383, 390

(1994). Second, the court must survey "the legal landscape as it then existed" to

determine whether existing precedent compelled a finding that the rule at issue

"was required by the Constitution." *Lambrix v. Singletary*, 520 U.S. 518, 527

(1997). If the rule is considered "new," the court must proceed to the third step

and determine whether either of two exceptions applies. *Teague*, 489 U.S. at 307.

The presumption against retroactivity is overcome only if (1) the new rule

prohibits "a certain category of punishment for a class of defendants because of

their status or offense," *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989),[13] or (2) the

case presents a new "watershed rule of criminal procedure" that enhances accuracy

and alters our understanding of bedrock procedural elements essential to the

fairness of a conviction. *Teague*, 489 U.S. at 311. *Teague* applies to procedural

rules, not substantive claims. *Bousley v. United States*, 523 U.S. 614, 620 (1998).

## K.    Discussion of Claims Alleged to be Barred by *Teague*

### 1.    Discussion of Claim Three

Grube's third claim is that he is actually innocent of his conviction and

---

[13]*Penry* was abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304 (2002).

**AMENDED MEMORANDUM ORDER  55**

sentence.  The United States Supreme Court has noted that a claim of actual

innocence is not cognizable on collateral review in a federal habeas corpus action.

*Herrera  v. Collins*, 506 U.S. 390 (1993).  A noncognizable claim is different from

a claim barred by *Teague*.  A freestanding actual innocence claim is a substantive

claim.  Therefore, it is not barred by *Teague*, which affects only procedural rules.

However, it is presently barred by *Herrera*.[14]

    2.    Discussion of Claim Four

    Grube's fourth claim is that the trial court violated his constitutional rights

by failing to instruct on the lesser-included offenses of manslaughter.  In *Beck v.*

*Alabama*, 447 U.S. 625, 638 (1980), the United States Supreme Court determined

that it was a due process violation for a court *not* to instruct a jury on lesser-

included offenses in a *capital* case.  *Id*. at 638.  The Court then noted, "We need

not and do not decide whether the Due Process Clause would require the giving of

such instructions in a noncapital case."  *Id*. at 638 n.14.

    Respondents argue that *Teague* bars a *Beck* claim in a noncapital case

because the United States Supreme Court has not yet addressed this issue in the

---

[14]The Court notes that the United States Supreme Court may address the freestanding
actual innocence issue in the capital case context in *House v. Bell*, 386 F.3d 668 (6th Cir. 2004),
*cert. granted*, 125 S.Ct. 2991 (2005).

**AMENDED MEMORANDUM ORDER  56**

noncapital context.  In *Turner v. Marshall*, 63 F.3d 807 (9th Cir. 1995),[15] the Ninth

Circuit noted that "[t]here is no settled rule of law on whether [this principle]

applies to noncapital cases," and, as a result, such a claim is *Teague*-barred.  *Id*. at

818-19.  The Second and Tenth Circuits have also held that a *Beck* claim is barred

in a noncapital case.  *See Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996); *Johnson*

*v. Puckett*, 176 F.3d 809, 819 (5th Cir. 1999).  The Third Circuit, on the other

hand, has extended the *Beck* rule to noncapital cases.  *See Vujosevic v. Rafferty*,

844 F.2d 1023, 1027 (3d Cir. 1988).  In *Carriger v. Lewis*, 948 F.2d 588 (9th Cir.

1991), a capital case, the Ninth Circuit held that the *Teague* exceptions do not

apply to the *Beck* rule.  *Id*. at 597.

   As a result of the foregoing law, the Court concludes that, absent a United

States Supreme Court case holding that the *Beck* rule is applicable in a noncapital

context, this claim is barred by *Teague*, and that no exception to *Teague* applies.

Consequently, Respondents are entitled to summary judgment on this claim.

## ORDER

   NOW THEREFORE IT IS HEREBY ORDERED granting Respondents'

Motion for Summary Judgment (Docket No. 73) as to Grube's second, third, and

fourth claims; denying the Motion as to Grube's first claim; and finding the Motion

---

   [15]*Turner* was overruled on other grounds by *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999).

**AMENDED MEMORANDUM ORDER  57**

moot as to Grube's fifth claim.

IT IS FURTHER HEREBY ORDERED granting Grube's Cross-Motion for Summary Judgment (Docket No. 91) as to Grube's first claim, and granting Grube's Petition for Writ of Habeas Corpus (Docket No. 3).  Respondents shall either retry Grube or release him within thirty (30) days after entry of this Order.

IT IS FURTHER HEREBY ORDERED that Respondents' Motion to Alter or Amend Order (Docket No. 104) is GRANTED to the extent that the Order of

**AMENDED MEMORANDUM ORDER  58**

September 30, 2005, is amended and superceded by this Order.



DATED:  **February 6, 2006**

_____
B. LYNN WINMILL
Chief Judge
United States District Court

**AMENDED MEMORANDUM ORDER  59**